UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GEORGE TOWN ASSOCIATES S.A.,

Plaintiff,

v.

ABAKAN, INC. and MESOCOAT, INC.,

Defendants.

Case No. _____

## COMPLAINT

Plaintiff George Town Associates S.A. ("George Town"), for its Complaint against the

above-named Defendants, states and alleges as follows:

## NATURE OF THE ACTION

1.      This action ("Action"), arises from the nonpayment at maturity and

noncompliance with reporting obligations, and resulting defaults, of a Secured Convertible

Promissory Note dated April 28, 2014, in the original principal amount of $1,341,963.34 (the

"Secured Note"), issued by Defendant Abakan, Inc. ("Abakan"), and payable to the order of

George Town.  The Secured Note was issued pursuant to the terms of that certain Securities

Exchange Agreement dated as of April 28, 2014 (the "Securities Exchange Agreement"), entered

into by Abakan, Abakan's majority-owned subsidiary, Defendant MesoCoat, Inc. ("MesoCoat"),

and George Town.  A true and correct copy of the Securities Exchange Agreement is attached

hereto as Exhibit A.  A true and correct copy of the Secured Note is attached hereto as Exhibit B.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332, in that

there is diversity of citizenship between George Town and Defendants Abakan and MesoCoat,

and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Additionally, Section

4.6 of the Secured Note provides, in pertinent part, that "[a]ny action brought by either party

against the other concerning the transactions contemplated by this Note shall be brought only in

the state courts of New York or in the federal courts located in New York County, New York."

Exhibit B, at *13.  A similar provision is contained in an Amended and Restated Security

Agreement and a Subsidiary Guarantee (both defined below).

## THE PARTIES

4.      George Town is a Panamanian corporation with its principal place of business

located at Samuel Lewis Ave. & 53rd Street, Omega Building Mezzanine, Panama, Republic of

Panama.

5.      Upon information and belief, Abakan is a Nevada corporation which, at all

relevant times to this Action, had its principal place of business at 2665 South Bayshore Drive,

Suite 450, Miami, Florida 33133.

6.      Upon information and belief, MesoCoat is a Nevada corporation which, at all

relevant times to this Action, had its principal place of business at 24112 Rockwell Drive,

Euclid, Ohio 44117.

## BACKGROUND FACTS

7.      On or about April 28, 2014, George Town, Abakan, and MesoCoat entered into

the Securities Exchange Agreement which provided for, among other things, the issuance by

2

Abakan of the Secured Note payable to the order of George Town, in substitution and exchange for a series of earlier promissory notes evidencing obligations of MesoCoat. *See* Exhibit A.

8.      As provided in the Securities Exchange Agreement, and to induce George Town to accept the Note, MesoCoat executed and delivered to George Town that certain Subsidiary Guarantee dated April 28, 2015 (the "Guarantee"), pursuant to which MesoCoat unconditionally guaranteed the payment and performance of all indebtedness, liabilities and obligations of Abakan under the Note. A true and correct copy of the Guarantee is attached hereto as Exhibit C.

9.      As provided in the Securities Exchange Agreement and as additional security for the payment and performance of Abakan's obligations under the Securities Exchange Agreement and the Secured Note, and MesoCoat's obligations under the Securities Exchange Agreement and the Guarantee, Defendants executed and delivered to George Town that certain Amended and Restated Security Agreement dated April 28, 2014 (the "Security Agreement"), pursuant to which MesoCoat assigned and granted to George Town a security interest under Article 9 of the Uniform Commercial Code (the "UCC"), in substantially all of MesoCoat's personal property and fixtures (except for the specific assets described in Schedule I of the Security Agreement). A true and correct copy of the Security Agreement is attached hereto as Exhibit D.

10.     George Town's security interest in the Collateral (as defined in the Security Agreement) was perfected by that certain UCC financing statement filed October 31, 2013, in the office of the Secretary of State of Nevada as Document No. 2013028180–1, as assigned to George Town in that certain UCC financing statement amendment filed April 30, 2014, in the office of the Secretary of State of Nevada as Document No. 2014010690–4. True and correct

3

copies of the Nevada UCC record and amendment to the financing statement are attached hereto as Exhibit E.

11.     Except for the liens and encumbrances in favor of The Director of Development of the State of Ohio, The Huntington National Bank and the County of Cuyahoga, Ohio, as described in Schedule IV to the Security Agreement, George Town's security interest constitutes a first lien on MesoCoat's personal property and fixtures.

12.     Abakan and MesoCoat are bound and obligated to perform their respective obligations under the Securities Exchange Agreement, the Secured Note, the Guarantee, and the Security Agreement.

13.     Defaults exist under the terms of the Secured Note.

14.     A default exists under the terms of the Secured Note as all principal due thereunder was required to be paid on April 27, 2015, and such amount, together with Default Interest (as defined in the Secured Note) and all other amounts required to be paid to George Town, as the owner and holder of the Secured Note, have not been paid.  Following notices and the expiration of a cure period set forth in the Secured Note, such failure constitutes an Event of Default as defined in the Secured Note.

15.     A default also exists under the terms of the Secured Note in that the Secured Note requires compliance with the reporting requirements with the U.S. Securities and Exchange Commission ("SEC"), but Abakan has not timely filed a form 10-Q with the SEC.  Following notices and the expiration of a cure period set forth in the Secured Note, such failure constitutes an Event of Default as defined in the Secured Note.

16.     On April 22, 2015 and April 28, 2015, respectively, George Town delivered the notices required under the Secured Note.  On April 30, 2015 and May 1, 2015, respectively,

George Town delivered the Default Notices referenced and defined in Section 3.16 of the Secured Note. Despite such Default Notices, Abakan and MesoCoat have not paid the amounts due on the Secured Note.

17.     The occurrence of an Event of Default under the Secured Note likewise constitutes a default under the Guarantee and the Security Agreement.

18.     As of May 1, 2015, the principal amount owed by Abakan on the Secured Note was $1,341,963.34. Default Interest and costs of collection, including attorneys' fees, continue to accrue from and after May 1, 2015. Under the Secured Note, Defendants are responsible for payment of a Default Amount (as defined therein).

19.     The Default Amount is set forth at Section 3.16 of the Secured Note and provides that:

"Upon the occurrence and during the continuation of an Event of Default specified in this Article III, the Note shall become immediately due and payable upon delivery of written notice to the Maker by the Holder (the "Default Notice"), in which case, Maker shall pay to the Holder an amount equal to the sum of:

(A)     125% times the greater of:

(1)     the sum of (x) the outstanding principal amount of this Note plus (y) Default Interest (if any) on the amount referred to in clause (x) plus (z) all other fees, penalties or liquidated damage amounts owed to the Holder pursuant to the terms of this Note (if any) (collectively, the "Default Amount");

and

(2)     the product of (x) the quotient of (i) the Default Amount divided by (ii) the Conversion Price then in effect multiplied by (y) the greater of (i) the Market Price and (ii) the VWAP; in each case, calculated as of the date on which the Default Notice is delivered. "Market Price" means, as of a particular date, the highest daily VWAP during the period of twenty (20) consecutive trading days occurring immediately prior to (but not including) such date. "VWAP" means, as of a particular date, the volume weighted average price of the Maker's common stock for such date (provided if such date is not a trading day, then as of the trading day immediately preceding such date) on its principal trading market as reported by Bloomberg Financial Markets or, if Bloomberg

5

Financial Markets is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holder and reasonably satisfactory to the Maker.

plus

> (B)     all costs of collection, including, without limitation, legal fees and expenses reasonably incurred."

## COUNT ONE – PROMISSORY NOTE
### (Nonpayment of Secured Note)

20.     George Town repeats and realleges paragraphs 1–19 above as if fully set forth herein.

21.     This is an Action for damages in excess of $75,000.

22.     On or about April 28, 2014, Abakan executed and delivered the Secured Note (Exhibit B) to or for the benefit of George Town.

23.     George Town is the owner and holder of the Secured Note.

24.     Abakan failed to pay the Secured Note when due on April 27, 2015.

25.     George Town satisfied all conditions precedent under the Secured Note.

26.     As of May 1, 2015, Abakan owes $1,341,963.34 of principal on the Note.

27.     Pursuant to the terms of the Secured Note, Abakan agreed to pay ongoing Default Interest and the costs of collection, including attorneys' fees, which continue to accrue, as well as the Default Amount.

## COUNT TWO – PROMISSORY NOTE
### (Noncompliance with Reporting under Secured Note)

28.     George Town repeats and realleges paragraphs 1–19 above as if fully set forth herein.

29.     This is an Action for damages in excess of $75,000.

30.     On or about April 28, 2014, Abakan executed and delivered the Secured Note (Exhibit B) to or for the benefit of George Town.

31.     George Town is the owner and holder of the Secured Note.

32.     Abakan failed to comply with the reporting requirements of the Secured Note by failing to timely file a form 10-Q with the SEC.

33.     George Town satisfied all conditions precedent under the Secured Note.

34.     As of May 1, 2015, Abakan owes $1,341,963.34 of principal on the Secured Note.

35.     Pursuant to the terms of the Secured Note, Abakan agreed to pay ongoing Default Interest and the costs of collection, including attorneys' fees, which continue to accrue, as well as the Default Amount.

### COUNT THREE – GUARANTEE

36.     George Town hereby repeats and realleges paragraphs 1–19 above as if fully set forth herein.

37.     On or about April 28, 2014, MesoCoat executed and delivered the Guarantee (Exhibit C) to or for the benefit of George Town, pursuant to which MesoCoat unconditionally guaranteed the payment and performance of all indebtedness, liabilities, and obligations of Abakan under the Secured Note.

38.     Pursuant to the terms of the Guarantee, there is due and owing from MesoCoat the sums described in paragraph 18 of this Complaint.

### COUNT FOUR – SECURITY INTEREST
(Security Agreement)

39.     George Town hereby repeats and realleges paragraphs 1–19 above as if fully set forth herein.

40.     On or about April 28, 2014, Abakan and MesoCoat executed and delivered the Security Agreement (Exhibit D) to or for the benefit of George Town.  Pursuant to the Security Agreement, MesoCoat assigned and granted to George Town a security interest in substantially all of MesoCoat's personal property and fixtures (except for the specific assets described in Schedule I of the Security Agreement).

41.     Abakan's failure to pay the Secured Note when due constitutes an Event of Default as defined in the Security Agreement.

42.     Upon the occurrence of an Event of Default under the Security Agreement, George Town is entitled to take possession of its Collateral (as defined in the Security Agreement) and foreclose its security interest in substantially all of MesoCoat's personal property and fixtures and exercise any and all of its rights and remedies as provided in Section 7 of the Security Agreement.

## COUNT FIVE – INJUNCTIVE RELIEF

43.     George Town hereby repeats and realleges paragraphs 1-42 above as if fully set forth herein.

44.     Section 4.11 of the Secured Note (Exhibit B) provides relief in the form of an injunction or injunctions restraining, preventing, or curing any breach of the Secured Note and to enforce specifically the terms and provisions thereof.

45.     Under the Guarantee (Exhibit C), MesoCoat unconditionally guaranteed the payment and performance of all indebtedness, liabilities, and obligations of Abakan under the Secured Note.

46.     Defaults exist under the terms of the Secured Note.

47.     Unless Defendants are restrained and enjoined, George Town will be irreparably harmed as Defendants will permanently deprive George Town of its ability to collect the amounts due and payable under the Secured Note.

48.     Unless Defendants are restrained and enjoined, nothing would prevent Defendants from selling, transferring, or otherwise disposing of or encumbering its assets.

49.     Consistent with Article II of the Secured Note (Exhibit B), Defendants should be enjoined from taking any of the following actions outside their ordinary course of business absent George Town's written consent:  (i) paying any dividends or capital distributions on stock; (ii) redeeming, repurchasing, or otherwise acquiring any of their capital stock; (iii) undertaking any material debt; (iv) issuing any equity securities; (v) selling, leasing, or otherwise disposing of any significant portion of assets; and (vi) advancing or lending any money or credit.

50.     Such injunctive relief is necessary and proper to preserve Defendants' *status quo* pending the outcome of this litigation.[1]

## COUNT SIX – RECEIVER

51.     George Town hereby repeats and realleges paragraphs 1–50 above as if fully set forth herein.

52.     MesoCoat is, upon information and belief, the sole owner of the Collateral.

53.     Under the Security Agreement (Exhibit D), George Town has a perfected security interest in the Collateral (as defined therein), which represents substantially all of MesoCoat's assets and property.

54.     The Security Agreement provides George Town, upon notice and default, the following rights:  (i) MesoCoat to hold all cash and payment obligations in trust for George

---

[1] George Town is contemporaneously filing a motion for injunctive relief (and appointment of a receiver), setting forth the grounds in support thereof in greater detail.

Town's benefit; (ii) taking possession of the collateral and removing the same; (iii) exercising discretion in all voting and consensual rights of MesoCoat, and receiving cash dividends, interest, and other payments on the collateral; (iv) exercising all rights with respect to the collateral as if it were the sole and absolute owner thereof; (v) operating MesoCoat's business using the collateral and to assign, sell, lease, or otherwise dispose of all or any part of the collateral, without demand upon or notice to MesoCoat; (vi) notifying MesoCoat's account debtors and obligors to make payments directly to George Town, and enforcing MesoCoat's rights against such account debtors and obligors; (vii) directing any financial intermediary or any other entity holding any investment property to transfer the same to George Town; (viii) transferring all intellectual property registered in MesoCoat's name with the U.S. Patent and Trademark Office (or the U.S. Copyright Office) into George Town's name; (ix) disposing of the collateral; and (x) using, licensing, or sublicensing any intellectual property owned by MesoCoat.

55.     Upon information and belief, there is an imminent danger that the Collateral will be lost, concealed, injured, diminished in value, or squandered if a receiver is not appointed.

56.     Accordingly, any such devaluation or dispossession of the Collateral would constitute an irreparable injury to George Town's interest in the Collateral.

57.     A receiver should be appointed to take immediate possession of, and hold and control, MesoCoat and the Collateral, with all rights provided under the Security Agreement, subject to the discretion of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff George Town respectfully prays the Court order and adjudge the following relief in favor of George Town and against Abakan and MesoCoat:

A.      Damages for Abakan's failure to pay the Note when due and to comply with its reporting requirements, in an amount currently due of $1,341,963.34, together with ongoing Default Interest and costs of collection, including attorneys' fees up to the date of judgment, and the Default Amount;

B.      Damages for MesoCoat's failure to pay the amounts described in paragraph A above;

C.      Determining that George Town has an attached and perfected security interest in substantially all of MesoCoat's personal property and fixtures assets (except for the specific assets described in Schedule I of the Security Agreement) and that George Town is entitled to possession of such assets and is entitled to foreclose its security interest in the Collateral;

D.      Injunctive relief as set forth in George Town's Fifth Cause of Action;

E.      Appointment of a receiver to take possession of, and hold and control, MesoCoat and the Collateral, with all powers as provided under the terms of the Security Agreement;

F.      George Town be awarded its costs, disbursements, and attorneys' fees; and

G.     The Court order such further and additional relief as it deems just, proper, and

equitable.

Dated:     New York, New York
           May 1, 2015


                              GOETZ FITZPATRICK LLP
                              *Attorneys for Plaintiff*


                              By: Douglas Gross, Esq. (DG 5984)
                                   Maxwell Rubin, Esq. (MR 3467)
                                   One Penn Plaza, 31st Floor
                                   New York, New York 10119
                                   Tel: (212) 695-8100
                                   Fax: (212) 629-4013


To:     Abakan Inc.
        2665 South Bayshore Drive
        Suite 450
        Miami, Florida 33133


        Mesocoat, Inc.
        24112 Rockwell Drive
        Euclid, Ohio 44117


                                      12

# EXHIBIT A

*Execution Copy*

### SECURITIES EXCHANGE AGREEMENT

This **SECURITIES EXCHANGE AGREEMENT** (the "**Agreement**"), dated as of April 28, 2014, by and between **ABAKAN INC.**, a Nevada corporation, with headquarters located at 2665 S. Bayshore Drive, Suite 450, Miami, Florida 33133 (the "**Company**"), **MESOCOAT, INC.**, a Nevada corporation, with headquarters located at 24112 Rockwell Drive, Euclid, Ohio 44117 ("**MesoCoat**") and **GEORGE TOWN ASSOCIATES S.A.**, a Panama corporation with headquarters located at Samuel Lewis Ave. & 53rd Street, Omega Building Mezanine, Panama, Republic of Panama (the "**Lender**").

### WHEREAS:

A.      As of the date hereof, MesoCoat, a majority owned subsidiary of the Company, has five outstanding loans from Kyrtos Limited, a British Virgin Islands company ("**Kyrtos**") in an aggregate amount of $1,309,000, all of which plus accrued interested remains outstanding, all as evidenced by five Secured Promissory Notes issued by MesoCoat to Kyrtos (collectively the "**Existing Notes**").

B.      The Existing Notes have been assigned by Kyrtos to the Lender.

C.      The Company, MesoCoat and the Lender have agreed to exchange the Existing Notes for (1) a new convertible note of the Company, in the form attached hereto as Exhibit A, in the principal amount of $1,341,963.34 (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "**New Note**"), convertible into units consisting of shares of Company common stock, $0.0001 par value per share (the "**Shares**"), and warrants to purchase shares of Company common stock (the "**Warrants**"), upon the terms and subject to the limitations and conditions set forth in such New Note, and (2) a Subsidiary Guarantee by MesoCoat in favor of the Lender, guarantying the satisfaction of all of the Company's obligations under the New Note, in the form attached hereto as Exhibit B (the "**Subsidiary Guarantee**").

D.      In connection with the foregoing transactions, the Company and MesoCoat have agreed to amend and restate that certain Security Agreement, dated as of October 30, 2013, by MesoCoat in favor of Kyrtos, which has been heretofore assigned to the Lender, and such amended and restated Security Agreement shall be in the from attached hereto as Exhibit C, and provide that the Company's obligations under the New Note and MesoCoat's obligations under the Guarantee will be continue to be secured by all of the assets of MesoCoat (the "**Security Agreement**").

E.      The Company and the Lender are executing and delivering this Agreement in reliance upon exemptions from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "**Securities Act**").

NOW THEREFORE, in consideration of the foregoing and such other consideration as the parties mutually agree, the parties hereto agree as follows:

1.      <u>Recitals</u>.  The recitals set forth above are accurate, represent the intent of the parties hereto and are incorporated herein by reference.

2.      <u>Exchange of Existing Notes and Guarantee for New Note.</u>

a.      Issuance of New Note. On the Closing Date (as defined below), the Company shall issue and deliver the New Note to the Lender. The New Note shall be issued to the Lender, and the Subsidiary Guarantee and Security Agreement shall be executed and delivered for the benefit of the Lender, all in exchange for the Existing Notes, without the payment of any additional consideration.

b.      Closing Date. Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Sections 12 and 13 below, the date and time of the issuance and delivery of the New Note and surrender of the Existing Notes pursuant to this Agreement (the "**Closing Date**") shall be 12:00 noon, Eastern Standard Time on or before April 28, 2014, or such other mutually agreed upon time. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur on the Closing Date.

c.      Expenses. At the Closing, the Company shall pay all expenses and costs of the Lender (including, without limitation, the attorney fees and expenses of counsel for Lender, all as reasonable incurred) in connection with the preparation, negotiation, execution and approval of this Agreement and any and all other documents, instruments and things contemplated hereby, whether or not such transactions are consummated.

3.      Lender's Representations and Warranties. The Lender represents and warrants to the Company and MesoCoat that:

a.      Investment Purpose. As of the date hereof, the Lender is acquiring the New Note and the Shares and Warrants issuable upon conversion of or otherwise pursuant to the New Note (including, without limitation, such additional Shares and Warrants, if any, as are issuable as a result of the events described in the New Note or pursuant to this Agreement) (such Shares and Warrants being collectively referred to herein as the "**Conversion Units**" and, collectively with the New Note, the "**Securities**") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the Securities Act; provided, however, that by making the representations herein, the Lender does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with U.S. federal and state securities laws applicable to such disposition.

b.      Lender Status.

(i)      The Lender is not a "U.S. person" as that term is defined in Rule 902 of Regulation S under the Securities Act, and is not acquiring the Securities for the account or benefit of any U.S. person;

(ii)     The Lender is not, and at Closing will not be, an affiliate of the Company;

(iii)    As of the date this Agreement was executed and delivered, and on the Closing Date, Lender was outside the United States; no offer to purchase the Securities was made in the United States and the transactions contemplated hereby have not been and will not be pre-arranged by the Lender with a purchaser located in the United States or who is a U.S. person;

(iv)    All offers or sales of the Securities made before the expiration of the six month "distribution compliance period" (which begins on the date of the final closing of

the offering and ending 180 days thereafter) shall not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor) unless such Securities are registered under the Securities Act or a valid exemption can be relied upon under both the appropriate U.S. state or federal securities laws;

(v)     Lender hereby agrees that Lender will resell the Securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration, and Lender shall not engage in hedging transactions with regard to such Securities unless in compliance with the Securities Act;

(vi)     Lender is not an underwriter or dealer in the Securities and is not a distributor or participating, pursuant to contractual agreement, in the distribution of such Securities;

(vii)     Each distributor participating in offering the Securities, if any, has agreed in writing that all offers and sales of the Securities prior to the expiration of the "distribution compliance period" shall only be made in compliance with the safe harbor contained in Rules 903 or 904 of Regulation S, pursuant to registration of such Securities under the Securities Act, or pursuant to an exemption from registration; and each distributor has further agreed in writing not to engage in hedging transactions regarding the Securities unless in compliance with the Securities Act;

(viii)     All offering documents received by Lender include statements to the effect that the Securities have not been registered under the Securities Act and may not be offered or sold in the United States or to U.S. persons (other than distributors as defined in Regulation S) during the "distribution compliance period" unless such Securities are registered under the Securities Act or an exemption from the registration requirements is available;

(ix)     Lender acknowledges that receipt of the Securities involves a high degree of risk and further acknowledges that it can bear the economic risk of the acquiring of such Securities, including the total loss of its investment;

(x)     Lender understands that the Securities are being offered and issued in reliance on specific exemptions from the registration requirements of federal and state securities laws and that the Company is relying on the truth and accuracy of the representations, warranties, and agreements of Lender set forth herein in order to determine the applicability of such exemptions and the suitability of Investor to acquire such securities;

(xi)     Lender is sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of receiving the Securities and to make an informed decision relating thereto;

(xii)     In evaluating its investment, Lender has consulted its own investment and/or legal and/or tax advisors; and

(xiii)     Lender understands that in the Commission's view, the statutory basis for the exemption claimed for this transaction would not be available if the offering,

though in technical compliance with Regulation S, is part of a plan or scheme to evade the registration provisions of the Securities Act; and Lender confirms that this transaction is not part of any such plan or scheme. Lender is acquiring the New Note and the underlying Conversion Units for investment purposes and has no present intention to sell such Securities in the United States or to a U.S. person or for the account or benefit of a U.S. person either now or promptly after the expiration of the "distribution compliance period."

c.    Reliance on Exemptions.  The Lender understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of U.S federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Lender's compliance with, the representations and warranties, agreements, acknowledgments and understandings of the Lender in this Section 3 in order to determine the availability of such exemptions and the eligibility of the Lender to acquire the Securities.

d.    Information.  The Lender and its advisors, if any, have been, and for so long as the New Note remains outstanding will continue to be, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Lender or its advisors.  The Lender and its advisors, if any, have been, and for so long as the New Note remains outstanding will continue to be, afforded the opportunity to ask questions of and receive answers from representatives of the Company, its officers, directors, employees and agents concerning the Company in order for the Lender to make an informed decision with respect to its investment in the Securities. Notwithstanding the foregoing, the Company has not disclosed to the Lender any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Lender.  Neither such inquiries nor any other due diligence investigation conducted by Lender or any of its advisors or representatives shall modify, amend or affect Lender's right to rely on the Company's and MesoCoat's representations and warranties contained in Sections 4 and 5 below.  The Lender is not aware of any facts that may constitute a breach of any of the Company's representations and warranties made herein.

e.    Governmental Review.  The Lender understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

f.    Transfer or Re-sale.  The Lender acknowledges that the Securities have not been and are not being registered under the Securities Act and may not be transferred or resold without registration under the Securities Act or unless pursuant to an exemption therefrom.

g.    Legends.  The Lender understands that unless the Securities underlying the Conversion Units have been registered under the Securities Act or the Securities may be sold pursuant to Rule 144 promulgated under the Securities Act (or a successor rule) ("Rule 144") without any restriction as to the number of Securities as of a particular date that can then be immediately sold, the Securities shall bear a restrictive legend in substantially the following form:

**"THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("COMMISSION") OR THE SECURITIES COMMISSION OF ANY STATE BECAUSE THEY ARE BELIEVED TO BE EXEMPT FROM REGISTRATION UNDER REGULATION "S" PROMULGATED UNDER**

THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"). THESE SECURITIES MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT, OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."

Notwithstanding the foregoing, the legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Securities upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Securities are registered for sale under an effective registration statement filed under the Securities Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the Securities Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Lender agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Lender with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144, it will be considered an Event of Default pursuant to Section 3.2 of the New Note.

h.      _Authorization; Enforcement_. This Agreement has been duly and validly authorized, executed and delivered on behalf of the Lender, and constitutes a valid and binding agreement of the Lender enforceable in accordance with its terms.

4.      _Representations and Warranties of the Company_. The Company and MesoCoat, jointly and severally, represent and warrant to the Lender that:

a.      _Organization and Qualification_. The Company and each of its Subsidiaries (as defined below) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. The Company and each of its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership or use of property or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. "**Material Adverse Effect**" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith. "**Subsidiaries**" or "**Subsidiary**" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest, which such entities are disclosed in the Commission Documents (defined below in Section 4(g)).

b.     Authorization; Enforcement.  (i) The Company has the requisite corporate power and authority to enter into and perform this Agreement and the Security Agreement, issue the New Note and to consummate the transactions contemplated hereby and on conversion to issue the Securities, in accordance with the terms hereof, (ii) the execution and delivery of this Agreement, the Security Agreement, the New Note and the consummation by it of the transactions contemplated hereby (including, without limitation, the issuance of the New Note and the issuance and reservation for the issuance of the Securities underlying the Conversion Units issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, or its shareholders is required, (iii) this Agreement and the Security Agreement have been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and to bind the Company accordingly, and (iv) this Agreement and the Security Agreement constitute, and upon execution and delivery by the Company of the New Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

c.     Capitalization.  As of the date hereof, the authorized capital stock of the Company consists of 2,500,000,000 shares of common stock, $0.0001 par value per share, of which 66,254,815 shares are issued and outstanding, there are no authorized shares of preferred stock, 4,166,667 shares of common stock are reserved for issuance pursuant to the Company's stock option plan, 2,136,397 shares are reserved for issuance pursuant to outstanding warrants exercisable or convertible into or exchangeable for shares, 3,300,000 shares are reserved for issuance pursuant to outstanding convertible notes and 2,516,181 shares are reserved for issuance upon conversion of the New Note into Shares and the exercise of the Warrants. All of such outstanding shares of capital stock are, or upon issuance will be, duly authorized, validly issued, fully paid and non-assessable. No shares of capital stock of the Company are subject to preemptive rights or any other similar rights of the shareholders of the Company or any liens or encumbrances imposed through the actions or failure to act of the Company.  As of the date of this Agreement, (i) except as disclosed above, there are no outstanding options, warrants, scrip, rights to subscribe for, puts, calls, rights of first refusal, agreements, understandings, claims or other commitments or rights of any character whatsoever relating to, or securities or rights convertible into or exchangeable for any shares of capital stock of the Company or any of its Subsidiaries, or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries, (ii) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of its or their securities under the Securities Act and (iii) there are no anti-dilution or price adjustment provisions contained in any security issued by the Company (or in any agreement providing rights to security holders) that will be triggered by the issuance of the New Note or the securities underlying the Conversion Units.  The Company has furnished to the Lender true and correct copies of the Company's Articles of Incorporation as in effect on the date hereof ("**Articles of Incorporation**"), the Company's By-laws, as in effect on the date hereof (the "**By-laws**"), and the terms of all securities convertible into or exercisable for Shares of the Company and the material rights of the holders thereof in respect thereto.

d.     Issuance of Conversion Units.  The Securities underlying the Conversion Units are duly authorized and reserved for issuance and, upon conversion of the New Note in accordance with its respective terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to

preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

e.    Acknowledgment of Dilution.    The Company understands and acknowledges the potentially dilutive effect of the Securities underlying the Conversion Units upon conversion of the New Note. The Company further acknowledges that its obligation to issue the Securities underlying the Conversion Units upon conversion of the New Note in accordance with this Agreement is absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

f.    No Conflicts.    The execution, delivery and performance of this Agreement, the Security Agreement, the New Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Securities underlying the Conversion Units) will not (i) conflict with or result in a violation of any provision of the Articles of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect). Neither the Company nor any of its Subsidiaries is in violation of its Articles of Incorporation, By-laws or other organizational documents and neither the Company nor any of its Subsidiaries is in default (and no event has occurred which with notice or lapse of time or both could put the Company or any of its Subsidiaries in default) under, and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action that would give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party or by which any property or assets of the Company or any of its Subsidiaries is bound or affected, except for possible defaults as would not, individually or in the aggregate, have a Material Adverse Effect. The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Lender owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the Securities Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self-regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement, the Security Agreement, the New Note in accordance with the terms hereof or thereof or to issue the New Note in accordance with the terms hereof and to issue the Securities upon conversion of the New Note. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. The Company is not in violation of the quotation requirements of the OTC Market Group (the "OTCQB") and does not reasonably anticipate that the Shares will be no longer eligible for quotation on the OTCQB in the foreseeable future. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

g.     Commission Documents; Financial Statements.  The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the Commission pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents (other than exhibits to such documents) incorporated by reference therein, being hereinafter referred to herein as the "**Commission Documents**").  Upon written request, the Company will deliver to the Lender true and complete copies of the Commission Documents, except for such exhibits and incorporated documents.  As of their respective dates, the Commission Documents complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to the Commission Documents, and none of the Commission Documents, at the time they were filed with the Commission, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  None of the statements made in any such Commission Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof).  As of their respective dates, the financial statements of the Company included in the Commission Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission with respect thereto.  Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).  Except as set forth in the financial statements of the Company included in the Commission Documents, the Company has no liabilities, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to February 28, 2014, and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in such financial statements, which, individually or in the aggregate, are not material to the financial condition or operating results of the Company. The Company is subject to the reporting requirements of the Exchange Act.

h.     Absence of Certain Changes.  Since February 28, 2014, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or Exchange Act reporting status of the Company or any of its Subsidiaries.

i.     Absence of Litigation.  There is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

j.     Patents, Copyrights, etc.  The Company and each of its Subsidiaries owns or possesses the requisite licenses or rights to use all patents, patent applications, patent rights, inventions, know-how, trade secrets, trademarks, trademark applications, service marks, service names, trade names and copyrights ("**Intellectual Property**") necessary to enable it to conduct its business as

now operated (and, as presently contemplated to be operated in the future). There is no claim or action by any person pertaining to, or proceeding pending, or, to the Company's knowledge, threatened, which challenges the right of the Company or of a Subsidiary with respect to any Intellectual Property necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future). To the best of the Company's knowledge, the Company's or its Subsidiaries' current and intended products, services and processes do not infringe on any Intellectual Property or other rights held by any person. The Company is unaware of any facts or circumstances which might give rise to any of the foregoing. The Company and each of its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of their Intellectual Property.

k.      No Materially Adverse Contracts, Etc.  Neither the Company nor any of its Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is a party to any contract or agreement which in the judgment of the Company's officers has or is expected to have a Material Adverse Effect.

l.      Tax Status.  The Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.  The Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, state or local tax.  None of the Company's tax returns is presently being audited by any taxing authority.

m.      Certain Transactions.  Except for arm's length transactions pursuant to which the Company or any of its Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than the Company or any of its Subsidiaries could obtain from third parties and other than the grant of stock options disclosed in the Commission Documents, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

n.      Disclosure.  All information relating to or concerning the Company or any of its Subsidiaries set forth in this Agreement and provided to the Lender in connection with the transactions contemplated hereby is true and correct in all material respects and the Company has not omitted to state any material fact necessary in order to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading. No event or circumstance has occurred or exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under

applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed (assuming for this purpose that the Company's reports filed under the Exchange Act are being incorporated into an effective registration statement filed by the Company under the Securities Act).

o.      Acknowledgment Regarding Lender's Acquiring of Securities.      The Company acknowledges and agrees that the Lender is acting solely in the capacity of an arm's length purchaser with respect to this Agreement and the transactions contemplated hereby.      The Company further acknowledges that the Lender is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Lender or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Lender's acquiring of the Securities.  The Company further represents to the Lender that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

p.      No Integrated Offering.  Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the Securities Act of the issuance of the Securities to the Lender.  The issuance of the Securities to the Lender will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

q.      No Brokers.  The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

r.      Permits; Compliance.  The Company and each of its Subsidiaries is in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate its properties and to carry on its business as it is now being conducted (collectively, the "**Company Permits**"), and there is no action pending or, to the knowledge of the Company, threatened regarding suspension or cancellation of any of the Company Permits.  Neither the Company nor any of its Subsidiaries is in conflict with, or in default or violation of, any of the Company Permits, except for any such conflicts, defaults or violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  Since February 28, 2014, neither the Company nor any of its Subsidiaries has received any notification with respect to possible conflicts, defaults or violations of applicable laws, except for notices relating to possible conflicts, defaults or violations, which conflicts, defaults or violations would not have a Material Adverse Effect.

s.      Environmental Matters.

(i)      There are, with respect to the Company or any of its Subsidiaries or any predecessor of the Company, no past or present violations of Environmental Laws (as defined below), releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to any common law environmental liability or any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or similar federal, state, local or foreign laws and neither the Company nor any of its Subsidiaries has

received any notice with respect to any of the foregoing, nor is any action pending or, to the Company's knowledge, threatened in connection with any of the foregoing. The term "**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants contaminants, or toxic or hazardous substances or wastes (collectively, "**Hazardous Materials**") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(ii)     Other than those that are or were stored, used or disposed of in compliance with applicable law, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries, except in the normal course of the Company's or any of its Subsidiaries' business.

(iii)     There are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with applicable law.

t.     Title to Property. The Company and its Subsidiaries have good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in the Commission Documents or such as would not have a Material Adverse Effect. Any real property and facilities held under lease by the Company and its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a Material Adverse Effect.

u.     Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are reasonably sufficient and customary in the businesses in which the Company and its Subsidiaries are engaged. As of the date hereof and as of the Closing Date, no notice of cancellation has been received for any of such policies and the Company is in compliance in all material respects with all of the terms and conditions thereof. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost. Upon written request, the Company will provide to the Lender true and correct copies of all policies relating to directors' and officers' liability coverage, errors and omissions coverage, and commercial general liability coverage.

v.     Internal Accounting Controls. The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's board of directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting

principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

w.      Foreign Corrupt Practices.  Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

x.      Solvency.  The Company (after giving effect to the transactions contemplated by this Agreement) is solvent (i.e., its assets have a fair market value in excess of the amount required to pay its probable liabilities on its existing debts as they become absolute and matured) and currently the Company has no information that would lead it to reasonably conclude that the Company would not, after giving effect to the transaction contemplated by this Agreement, have the ability to, nor does it intend to take any action that would impair its ability to, pay its debts from time to time incurred in connection therewith as such debts mature.  The Company did not receive a qualified opinion from its auditors with respect to its most recent fiscal year end and, after giving effect to the transactions contemplated by this Agreement, does not anticipate or know of any basis upon which its auditors might issue a qualified opinion in respect of its current fiscal year.

y.      No Investment Company.  The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "**Investment Company**").   The Company is not controlled by an Investment Company.

z.      Breach of Representations and Warranties by the Company.  If the Company breaches any of the representations or warranties set forth in this Section 4, in addition to any other remedies available to the Lender pursuant to this Agreement, it will be considered an Event of default under Section 3.4 of the New Note.

5.      Representations and Warranties of MesoCoat.   The Company and MesoCoat, jointly and severally, represent and warrant to the Lender that:

a.      MesoCoat has the requisite corporate power and authority to enter into this Agreement, the Security Agreement, the Subsidiary Guarantee and all other agreements, documents and instruments contemplated herein to which it is a party.

b.      All corporate action on the part of MesoCoat by its officers, directors and shareholders necessary for the authorization, execution and delivery of, and the performance by MesoCoat of its obligations in connection with this Agreement, including, without limitation, the issuance and delivery of the Security Agreement and the Subsidiary Guarantee, has been duly and validly taken.

c.      This Agreement and all other agreements, documents and instruments contemplated herein to which MesoCoat is a party constitute, including, without limitation, the issuance and delivery of the Security Agreement and the Subsidiary Guarantee, will constitute, valid and legally binding obligations of MesoCoat, enforceable against MesoCoat in accordance with their respective terms, subject to (a) applicable bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or other similar laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) general principles of equity.

d.      The execution and performance of this Agreement, Security Agreement, the Subsidiary Guarantee and all other agreements, documents and instruments contemplated herein to which MesoCoat is a party do not conflict in any material respect with any other agreement to which MesoCoat is a party or is bound, any court order or judgment applicable to MesoCoat or the constituent documents of MesoCoat.

e.      MesoCoat has received fair value from the Company in consideration for the executing the Security Agreement and Subsidiary Guarantee made part of this Agreement.

f.      The total indebtedness owed by MesoCoat to Huntington National Bank as of the date hereof is $134,427.22. Without the prior written consent of the Lender, MesoCoat shall not incur additional indebtedness from Huntington National Bank or any other lender, other than the Company, after the date hereof, while the New Note remains outstanding. MesoCoat acknowledges and agrees that the subordination of Lender's security interest as set forth in the Security Agreement is conditioned on the accuracy and compliance with this Section 5(f).

6.      Covenants.

a.      Best Efforts.   The parties shall use their best efforts to satisfy timely each of the conditions described in Sections 12 and 13 of this Agreement.

b.      Financial Information.   Upon written request, the Company agrees to send or make available the following reports to the Lender until the Lender transfers, assigns, or sells all of the Securities: (i) within ten (10) days after the filing with the Commission, a copy of its Annual Report on Form 10-K, its Quarterly Reports on Form 10-Q and any Current Reports on Form 8-K; (ii) within one (1) day after release, copies of all press releases issued by the Company or any of its Subsidiaries; and (iii) contemporaneously with the making available or giving to the shareholders of the Company, copies of any notices or other information the Company makes available or gives to such shareholders.

c.      Listing.   The Company shall maintain quotation of its common stock upon each automated quotation system upon which its common stock is now quoted and, for so long as the Lender owns any of the Securities, shall maintain such quotation for all Shares from time to time issuable upon conversion of the New Note. The Company will obtain and, so long as the Lender owns any of the Securities, maintain the trading of its common stock on the OTCQB or any equivalent replacement exchange, the Nasdaq National Market ("Nasdaq"), the Nasdaq SmallCap Market ("Nasdaq SmallCap"), the New York Stock Exchange ("NYSE"), or the American Stock Exchange ("AMEX") and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Financial Industry Regulatory Authority ("FINRA") and such exchanges, as applicable. The Company shall promptly provide to the Lender copies of any notices it receives from the OTCQB and any other exchanges or quotation systems on which its common stock are then listed regarding the continued eligibility of its common stock for listing on such exchanges and quotation systems.

d.       Corporate Existence.  So long as the Lender or any of its affiliates beneficially own the New Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith and (ii) is a publicly traded corporation whose shares are listed for trading on the OTCQB, Nasdaq, Nasdaq SmallCap, NYSE or AMEX.

e.       No Integration.  The Company shall not make any offers or sales of any security (other than the Securities) under circumstances that would require registration of the Securities being offered or sold hereunder under the Securities Act or cause the offering of the Securities to be integrated with any other offering of securities by the Company for the purpose of any stockholder approval provision applicable to the Company or its securities.

f.       Breach of Covenants.  If the Company breaches any of the covenants set forth in this Section 6, in addition to any other remedies available to the Lender pursuant to this Agreement, it will be considered an event of default under Section 3.4 of the New Note.

g.       Failure to Comply with the Exchange Act.  So long as the New Note is outstanding, the Company shall comply with the reporting requirements of the Exchange Act and the Company shall continue to be subject to the reporting requirements of the Exchange Act.

h.       Trading Activities.  Neither the Lender nor its affiliates has an open short position in the common stock of the Company and the Lender agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

i.       Borrowings.  So long as the Company shall have any obligation under the New Note, the Company and MesoCoat shall not, without giving advance notice to the Lender and obtaining the Lender's prior written consent, which consent may not be unreasonably withheld, incur any indebtedness, or otherwise assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for the indebtedness of any other person, firm, partnership, joint venture or corporation, or grant or suffer to exist any lien on its assets, except (a) the Ohio State Calf loan that is currently committed as publically disclosed on February 18, 2014, (b) the Director of Development of the State of Ohio lien, (c) the Huntington National Bank lien, (c) the County of Cuyahoga, Ohio lien, or (d) indebtedness to trade creditors or financial institutions incurred in the ordinary course of business and consistent with past practice.

j.       Issuances of Equity.  So long as the Company shall have any obligation under the New Note, the Company and MesoCoat shall not, without giving advance notice to the Lender and obtaining the Lender's prior written consent, which consent may not be unreasonably withheld, issue any equity securities of the Company or MesoCoat, or any securities that are convertible, exercisable or exchangeable into equity securities of the Company or MesoCoat, except shares of common stock that are issuable (a) under any employee equity incentive plans in effect prior to the date of the New Note, or (b) upon the exercise or conversion of securities that were outstanding prior to the date of the New Note; provided that in each such case, issuances are made in accordance with the terms of the underlying plan or securities documents as in effect prior to the date of the New Note and not pursuant to terms that have been amended after the date of the New Note.

k.     Advances and Loans.  So long as the Company shall have any obligation under the New Note, the Company and MesoCoat shall not, without giving advance notice to the Lender and obtaining the Lender's prior written consent, which consent may not be unreasonably withheld, lend money, give credit or make advances to any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Company and MesoCoat.

7.   Preemptive Right.

a.     Right of Lender to Purchase Company Securities.  The Company shall give the Lender written notice (an "**Issuance Notice**") of any proposed issuance by the Company of any shares of capital stock of the Company, warrants, convertible notes or any other instruments exercisable, convertible into or exchangeable for shares of capital stock of the Company ("**Company Securities**") at least 15 days prior to the proposed issuance date. The Issuance Notice shall specify the number and class of such Company Securities, the price at which such Company Securities are to be issued and the other material terms and conditions of the issuance.  As used herein, a "proposed issuance" means a proposal for which the Company has one or more third party purchasers that are willing to purchase the Company Securities on the terms stated in the Issuance Notice, all on an arm's length basis.  The Lender shall be entitled to purchase all or any of the Company Securities proposed to be issued, at the price and on the other terms and conditions specified in the Issuance Notice.

b.     Exercise of Preemptive Right.  The Lender may exercise its rights under this Section 7 by delivering notice of its election to purchase such Company Securities to the Company, within 15 days of receipt of the Issuance Notice. A delivery of such notice (which notice shall specify the number (or amount) of Company Securities to be purchased) by the Lender shall constitute a binding agreement of the Company to sell, at the price and on the terms and conditions specified in the Issuance Notice, the number of shares (or amount) of Company Securities specified in the Lender's notice.

c.     Issuance of Company Securities Not Purchased by Lender.  Subject to Section 6(i) of this Agreement, the Company shall have 90 days from the date of the Issuance Notice to consummate the proposed issuance of any or all of such Company Securities that the Lender has elected not to purchase at the price and upon terms and conditions that are not materially less favorable to the Company than those specified in the Issuance Notice, *provided* that, if such issuance is subject to regulatory approval, such 90 day period shall be extended until the expiration of five business days after all such approvals have been received, but in no event later than 120 days from the date of the Issuance Notice. If the Company proposes to issue any class of Company Securities after such 90 day period or on other terms materially less favorable to the Company, it shall again comply with the procedures set forth in this Section 7.

d.     No Waiver.  The election by the Lender not to exercise its preemptive rights in any one instance shall not affect its rights under this Section 7 as to any future issuances of Company securities.  Any sale of Company Securities by the Company without first giving the Lender the rights described in this Section 7 shall be void and of no force and effect.

8.   Transfer Agent Instructions.  The Company shall issue instructions to its transfer agent to issue certificates, registered in the name of the Lender or its nominee, for the Shares in such amounts as specified from time to time by the Lender to the Company upon conversion of the New Note in accordance with the terms thereof. Prior to any registration of the securities underlying the Conversion

Units under the Securities Act or the date on which the Shares may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, all such certificates shall bear the restrictive legend specified in Section 3(g) of this Agreement. Nothing in this Section shall affect in any way the Lender's obligations and agreement set forth in Section 3(g) hereof to comply with all applicable prospectus delivery requirements, if any, upon re-sale of the Securities. If the Lender provides the Company with (i) an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the Securities Act and such sale or transfer is effected or (ii) the Lender provides reasonable assurances that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the securities underlying the Conversion Units, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Lender. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Lender, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 8 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Lender shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

9.      Release. The Company and MesoCoat do hereby release, remise, acquit and forever discharge the Lender, Kyrtos and the Lender's and Kyrtos' employees, agents, representatives, consultants, attorneys, fiduciaries, servants, officers, directors, partners, predecessors, successors and assigns, subsidiary corporations, parent corporation, and related corporate divisions (all of the foregoing hereinafter called the "**Released Parties**"), from any and all action and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Released Parties prior to and including the Closing Date, and in any way directly or indirectly arising out of or in any way connected to this Agreement, the Existing Notes, and the New Note (all of the foregoing hereinafter called the "**Released Matters**"). The Company and MesoCoat acknowledge that the agreements in this Section 9 are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. The Company and MesoCoat represent and warrant to the Lender that it has not purported to transfer, assign or otherwise convey any right, title or interest of the Company or MesoCoat in any Released Matter to any other person and that the foregoing constitutes a full and complete release of all Released Matters.

10.     Renewal. To the extent that any payment or payments made to the Lender or Kyrtos under this Agreement, the Existing Notes, or the New Note, as each may be amended, are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to the Company or MesoCoat, whether directly or indirectly as a debtor-in-possession, or to a receiver or any other party under any bankruptcy law, or other state or federal law, then the portion of the indebtedness of the Company or MesoCoat intended to have been satisfied by such payment or payments will be revived and will continue in full force and effect as if such payment or payments had never been received by the Lender or Kyrtos.

11.     No Cancellation. This Agreement evidences the same indebtedness as evidenced by the Existing Notes and the same lien as evidenced by the UCC Financing Statement filed by Kyrtos in the State of Nevada against MesoCoat on October 31, 2013 (the "**UCC-1**"). This Agreement is an extension, modification and amendment of the prior documents and the execution hereof does not evidence a

cancellation of the indebtedness evidenced by the Existing Notes or the lien evidenced by the UCC-1. The Company and MesoCoat agree that Kyrtos may assign the UCC-1 to the Lender and that the lien evidenced by the UCC-1 is hereby continued.

12.   Conditions to the Company's and MesoCoat's Obligations Hereunder.  The obligations of the Company and MesoCoat to the Lender at the Closing are subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's and MesoCoat's sole benefit and may be waived by the Company and MesoCoat at any time in their sole discretion:

   a.     The Lender shall have executed this Agreement and delivered the same to the Company and MesoCoat.

   b.     The Lender shall have executed the Security Agreement and delivered the same to the Company and MesoCoat.

   c.     The Lender shall have delivered the Existing Notes to the Company.

   d.     The representations and warranties of the Lender in this Agreement shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Lender shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Lender at or prior to the Closing Date.

   e.     No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

13.   Conditions to the Lender's Obligations Hereunder.  The obligations of the Lender hereunder are subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Lender's sole benefit and may be waived by the Lender at any time in its sole discretion:

   a.     The Company and MesoCoat shall have executed this Agreement and delivered the same to the Lender.

   b.     The Company and MesoCoat shall have executed the Security Agreement and delivered the same to the Lender.

   c.     MesoCoat shall have executed the Subsidiary Guarantee and delivered the same to the Lender.

   d.     The Company shall have delivered to the Lender the duly executed New Note.

   e.     The representations and warranties of the Company and MesoCoat shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at such time (except for representations and warranties that speak as of a specific date) and

the Company and MesoCoat shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company and MesoCoat at or prior to the Closing Date.

f.      The Lender shall have received documentation as may be reasonably requested by the Lender including, but not limited to, certificates signed by the Secretary of the Company and MesoCoat dated as of the Closing Date with respect to the Company's and MesoCoat's Articles of Incorporation, By-laws, board of directors' resolutions relating to the transactions contemplated hereby and the authority and incumbency of the officers executing this Agreement, the New Note or any other documents required to be executed or delivered in connection therewith.

g.      No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

h.      No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company or MesoCoat.

i.      The Company's common stock being eligible for quotation on the OTCBQ and trading in the common stock of the Company on the OTCBQ shall not have been suspended by the Commission or the OTCQB.

j.      The Company and MesoCoat shall have paid the expenses described in Section 2(c) of this Agreement.

14.    <u>Governing Law; Miscellaneous.</u>

a.      <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by any party against another party concerning the transactions contemplated by this Agreement shall be brought only in the Supreme Court of the State of New York or the United States District Court for the Southern District of New York located in New York County, New York. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Company, MesoCoat and Lender waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Security Agreement, the Subsidiary Guarantee or the New Note by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.      <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement

and shall become effective when counterparts have been signed by each party and delivered to the other party.

c.      Headings.  The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d.      Severability.  In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

e.      Entire Agreement; Amendments.  This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, none of the parties hereto makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be waived or amended other than by an instrument in writing signed by all of the parties hereto.

f.      Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Company, to:

        ABAKAN INC.
        2665 South Bayshore Drive, Suite 450
        Miami, Florida 33133
        Attn: Robert H. Miller, Chief Executive Officer
        Facsimile: (786) 347-7706
        E-mail:  robert.miller@abakaninc.com

If to MesoCoat, to

        MESOCOAT, INC.
        24112 Rockwell Drive
        Euclid, Ohio 44117
        Attn: Andrew Shennan, President
        Facsimile:

E-mail: ajsherman@mesocoatinc.com

If to the Lender:

GEORGE TOWN ASSOCIATES S.A.
c/o JTE FINANCE AG
Biermensdorferstrasse 55
CH 8004 Zurich, Switzerland
Facsimile:
E-mail:

With a Copy to:

Mazzeo Song & Bradham LLP
708 Third Avenue
New York, NY 10017
Facsimile: 212-599-8400
E-mail: dsong@mazzeosong.com

Each party shall provide notice to the other party of any change in address.

g.   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. None of the parties hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties. Notwithstanding the foregoing, subject to Section 3(f), the Lender may assign its rights hereunder to any person that purchases Securities in a private transaction from the Lender or to any of its "affiliates," as that term is defined under the Exchange Act, without the consent of the Company.

h.   Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

i.   Survival. The representations and warranties of the Company and MesoCoat and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Lender. The Company and MesoCoat agree to indemnify and hold harmless the Lender and its officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company or MesoCoat of any of their representations, warranties and covenants set forth in this Agreement.

j.   Publicity. The Company shall be entitled, without the prior approval of the Lender, to make any press release or filing with the Commission, OTCQB (or other applicable trading market) or FINRA with respect to such transactions as is required by applicable law and regulations.

k.   Further Assurances. Each of the parties shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

*Securities Exchange Agreement*                                                        *Page 20*

l.　　No Strict Construction.　The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

m.　　Remedies.　The Company and MesoCoat acknowledge that a breach by either party of their obligations hereunder will cause irreparable harm to the Lender by vitiating the intent and purpose of the transaction contemplated hereby.　Accordingly, the Company and MesoCoat acknowledge that the remedy at law for a breach of their obligations under this Agreement will be inadequate and agree, in the event of a breach or threatened breach by the Company or MesoCoat of the provisions of this Agreement, that the Lender shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required

n.　　Conflict.　In the event of a conflict between or among the terms, covenants, conditions or provisions of this Agreement, the Existing Notes or the New Note, as each may be amended, the Lender may elect to enforce from time to time those provisions that would afford the Lender the maximum financial benefits and security for the obligations under the New Note and/or provide the Lender the maximum assurance of payment of the obligations under the New Note in full.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned the Company, MesoCoat and Lender have caused this Agreement to be duly executed as of the date first above written.

**ABAKAN INC.**

By: _____

Name: Robert H. Miller

Title: Chief Executive Officer


**MESOCOAT, INC.**


By: _____

Name: Andrew Sherman

Title: President


**GEORGE TOWN ASSOCIATES S.A.**


By: _____

Name: Engelbert Schreiber

Title: Director

IN WITNESS WHEREOF, the undersigned the Company, MesoCoat and Lender have caused this Agreement to be duly executed as of the date first above written.

**ABAKAN INC.**

By: _____
Name: Robert H. Miller
Title: Chief Executive Officer

**MESOCOAT, INC.**

By: _____
Name: Andrew Sherman
Title: President

**GEORGE TOWN ASSOCIATES S.A.**

By: _____
Name: Engelbert Schreiber
Title: Director

IN WITNESS WHEREOF, the undersigned the Company, MesoCoat and Lender have caused this Agreement to be duly executed as of the date first above written.

**ABAKAN INC.**

By: _____
Name: Robert H. Miller
Title: Chief Executive Officer

**MESOCOAT, INC.**

By: _____
Name: Andrew Sherman
Title: President

**GEORGE TOWN ASSOCIATES S.A.**

By: _____
Name: Engelbert Schreiber
Title: Director

EXHIBIT B

*Execution Copy*

# SECURED CONVERTIBLE PROMISSORY NOTE

**Principal Amount: $1,341,963.34**                                   **Issue Date: April 28, 2014**

**FOR VALUE RECEIVED, ABAKAN INC.**, a Nevada corporation (hereinafter called the "**Maker**"), hereby promises to pay to the order of **GEORGE TOWN ASSOCIATES S.A.**, a Panama corporation, or its registered assigns (as the case may be, the "**Holder**"), the sum of **$1,341,963.34** on April 27, 2015 (the "**Maturity Date**"). Any amount of principal on this Secured Convertible Promissory Note (this "**Note**") which is not paid when due shall bear interest at the rate of eighteen percent (18%) per annum from the due date thereof until the same is paid ("**Default Interest**"). Any payment due hereunder (to the extent not converted into common stock, $0.0001 par value per share (the "**Shares**"), and stock purchase warrants (the "**Warrants**") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Maker by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of Miami, Florida are authorized or required by law or executive order to remain closed. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Exchange Agreement dated the date hereof pursuant to which this Note was originally issued (the "**Exchange Agreement**").

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Maker and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1     Holder Conversion Right. The Holder shall have the right from time to time following the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.8(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into Conversion Units (as defined in Section 1.3(b)) at the Conversion Price (as defined in Section 1.3(a)). Each such conversion is referred to herein as a "**Conversion**". The number of Conversion Units to be issued upon each Conversion shall be determined by dividing the Conversion Amount (as defined below) by the Conversion Price then in effect on the date specified in the notice of Conversion, in the form attached hereto as Exhibit I (the "**Notice of Conversion**"), delivered to the Maker by the Holder in accordance with Section 1.6 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in notice) to the Maker before 6:00 p.m., Miami, Florida time on such conversion date (the "**Conversion Date**"). The term "**Conversion Amount**" means, with respect to a Conversion, the sum of (1) the principal amount of this Note to be converted in such Conversion, plus (2) at the Holder's option, Default Interest (if any) on the amounts referred to in the immediately preceding clause (1), plus (3) at the Holder's option, any other fees, penalties or liquidated damage amounts owed to the Holder pursuant to the terms of this Note (if any).

1.2    Maker Conversion Right.

(a)    Unit Conversion. The Maker shall have the right from time to time, and at any time following the date of this Note and ending on the Maturity Date, in respect of the remaining outstanding principal amount of this Note, in its sole discretion, to cause the conversion of all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable Conversion Units, or any shares of capital stock or other securities of the Maker into which such Units shall hereafter be changed or reclassified at the Conversion Price if (i) at any time the closing price for the Shares for each of ten (10) consecutive trading days is greater than three times the Conversion Price then in effect, (ii) the Maker shall have complied in all material respects with its obligations under this Note, and (iii) the Shares shall at all times have been and continue to be listed or quoted on a trading market, then, subject to the conditions set forth in this Section (the **"Call Condition Period"**) on the date that is five days after written notice thereof (a **"Call Notice"**) is received by the Holder (such date shall be known as the "Call Date") at the address last shown on the records of the Maker for the Holder or given by the Holder to the Maker for the purpose of notice; provided, that the conditions to giving such notice must be in effect at all times during the Call Condition Period or any such Call Notice shall be null and void.

(b)    Warrant Exercise. The Maker may further, in its sole discretion, require the exercise of all of the then unexercised Warrants, if (i) at any time the closing price for the Shares for each of ten (10) consecutive trading days is greater than five times the Conversion Price then in effect, (ii) the Maker shall have complied in all material respects with its obligations under this Note, and (iii) the Shares shall at all times have been and continue to be listed or quoted on a trading market, then, subject to the conditions set forth in this Section on the date that is five (5) days after a Call Notice is received by the Holder on the Call Date at the address last shown on the records of the Maker for the Holder or given by the Holder to the Maker for the purpose of notice; provided, that the conditions to giving such notice must be in effect at all times during the Call Condition Period or any such Call Notice shall be null and void. Should Holder fail to exercise Warrants according to the terms and conditions hereinabove, such Warrants shall expire within ten (10) days after a Call Notice is received.

1.3    Conversion.

(a)    Conversion Price. As used in this Note, the term **"Conversion Price"** shall equal $0.80, and shall be subject to (i) equitable adjustments for stock splits, stock dividends or rights offerings by the Maker relating to the Maker's securities, combinations, recapitalization, reclassifications, extraordinary distributions and similar events, and (ii) all other adjustments required under Section 1.8.

(b)    Conversion Units    As used in this Note, the term **"Conversion Unit"** shall consist of one (1) share of fully paid and non-assessable Share and one half (½) Warrant entitling the Holder to purchase an additional Share at $1.20 (**"Warrant Exercise Price"**) for each whole Warrant. The Warrant Exercise Price shall be subject to (i) equitable adjustments for stock splits, stock dividends or rights offerings by the Maker relating to the Maker's securities, combinations, recapitalization, reclassifications, extraordinary distributions and similar events, and (ii) all other adjustments required under Section 1.8 and under the terms of the Warrant. The exercise period of each Warrant shall be a period of two (2) years following the applicable Conversion Date.

1.4    <u>Authorized Shares</u>.  The Maker covenants that during the period the conversion right exists, and if converted, until the expiration or exercise of all Warrants, the Maker will reserve from its authorized and unissued capital a sufficient number of Shares, free from preemptive rights, to provide for the issuance of Shares and the exercise of the Warrants upon the full conversion of this Note issued pursuant to the Exchange Agreement (the "**Reserved Amount**").  The Maker represents that upon issuance, the Shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Maker shall issue any securities or make any change to its capital structure which would change the number of Shares and Warrants into which the Note shall be convertible, the Maker shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares authorized and reserved, free from preemptive rights, for conversion of the outstanding Note.

1.5    <u>Failure to Maintain Reserved Amount</u>.  If at any time the Maker does not maintain the Reserved Amount, it will be considered an Event of Default under Article III.

1.6    <u>Method of Conversion</u>.

(a)    <u>Mechanics of Conversion</u>.  Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Maker a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., Miami, Florida time) and (B) subject to Section 1.6(b), surrendering this Note at the principal office of the Maker.

(b)    <u>Surrender of Note Upon Conversion</u>.  Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Maker unless the entire unpaid principal amount of this Note is so converted. The Holder and the Maker shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Maker, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Maker shall, *prima facie*, be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Maker, whereupon the Maker will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that. by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c)    <u>Payment of Taxes</u>.  The Maker shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of Shares or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Maker shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Maker the amount of any such tax or shall have established to the satisfaction of the Maker that such tax has been paid.

(d)     <u>Delivery of Shares and Warrants Upon Conversion</u>.  Upon receipt by the Maker from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.6, the Maker shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Shares and Warrants issuable upon such conversion within three (3) business days after such receipt (but in any event the fifth (5th) business day being hereinafter referred to as the "**Deadline**") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Exchange Agreement.

(e)     <u>Obligation of Maker to Deliver Conversion Units</u>.  Upon receipt by the Maker of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Shares issuable upon such conversion and the Warrants attached thereto, the outstanding principal amount on this Note shall be reduced to reflect such conversion, and, unless the Maker defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Shares and Warrants or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Maker's obligation to issue and deliver the certificates for Shares and Warrants shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Maker to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Maker, and irrespective of any other circumstance which might otherwise limit such obligation of the Maker to the Holder in connection with such conversion.  The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Maker before 6:00 p.m., Miami, Florida time, on such date.

(f)     <u>Failure to Deliver Conversion Units Prior to Deadline</u>.  Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Shares and Warrants issuable upon conversion of this Note are not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.4 above, which failure shall be governed by Sections 1.4 and 1.5), the Maker shall pay to the Holder the greater of (x) $500 per day in cash, for each day beyond the Deadline that the Maker fails to deliver such Shares and Warrants, and (y) an amount in cash equal to (A) (N/360) multiplied by (B) the Conversion Amount multiplied by (C) the Default Interest rate, where "N" equals the number of days beyond the Deadline that the Maker fails to deliver such Shares and Warrants.  Amounts payable pursuant to the preceding sentence shall be paid to the Holder in immediately available funds on or before the second (2nd) business day following written notice from the Holder to the Maker specifying the amount owed to it by the Maker.  In the event that shares of Maker's common stock are purchased by or on behalf of the Holder in order to make delivery on a sale effected in anticipation of receiving Shares upon conversion, and there is a conversion default with respect thereto, the Holder shall have the right to receive from the Maker, in addition to the foregoing amounts, (1) the aggregate amount paid by or on behalf of the Holder for such shares of common stock minus (2) the aggregate amount of net proceeds, if any, received by the Holder from the sale of the Shares as and when such Shares are delivered by the Maker to the Holder.  At the Holder's option, amounts payable hereunder may be added to the principal amount of this Note, and such additional principal amount shall be convertible into Conversion Units in accordance with the terms of this Note.  The Maker agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly the parties acknowledge that the liquidated damages provision in this Section 1.6(f) are justified.

*Execution Copy*

1.7     Concerning the Conversion Units. The Shares and Warrants issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Securities Act or (ii) the Maker or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Securities Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Holder who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.7 and who is not a U.S. Person (as defined in the Exchange Agreement).   Except as otherwise provided in the Exchange Agreement (and subject to the removal provisions set forth below), until such time as the Shares issuable upon conversion of this Note have been registered under the Securities Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for Shares and the Warrants issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

> **"THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("COMMISSION") OR THE SECURITIES COMMISSION OF ANY STATE BECAUSE THEY ARE BELIEVED TO BE EXEMPT FROM REGISTRATION UNDER REGULATION "S" PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"). THESE SECURITIES MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENT IS AVAILABLE. HEDGING TRANSACTIONS INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT.   THESE SECURITIES SHALL NOT CONSTITUTE AN OFFER TO SELL NOR A SOLICITATION OF AN OFFER TO BUY THE SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL."**

The legend set forth above shall be removed and the Maker shall issue to the Holder a new certificate or stock purchase warrant therefore free of any transfer legend if (i) the Maker or its transfer agent shall have received an opinion of counsel, to the effect that a public sale or transfer of such security may be made without registration under the Securities Act, or (ii) in the case of securities issuable upon conversion of this Note or exercise of Warrants, such securities are registered for sale by the Holder under an effective registration statement filed under the Securities Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold.

1.8    Effect of Certain Events.

(a)    Effect of Merger, Consolidation, Etc.  At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Maker, the effectuation by the Maker of a transaction or series of related transactions in which more than 50% of the voting power of the Maker is disposed of, or the consolidation, merger or other business combination of the Maker with or into any other Person (as defined below) or Persons when the Maker is not the survivor shall either: (i) be deemed to be an Event of Default (as defined in Article III) pursuant to which the Maker shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III) or (ii) be treated pursuant to Section 1.8(b) hereof. "**Person**" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b)    Adjustment Due to Merger, Consolidation, Etc.  If, at any time when this Note is issued and outstanding, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which securities of the Maker shall be changed into the same or a different number of shares and warrants of another class or classes of stock or securities of the Maker or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Maker other than in connection with a plan of complete liquidation of the Maker, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of Shares and Warrants immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof.  The Maker shall not affect any transaction described in this Section 1.8(b) unless (a) it first gives, to the extent practicable, thirty (30) days prior written notice (but in any event at least fifteen (15) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Maker) assumes by written instrument the obligations of this Section 1.8(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c)    Adjustment Due to Distribution.  If the Maker shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of its shares as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Maker's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall receive the amount of such assets on an "as-converted" basis; that is, the amount which would have been payable to the Holder with respect to the Shares issuable if the Holder converted this Note in full (without regard to any limitations on conversion contained herein) immediately prior to the date of record for determining shareholders entitled to such Distribution.

*Execution Copy*

(d)     Purchase Rights.  If, at any time when this Note is issued and outstanding, the Maker issues any convertible securities or rights to purchase stock, warrants, securities or other property (the **"Purchase Rights"**) pro rata to the record holders of any class of Shares, then the Holder of this Note will acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights on an "as-converted" basis; that is, the aggregate Purchase Rights such Holder would have acquired if such Holder converted this Note in full (without regard to any limitations on conversion contained herein) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights or, if no such record is taken, the date as of which the record holders of Shares are to be determined for the grant, issue or sale of such Purchase Rights.

(e)     Dilutive Issuances.  If the Maker issues or sells, or is deemed to have issued or sold, any Shares for no consideration or for consideration on a per share basis less than the Conversion Price in effect on the date of such issuance or sale (or deemed issuance or sale) (a **"Dilutive Issuance"**), then the Conversion Price and the Warrant Exercise Price shall be adjusted so as to equal the consideration per share received or receivable by the Maker (on a per share basis) for the additional Shares so issued, sold, or deemed issued or sold in such Dilutive Issuance.  If the Maker issues or sells, or is deemed to have issued or sold, any Shares for consideration per share less than the Warrant Exercise Price and equal to or greater than the Conversion Price in effect on the date of such issuance or sale (or deemed issuance or sale), then the Warrant Exercise Price shall be adjusted so as to equal the consideration per share received or receivable by the Maker (on a per share basis) for the additional Shares so issued, sold, or deemed issued or sold in such issuance.  For purposes of this Section 1.8(e), if the Maker issues, sells or amends any options, warrants, convertible securities or other similar instruments whether or not immediately convertible, exercisable or exchangeable, then the Shares issuable upon the exercise of such securities shall, as of the date of the issuance, sale or amendment of such securities, be deemed to be outstanding and to have been issued and sold by the Maker at the per share price for which Shares are issuable upon the conversion, exercise or exchange of such securities.

(f)     Notice of Adjustments.  Upon the occurrence of each adjustment or readjustment as a result of the events described in this Section 1.8, the Maker, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder of a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Maker shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment, and (ii) the number of Shares, Warrants and the amount, if any, of other securities or property which at the time would be received upon conversion of this Note.

1.9     Reserved.

1.10    Status as Shareholder.  Upon submission of a Notice of Conversion by a Holder, (i) the Conversion Units covered thereby shall be deemed converted into Shares and Warrants and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such Shares and Warrants and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Maker to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all Shares and all Warrants prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Shares and Warrants by so notifying the Maker) the Holder shall regain, retroactive to the date the Notice of Conversion was submitted, the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Maker shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted.  In all cases, the Holder shall retain all of its rights and remedies for the Maker's failure to convert this Note.

1.11    Prepayment.  Notwithstanding anything to the contrary contained in this Note, so long as the Maker has not received a Notice of Conversion from the Holder, then at any time during the period beginning on October 30, 2014 and ending on the Maturity Date, the Maker shall have the right, exercisable on not less than five (5) business days prior written notice to the Holder, to prepay the outstanding Note in full, in accordance with this Section 1.11. Any notice of prepayment hereunder (an "**Optional Prepayment Notice**") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Maker is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not less than five (5) business days from the date on which the Optional Prepayment Notice is delivered.  On (and not before) the date fixed for prepayment (the "**Optional Prepayment Date**"), the Maker shall make payment of the Optional Prepayment Amount (as defined below) to or upon the order of the Holder as specified by the Holder in writing to the Maker at least one (1) business day prior to the Optional Prepayment Date.  Notwithstanding the foregoing, the Holder shall have the right to convert all or any portion of this Note even after an Optional Prepayment Notice has been delivered, so long as the Holder submits a Notice of Conversion prior to actual prepayment of this Note.

If the Maker exercises its right to prepay the Note, the Maker shall make payment to the Holder of an amount (the "**Optional Prepayment Amount**") in cash equal to 125% of the sum of: (x) the then outstanding principal amount of this Note plus (y) Default Interest (if any) on the amount referred to in clause (x), plus (z) all other fees, penalties or liquidated damage amounts owed to the Holder pursuant to the terms of this Note (if any). The Maker shall also issue, for no additional consideration, the number of Warrants equal to what the Holder would have received if such Holder converted this Note in full (without regard to any limitations on conversion contained herein) immediately before the date on which the Optional Prepayment Notice is delivered.  If the Maker delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder on the Optional Prepayment Date, the Maker shall forever forfeit its right to prepay the Note pursuant to this Section 1.11.

## ARTICLE II. CERTAIN COVENANTS

2.1    Distributions on Capital Stock.  So long as the Maker shall have any obligation under this Note, the Maker shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on Shares solely in the form of additional Shares or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Maker's disinterested directors.

2.2    Restriction on Stock Repurchases.  So long as the Maker shall have any obligation under this Note, the Maker shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Maker or any warrants, rights or options to purchase or acquire any such shares.

2.3    Borrowings.  So long as the Maker shall have any obligation under this Note, the Maker shall not, without giving advance notice to the Holder and obtaining the Holder's prior written consent, which consent shall not be unreasonably withheld, incur any indebtedness, or otherwise assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for the indebtedness of any other person, firm, partnership, joint venture or corporation, or grant or suffer to exist any lien on its assets, except (a) the Ohio State Calf loan that is currently committed as publically disclosed on February 18, 2014, (b) the Director of Development of the State of Ohio lien, (c) the Huntington National Bank lien, (d) the County of Cuyahoga, Ohio lien or (e) indebtedness to trade creditors or financial institutions incurred in the ordinary course of business and consistent with past practice.

2.4     Issuances of Equity.  So long as the Maker shall have any obligation under this Note, the Maker shall not, without giving advance notice to the Holder and obtaining the Holder's prior written consent, which consent may not be unreasonably withheld, issue any equity securities of the Maker, or any securities that are convertible, exercisable or exchangeable into equity securities of the Maker, except shares of common stock that are issuable (a) under any employee equity incentive plans in effect prior to the date of this Note, or (b) upon the exercise or conversion of securities that were outstanding prior to the date of this Note; provided that in each such case, issuances are made in accordance with the terms of the underlying plan or securities documents as in effect prior to the date of this Note and not pursuant to terms that have been amended after the date of this Note.  Any issuances of equity securities consented to by the Holder shall nonetheless remain subject to the provisions of Section 1.8 of this Note.

2.5     Sale of Assets.  So long as the Maker shall have any obligation under this Note, the Maker shall not, without giving advance notice to the Holder and obtaining the Holder's prior written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business.  Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

2.6     Advances and Loans.  So long as the Maker shall have any obligation under this Note, the Maker shall not, without giving advance notice to the Holder and obtaining the Holder's prior written consent, which consent may not be unreasonably withheld, lend money, give credit or make advances to any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Maker.

## ARTICLE III.  EVENTS OF DEFAULT

If any of the following events of default (each, an "**Event of Default**") shall occur:

3.1     Failure to Pay Principal.  The Maker fails to pay the principal hereof when due on this Note, whether at maturity, upon acceleration or otherwise and such failure to pay shall continue for a period of two (2) business days after written notice thereof to the Maker from the Holder.

3.2     Conversion and the Shares.  The Maker fails to issue Shares and Warrants to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for Shares and Warrants issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Maker directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for Shares or Warrants to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Shares or Warrants issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion.

*Execution Copy*

3.3     Breach of Covenants.  The Maker or MesoCoat, Inc. ("**MesoCoat**"), a majority owned subsidiary of Maker, breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Exchange Agreement, Security Agreement and such breach continues for a period of five (5) business days after written notice thereof to the Maker from the Holder.

3.4     Breach of Representations and Warranties.   Any representation or warranty of the Maker or MesoCoat made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Exchange Agreement and Security Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note, the Exchange Agreement or the Security Agreement.

3.5     Receiver or Trustee.  The Maker or any subsidiary of the Maker shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6     Judgments.  Any money judgment, writ or similar process shall be entered or filed against the Maker or any subsidiary of the Maker or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.7     Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Maker or any subsidiary of the Maker.

3.8     Delisting of Shares.  The Maker shall fail to maintain the listing of the Shares on at least one of the OTCQB or an equivalent replacement exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange, or the American Stock Exchange and such failure to maintain continues for a period of five (5) business days after written notice thereof to the Maker from the Holder.

3.9     Failure to Comply with the Exchange Act.  The Maker shall fail to comply with the reporting requirements of the Exchange Act; and/or the Maker shall cease to be subject to the reporting requirements of the Exchange Act and such failure or ceasing continues for a period of five (5) business days after written notice thereof to the Maker from the Holder.

3.10    Liquidation. Any dissolution, liquidation, or winding up of Maker or any subsidiary of the Maker or any substantial portion of their respective businesses.

3.11    Cessation of Operations. Any cessation of operations by Maker or any subsidiary of Maker, or Maker or any subsidiary of Maker admits it is otherwise generally unable to pay its debts as such debts become due, provided however, that any disclosure of the Maker's ability to continue as a "going concern" shall not be an admission that the Maker cannot pay its debts as such become due.

3.12    Maintenance of Assets. The failure by Maker or any subsidiary of Maker to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future) and such failure to maintain continues for a period of five (5) business days after written notice thereof to the Maker from the Holder.

3.13    <u>Financial Statement Restatement</u>. The restatement of any financial statements filed by the Maker with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note, the Exchange Agreement or the Security Agreement.

3.14    <u>Reverse Splits</u>. The Maker effectuates a reverse split of its Shares without twenty (20) days prior written notice to the Holder.

3.15    <u>Replacement of Transfer Agent</u>. In the event that the Maker proposes to replace its transfer agent, the Maker fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions (including, but not limited to, the provision to irrevocably reserve Shares in the Reserved Amount) signed by the successor transfer agent to Holder.

3.16    <u>Cross-Default</u>. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Maker or any subsidiary of the Maker of any covenant or other term or condition contained in any of the Other Agreements (as defined below), after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "**Other Agreements**" means, collectively, all agreements and instruments between, among or by: (1) the Maker and any affiliate of the Maker, and, or for the benefit of, (2) the Holder and any affiliate of the Holder, however, the term "Other Agreements" shall not include the related or companion documents to this Note.

Upon the occurrence and during the continuation of an Event of Default specified in this Article III, the Note shall become immediately due and payable upon delivery of written notice to the Maker by the Holder (the "**Default Notice**"), in which case, the Maker shall pay to the Holder an amount equal to the <u>sum</u> of:

(A) 125% <u>times</u> the greater of:

(1) the <u>sum</u> of (x) the outstanding principal amount of this Note <u>plus</u> (y) Default Interest (if any) on the amount referred to in clause (x) <u>plus</u> (z) all other fees, penalties or liquidated damage amounts owed to the Holder pursuant to the terms of this Note (if any) (collectively, the "**Default Amount**");

and

(2) the <u>product</u> of (x) the quotient of (i) the Default Amount <u>divided by</u> (ii) the Conversion Price then in effect <u>multiplied by</u> (y) the greater of (i) the Market Price and (ii) the VWAP; in each case, calculated as of the date on which the Default Notice is delivered. "**Market Price**" means, as of a particular date, the highest daily VWAP during the period of twenty (20) consecutive trading days occurring immediately prior to (but not including) such date. "**VWAP**" means, as of a particular date, the volume weighted average price of the Maker's common stock for such date (provided if such date is not a trading day, then as of the trading day immediately preceding such date) on its principal trading market as reported by Bloomberg Financial Markets or, if Bloomberg Financial Markets is not then reporting such prices, by a comparable reporting service of national reputation selected by the Holder and reasonably satisfactory to the Maker.

<u>plus</u>

(B) all costs of collection, including, without limitation, legal fees and expenses reasonably incurred.

The Maker's payment in full of the above amount shall be in full satisfaction of its obligations hereunder. The Holder shall be entitled to exercise all other rights and remedies available at law or in equity. If the Maker fails to pay the Default Amount as and when due, then the Holder shall have the right at any time, so long as the Maker remains in default, to require the Maker, upon written notice, to immediately issue, in lieu of the Default Amount, the number of Shares of the Maker equal to the Default Amount divided by 80% of the Conversion Price then in effect.

## ARTICLE IV. MISCELLANEOUS

4.1     Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges.   All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2     Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Maker, to:

> ABAKAN INC.
> 2665 S. Bayshore Drive, Suite 450
> Miami, Florida 33133
> Attn: Robert H. Miller, Chief Executive Officer
> Facsimile: (786) 347-7706
> E-mail: robert.miller@abakaninc.com

If to the Holder:

> GEORGE TOWN ASSOCIATES S.A.
> Samuel Lewis Ave. & 53rd Street
> Omega Building Mezanine,
> Panama, Republic of Panama
> Attn: _____
> Facsimile: _____
> E-mail: _____

and

*Execution Copy*

JTE FINANCE AG
Biermensdorferstrasse 55
CH 8004 Zurich, Switzerland

With a copy to:

Mazzeo Song & Bradham LLP
708 Third Avenue
New York, NY 10017
Attn:  David S. Song
Facsimile:  212-599-8400
E-mail:  dsong@mazzeosong.com

4.3     Amendments.  This Note and any provision hereof may only be amended by an instrument in writing signed by the Maker and the Holder.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4     Assignability.  This Note shall be binding upon the Maker and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns.  Except as otherwise permitted, each transferee of this Note must not be a "U.S. Person" (as that term is defined in Rule 902 of Regulation S), and is not acquiring the securities for the account or benefit of any U.S. Person (as defined in Rule 501(a) of the Securities Act).  Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement.

4.5     Cost of Collection.  If default is made in the payment of this Note, the Maker shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6     Governing Law.  This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts of New York or in the federal courts located in New York County. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Maker and Holder waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

4.7   <u>Certain Amounts</u>.   Whenever pursuant to this Note the Maker is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus Default Interest, the Maker and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid, by the Maker represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of Shares acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Maker and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into Shares.

4.8   <u>Exchange Agreement</u>.   By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Exchange Agreement.

4.9   <u>Security Agreement</u>.   The Note shall be secured by a security interest in the assets of MesoCoat, as evidenced by the Exchange Agreement and the Security Agreement that includes a UCC Financing Statement Amendment perfecting and continuing Holder's lien on MesoCoat's assets.

4.10   <u>Notice of Corporate Events</u>.   Except as otherwise provided herein, the Holder of this Note shall have no rights as an owner of Shares unless and only to the extent that it converts this Note into Shares. The Maker shall provide the Holder with prior notification of any meeting of the Maker's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Maker of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any proposed sale, lease or conveyance of all or substantially all of the assets of the Maker or any proposed liquidation, dissolution or winding up of the Maker, the Maker shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Maker shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.10.

4.11   <u>Remedies</u>.   The Maker acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Maker acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Maker of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Maker has caused this Note to be signed in its name by its duly authorized officer as of the date first written above.


**ABAKAN INC.**


By: _____
Robert H. Miller, Chief Executive Officer

*Execution Copy*

## EXHIBIT I:  NOTICE OF CONVERSION

*Capitalized terms that are used and not defined in this Notice of Conversion that are defined in the secured convertible promissory note of ABAKAN INC., a Nevada corporation, dated April 28, 2014 (the "Note") to which this Notice of Conversion is attached, shall have the respective definitions set forth in the Note.*

The undersigned hereby elects to convert a principal amount of $_____from the Note into that number of Shares and Warrants to be issued pursuant to the conversion of the Note, as set forth below, according to the conditions of the Note, as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Check box as to applicable instructions:

[ ]  The Maker shall electronically transmit the Shares issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer") and deliver the Warrants in the name(s) specified below or, if additional space is necessary, on an attachment hereto.

Name of DTC Prime Broker: _____
Account Number: _____

[ ]  The undersigned hereby requests that the Maker issue a certificate or certificates for the Shares set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

_____
_____

Attention: Certificate Delivery
_____

Date of Conversion:
Applicable Conversion Price:                    $    _____
Number of Shares to be issued                        _____
    pursuant to Conversion of the Note:
Number of Warrants to be issued                      _____
    pursuant to Conversion of the Note:
Amount of principal balance due remaining            _____
    under the Note after this conversion:            _____

By: _____
Name: _____
Title: _____
Date: _____

EXHIBIT C

*Execution Copy*

### SUBSIDIARY GUARANTEE

This **SUBSIDIARY GUARANTEE** (the "**Guarantee**"), dated as of April 28, 2014, is made by **MESOCOAT, INC.**, a Nevada corporation (the "**Guarantor**"), for and on behalf of **GEORGE TOWN ASSOCIATES S.A.**, a Panama corporation (the "**Lender**").   This Guarantee is being executed and delivered by the Guarantor in connection with that certain Securities Exchange Agreement, dated as of April 28, 2014 (the "**Exchange Agreement**"), between Abakan, Inc., a Nevada corporation (the "**Company**"), the Guarantor and the Lender.   Capitalized terms used herein and not otherwise defined herein have the respective meanings set forth in the Exchange Agreement.

### WHEREAS:

A.     The Guarantor shall derive substantial direct and indirect benefits from the transactions contemplated by the Exchange Agreement; and

B.     It is a condition to the transactions contemplated by the Exchange Agreement that the Guarantor execute and deliver this Guarantee to the Lender.

**NOW, THEREFORE,** in consideration of the foregoing, the covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. the Guarantor hereby agrees as follows:

1.     <u>Guarantee.</u>

    a.     <u>Guarantee of Guaranteed Obligations</u>.   The Guarantor hereby unconditionally guarantees to the Lender, its successors, endorsees, transferees and assigns, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of any and all indebtedness (whether principal or interest), liabilities and other obligations of the Company under the New Note now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several or joint and several, and to pay all fees, indemnities. costs and expenses (including reasonable attorneys' fees) provided for in this Guarantee (collectively, the "**Guaranteed Obligations**").   The Guarantor agrees that this Guarantee is a guaranty of payment and performance and not of collection, and that its obligations under this Guarantee shall be primary, absolute and unconditional, irrespective of, and unaffected by:

        i.     the genuineness, validity, regularity, enforceability or any future amendment of, or change in this Guarantee or any other document now existing or hereafter arising;

        ii.     the absence of any action to enforce this Guarantee or any other document, or the waiver or consent by the Lender with respect to any of the provisions thereof;

        iii.     the existence, value or condition of, or failure to perfect a lien against, any collateral ("**Collateral**") for the Guaranteed Obligations or any action, or the absence of any action, by the Lender in respect thereof (including, without limitation, the release of any such security);

        iv.     the insolvency of the Company, the Guarantor or any other party; or

v.       any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor;

it being agreed by the Guarantor that its obligations under this Guarantee shall not be discharged until the satisfaction of the Guaranteed Obligations in full.  The Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Guaranteed Obligations.

b.       <u>Enforcement of Guarantee</u>.  In no event shall the Lender have any obligation (although it is entitled, at its option) to proceed against the Company or any Collateral before seeking satisfaction from Guarantor, and the Lender may proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any liens it may have as security for all or any portion of the Guaranteed Obligations.

c.       <u>Waiver</u>.  The Guarantor (i) waives, and agrees that it shall not at any time insist upon, plead or in any manner whatsoever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by the Guarantor of its Guaranteed Obligations under, or the enforcement by the Lender of, this Guarantee, (ii) waives diligence, presentment and demand (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Guaranteed Obligations, notice of adverse change in the Company's financial condition or any other fact which might increase the risk to the Guarantor) with respect to any of the Guaranteed Obligations or all other demands whatsoever, (iii) represents, warrants and agrees that to its knowledge, as of the date of this Guarantee, its obligations under this Guarantee are not subject to any offsets or defenses against the Company or the Lender and (iv) agrees that its obligations under this Guarantee shall not be subject to any counterclaims, offsets or defenses against the Company or the Lender which may arise in the future, except those counterclaims, offsets or defenses related to the satisfaction in whole or part of the Guaranteed Obligations.

d.       <u>Benefit of</u> Guarantee.  The provisions of this Guarantee are for the benefit of the Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between the Guarantor and the Lender, the obligations of the Guarantor under this Guarantee. In the event all or any part of the Guaranteed Obligations are transferred, indorsed or assigned by the Lender to any person or entity, any reference to the Lender herein shall be deemed to refer equally to such person or entity.

e.       <u>Modification of Guaranteed Obligations, Etc</u>.  The Guarantor hereby acknowledges and agrees that the Lender may at any time or from time to time, with or without the consent of, or notice to, the Guarantor:

i.       change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Guaranteed Obligations in accordance with the terms therein;

ii.       take any action under or in respect of the Exchange Agreement or any document executed thereunder in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

iii.     amend or modify, in any manner whatsoever, the Exchange Agreement, the New Note or any document executed thereunder in accordance with the terms therein;

iv.     extend or waive the time for the Company's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Exchange Agreement, the New Note or any document executed thereunder, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance in accordance with the terms therein;

v.     take and hold Collateral for the payment of the Guaranteed Obligations guaranteed hereby or sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which the Lender has been granted a lien, to secure any Guaranteed Obligations or any other obligations in accordance with the terms therein;

vi.     release anyone who may be liable in any manner for the payment of any amounts owed by Guarantor or the Company to the Lender; and/or

vii.     apply any sums by whomever paid or however realized to any amounts owing by Guarantor or the Company to the Lender in such manner as the Lender shall determine in its discretion;

and the Lender shall not incur any liability to the Guarantor as a result thereof, and no such action, except satisfaction of the Guaranteed Obligations, shall impair or release the Guarantor or any of the Guaranteed Obligations under this Guarantee.

f.     Deferral of Subrogation, Etc. Notwithstanding anything to the contrary in this Guarantee or any other document, the Guarantor hereby:

i.     expressly and irrevocably waives, on behalf of itself and its successors and assigns (including any surety) until the satisfaction of the Guaranteed Obligations in full, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any person or entity, and which Guarantor may have or hereafter acquire against the Company in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guarantee, or any other documents to which such Guarantor is a party or otherwise; and

ii.     acknowledges and agrees (x) that this waiver is intended to benefit the Lender and shall not limit or otherwise affect the Guarantor's liability hereunder or the enforceability of this Guarantee, and (y) that the Lender and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 1(f).

g.     Election of Remedies.     If the Lender may, under applicable law, proceed to realize benefits under the Exchange Agreement, New Note or any document executed thereunder, giving such Lender a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, the Lender may, at its sole option, determine which of such remedies or rights it

may pursue without affecting any of such rights and remedies under this Guarantee. If, in the exercise of any of its rights and remedies, the Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against the Guarantor or the Company, whether because of any applicable laws pertaining to "election of remedies" or the like, the Guarantor hereby consents to such action by the Lender and waives any claim based upon such action, even if such action by the Lender shall result in a full or partial loss of any rights of subrogation which the Guarantor might otherwise have had but for such action by the Lender. Any election of remedies which results in the denial or impairment of the right of the Lender to seek a deficiency judgment against the Guarantor or the Company shall not impair, reduce or limit the Guarantor's obligation to pay the full amount of the Guaranteed Obligations. In the event the Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Exchange Agreement, New Note or any document executed thereunder, such Lender may bid all or less than the amount of the Guaranteed Obligations and the amount of such bid need not be paid by the Lender but shall be credited against the Guaranteed Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Guaranteed Obligations shall be conclusively deemed to be the amount of the Guaranteed Obligations guaranteed under this Guarantee, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the Lender might otherwise be entitled but for such bidding at any such sale.

2.      Representations and Warranties. The Guarantor hereby represents and warrants to the Lender as follows:

        a.      Organization, Good Standing. The Guarantor is duly and validly organized, validly existing and in good standing under the laws of its formation and has all requisite power and authority to carry on its business as now conducted.

        b.      Authorization; Consents. The Guarantor has the requisite power and authority to enter into and perform its obligations under this Guarantee. All action on the part of the Guarantor necessary for the authorization, execution and delivery of, and the performance of its obligations under, this Guarantee has been taken, and no further consent or authorization of the Guarantor, its board of directors, equity holders or, to its knowledge, any Governmental Authority or any other Person is required in connection therewith.

        c.      Due Execution; Enforceability. This Guarantee has been duly executed and delivered by the Guarantor. This Guarantee constitutes the valid and legally binding obligation of the Guarantor, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or other similar laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) general principles of equity.

        d.      No Conflict with Other Instruments. The execution, delivery and performance of this Guarantee will not result in any material violation of any provisions of the Guarantor's articles of incorporation or any other governing document or in a default under any provision of any instrument or contract to which it is a party or by which it or any of its assets or properties are bound, or in any violation of any provision of any laws, regulations or permits applicable to the Guarantor or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any material provision, instrument or contract or an event which results in the creation of any lien upon any assets of the Guarantor.

3.     Further Assurances. The Guarantor agrees, upon the written request of the Lender, to execute and deliver to the Lender, from time to time, any additional instruments or documents reasonably considered necessary by the Lender to cause this Guarantee to be, become or remain valid and effective in accordance with its terms.

4.     Reinstatement. This Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Guarantor or the Company for liquidation or reorganization, should the Guarantor or the Company become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Guarantor's or the Company' assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Guaranteed Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Guaranteed Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

5.     Miscellaneous.

    a.     Survival; Severability. In the event that any provision of this Guarantee becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Guarantee shall continue in full force and effect without said provision; provided that in such case the parties shall negotiate in good faith to replace such provision with a new provision which is not illegal, unenforceable or void, as long as such new provision does not materially change the economic benefits of this Guarantee to the parties.

    b.     Successors and Assigns. The terms and conditions of this Guarantee shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. Nothing in this Guarantee, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Guarantee, except as expressly provided in this Guarantee. The Lender may assign its rights and obligations hereunder in connection with any private sale or transfer of the New Note, in which case the term "Lender" shall also be deemed to refer to such transferee. The Guarantor may not assign its obligations under this Guarantee.

    c.     Governing Law; Jurisdiction. This Guarantee shall be governed by and construed under the laws of the State of New York applicable to contracts made and to be performed entirely within the State of New York. The Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in the City and County of New York for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. The Guarantor hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Guarantor at the address in effect for notices to it under this Guarantee and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

d.     Waiver of Jury Trial.  The parties hereto waive all right to trial by jury in any action, suit or proceeding brought to resolve any dispute, whether sounding in contract, tort, or otherwise, between the Guarantor and the Lender arising out of, connected with, related to, or incidental to the relationship established in connection with, this Guarantee or the transactions related hereto.

e.     Headings.  The headings used in this Guarantee are used for convenience only and are not to be considered in construing or interpreting this Guarantee.

f.     Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

    If to Guarantor, to:

        MESOCOAT, INC.
        24112 Rockwell Drive
        Euclid, Ohio 44117
        Attn: Andrew Sherman, President
        Facsimile:
        E-mail: ajsherman@mesocoatinc.com

    If to the Lender, to:

        GEORGE TOWN ASSOCIATES S.A.
        c/o JTE FINANCE AG
        Biermensdorferstrasse 55
        CH 8004 Zurich, Switzerland
        Facsimile:
        E-mail:

    With a Copy to:

        Mazzeo Song & Bradham LLP
        708 Third Avenue
        New York, NY 10017
        Facsimile: 212-599-8400
        E-mail: dsong@mazzeosong.com

Each party shall provide notice to the other party of any change in address.

g.     Entire Agreement; Amendments.  This Guarantee constitutes the entire agreement between the parties with regard to the subject matter hereof, superseding all prior agreements or understandings, whether written or oral, between or among the parties.  Except as expressly provided herein, neither this Guarantee nor any term hereof may be amended or waived except pursuant to a written instrument executed by the Guarantor and the Lender, and no provision hereof may be waived other than by a written instrument signed by the Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

h.     No Waiver; Cumulative Remedies.  The Lender shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder.  No failure to exercise, nor any delay in exercising on the part of the Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law.

i.     Limitation by Law.  All rights, remedies and powers provided in this Guarantee may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and the provisions of this Guarantee are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Guarantee invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Guarantee as of the date first-above written.

MESOCOAT, INC

By:
Name: Andrew Sherman
Title: President

EXHIBIT D

### AMENDED AND RESTATED SECURITY AGREEMENT

This **AMENDED AND RESTATED SECURITY AGREEMENT** (this "**Agreement**"), dated as of April 28, 2014, is by and between **ABAKAN INC.**, a Nevada corporation (the "**Parent**"), **MESOCOAT, INC.**, a Nevada corporation (the "**Company**"), and **GEORGE TOWN ASSOCIATES S.A.**, a Panama corporation (the "**Secured Party**").

#### WHEREAS:

A.      The Company and Kyrtos Limited, a British Virgin Islands company ("**Kyrtos**") are party to a Security Agreement, dated as of October 30, 2013 (the "**Existing Agreement**"), pursuant to which the Company granted to Kyrtos a security interest in its assets to secure the obligations of the Company under (i) a Secured Promissory Note dated October 30, 2013, issued by the Company to Kyrtos in the principal amount of $689,000, (ii) a Secured Promissory Note dated October 30, 2013, issued by the Company to Kyrtos in the principal amount of $80,000; (iii) a Secured Promissory Note dated November 12, 2013, issued by the Company to Kyrtos in the principal amount of $180,000; (iv) a Secured Promissory Note dated December 10, 2013, issued by the Company to Kyrtos in the principal amount of $180,000; and (v) a Secured Promissory Note dated January 10, 2014, issued by the Company to Kyrtos in the principal amount of $180,000 (collectively, the "**Existing Notes**").

B.      Pursuant to an Assignment of Promissory Notes and Security Agreement dated April 28, 2014, Kyrtos assigned the Existing Notes and the Existing Agreement to the Secured Party.

C.      Pursuant to a Securities Exchange Agreement dated as of April 28, 2014, by and between the Company, the Parent and the Secured Party (the "**Exchange Agreement**"), the Parent has agreed to issue a Secured Convertible Promissory Note (the "**New Note**") to the Secured Party in exchange for the Existing Notes.

D.      It is a condition precedent to the transactions contemplated by the Exchange Agreement that the parties hereto amend and restate the Existing Agreement as contemplated by this Agreement.

E.      The Company will directly or indirectly benefit from the extension of credit to the Parent represented by the issuance of the New Note and the other transactions contemplated by the Exchange Agreement and the other agreements contemplated therein.

**NOW, THEREFORE**, in consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Existing Agreement is hereby amended and restated as follows:

1.      *CERTAIN DEFINITIONS*.

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Exchange Agreement. Terms used herein that are defined in Article 9 of the UCC but not otherwise defined in this Agreement (such as "**account**", "**chattel paper**", "**commercial tort claim**", "**deposit account**", "**document**", "**equipment**", "**fixtures**", "**general intangibles**", "**goods**", "**instruments**", "**inventory**", "**investment property**", "**letter-of-credit rights**", "**proceeds**" and "**supporting obligations**") shall have the respective meanings given such terms in Article 9 of the UCC. As used in this Agreement, the following terms shall have the meanings set forth in this Section 1:

"**Collateral**" means the collateral in which the Secured Party is granted a perfected security interest by this Agreement which shall include all assets and properties of the Company, (except those assets and properties described in Schedule 1 hereto (the "**Excluded Collateral**")), including the following personal property presently owned or hereafter acquired by the Company, wherever situated, and all additions and accessions thereto and all substitutions and replacements thereof, and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer of the Collateral and of insurance covering the same and of any tort claims in connection therewith, and all dividends, interest, cash, notes, securities, equity interest or other property at any time and from time to time acquired, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Securities (as defined below):

(i)      All goods, including, without limitation, (A) all machinery, equipment, computers, motor vehicles, trucks, tanks, boats, ships, appliances, furniture, special and general tools, fixtures, test and quality control devices and other equipment of every kind and nature and wherever situated, together with all documents of title and documents representing the same, all additions and accessions thereto, replacements therefor, all parts therefor, and all substitutes for any of the foregoing and all other items used and useful in connection with the Company's businesses and all improvements thereto; and (B) all inventory;

(ii)     All contract rights and other general intangibles, including, without limitation, all partnership interests, membership interests, stock or other securities, rights under any of the Organizational Documents, agreements related to the Pledged Securities, licenses, distribution and other agreements, computer software (whether "off-the-shelf", licensed from any third party or developed by the Company), computer software development rights, leases, franchises, customer lists, quality control procedures, grants and rights, goodwill, trademarks, service marks, trade styles, trade names, patents, patent applications, copyrights, Intellectual Property, and income tax refunds;

(iii)    All accounts, together with all instruments, all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment, motor vehicles and trucks which any of the same may represent, and all right, title, security and guaranties with respect to each account, including any right of stoppage in transit;

(iv)     All documents, letter-of-credit rights, instruments and chattel paper;

(v)      All commercial tort claims;

(vi)     All deposit accounts and all cash (whether or not deposited in such deposit accounts);

(vii)    All investment property;

(viii)   All supporting obligations;

(ix)     All files, records, books of account, business papers, and computer programs;

(x)      All fiber-optic cable runs and networks with respect to which the Company has an ownership interest; and

(xi)     the products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(x) above.

Without limiting the generality of the foregoing, the term **"Collateral"** shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Subsidiary, including, without limitation, the shares of capital stock and the other equity interests listed on Schedule II (as the same may be modified from time to time pursuant to the terms hereof), and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of the Company obtained in the future, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing (all of the foregoing being referred to herein as the **"Pledged Securities"**) and all rights arising under or in connection with the Pledged Securities, including, but not limited to, all dividends, interest and cash.

Notwithstanding the foregoing, nothing herein shall be deemed to constitute an assignment of any asset which, in the event of an assignment, becomes void by operation of applicable law or the assignment of which is otherwise prohibited by applicable law (in each case to the extent that such applicable law is not overridden by Sections 9-406, 9-407 and/or 9-408 of the UCC or similar applicable law); *provided, however,* that to the extent permitted by applicable law, this Agreement shall create a valid security interest in such asset and, to the extent permitted by applicable law, this Agreement shall create a valid security interest in the proceeds of such asset.

**"Event of Default"** means the occurrence of any of the following:  (i) Parent's failure to repay the full outstanding principal balance of the New Note when due, whether at maturity, upon acceleration or otherwise; (ii) Company's breach of the Subsidiary Guarantee dated as of April 28, 2014 (the **"Guarantee"**) executed by it in favor of the Secured Party; or (iii) any provision of this Agreement shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by the Company or Parent, or a proceeding shall be commenced by the Company or Parent, or by any governmental authority having jurisdiction over the Company or Parent, seeking to establish the invalidity or unenforceability thereof, or the Company or Parent shall deny that the Company or Parent has any liability or obligation purported to be created under this Agreement.

**"Intellectual Property"** means the collective reference to all existing rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, (ii) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof, and all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, (iii) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade dress, service marks, logos, domain names and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common law rights related thereto, (iv) all trade secrets arising under the laws of the United States, any other country or any political subdivision thereof, (v) all rights to obtain any reissues, renewals or extensions of the foregoing, (vi) all licenses for any of the foregoing, and (vii) all causes of action for infringement of the foregoing.

**"Necessary Endorsement"** shall mean undated stock powers endorsed in blank or other proper instruments of assignment duly executed and such other instruments or documents as the Secured Party may reasonably request.

"**Obligations**" means (i) all of the Company's and Parent's obligations under this Agreement, (ii) all of the Company's and Parent's obligations under the Exchange Agreement, (iii) all of the Parent's obligations under the New Note and (iv) all of the Company's obligations under the Guarantee, in each case, whether now or hereafter existing, voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from the Secured Party as a preference, fraudulent transfer or otherwise as such obligations may be amended, supplemented, converted, extended or modified from time to time. Without limiting the generality of the foregoing, the term "**Obligations**" shall include, without limitation: (i) principal of the New Note and the loan extended pursuant thereto; (ii) any and all other fees, indemnities, costs, obligations and liabilities of the Company and the Parent from time to time under or in connection with this Agreement, the New Note, Guarantee or the Exchange Agreement; and (iii) all amounts (including, but not limited to, post-petition interest) in respect of the foregoing that would be payable but for the fact that the obligations to pay such amounts are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Company.

"**Organizational Documents**" means with respect to an entity, the documents by which such entity was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such entity (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

"**Person**" means any individual, corporation, trust, association, company, partnership, joint venture, limited liability company, joint stock company, governmental authority or other entity.

"**Subsidiary**" means, with respect to any Person, any corporation or other entity of which at least a majority of the outstanding shares of stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors (or Persons performing similar functions) of such corporation or entity (regardless of whether or not at the time, in the case of a corporation, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries.

"**UCC**" means the Uniform Commercial Code of the State of New York and or any other applicable law of any state or states which has jurisdiction with respect to all, or any portion of, the Collateral or this Agreement, from time to time. It is the intent of the parties that defined terms in the UCC should be construed in their broadest sense so that the term "**Collateral**" will be construed in its broadest sense. Accordingly if there are, from time to time, changes to defined terms in the UCC that broaden the definitions, they are incorporated herein and if existing definitions in the UCC are broader than the amended definitions, the existing ones shall be controlling.

2.  *GRANT OF SECURITY INTEREST*.

As an inducement for the Secured Party to extend the loan as evidenced by the New Note and to secure the complete and timely payment, performance and discharge in full, as the case may be, of all of the Obligations, the Company hereby unconditionally and irrevocably pledges, grants and hypothecates to the Secured Party a continuing perfected security interest in and to, a lien upon and a right of set-off against all of its right, title and interest of whatsoever kind and nature in and to, the Collateral (the "**Security Interest**").

3.    _DELIVERY OF CERTAIN COLLATERAL._

Contemporaneously or prior to the execution of this Agreement, the Company shall deliver or cause to be delivered to the Secured Party (a) any and all certificates and other instruments representing or evidencing the Pledged Securities, and (b) any and all certificates and other instruments or documents representing any of the other Collateral, in each case, together with all Necessary Endorsements.  The Company is, contemporaneously with the execution hereof, delivering to the Secured Party, or has previously delivered to the Secured Party, a true and correct copy of each Organizational Document governing any of the Pledged Securities.

4.    _REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS OF THE COMPANY AND THE PARENT._

The Company and the Parent, jointly and severally, represent and warrant to, and covenants and agrees with, the Secured Party, as follows:

4.1    Good Standing; Due Authorization; Enforceability.

(a)    The Company and the Parent are duly organized and in good standing in the jurisdiction of their formation.  The Company and the Parent shall at all times preserve and keep in full force and effect its valid existence and good standing and any rights and franchises material to its business.

(b)    The Company and the Parent have the requisite corporate, partnership, limited liability company or other power and authority to enter into this Agreement and otherwise to carry out their obligations hereunder. The execution, delivery and performance by the Company and Parent of this Agreement and the filings contemplated therein have been duly authorized by all necessary action on the part of the Company and the Parent and no further action is required by the Company or the Parent.  This Agreement has been duly executed and delivered by the Company and the Parent.

(c)    This Agreement constitutes the legal, valid and binding obligations of the Company and the Parent, enforceable against the Company and the Parent in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting the rights and remedies of creditors and by general principles of equity.

4.2    No Conflicts.    The execution, delivery and performance of this Agreement by the Company and the Parent does not (i) violate any of the provisions of any Organizational Documents of the Company or the Parent or any judgment, decree, order or award of any court, governmental body or arbitrator or any applicable law, rule or regulation applicable to the Company or the Parent or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing the Company's or Parent's debt or otherwise) or other understanding to which the Company or the Parent is a party or by which any property or asset of the Company or Parent is bound or affected.  No consent (including, without limitation, from stockholders or creditors of the Company or the Parent) is required for the Company or Parent to enter into and perform its obligations hereunder.

**4.3**     Information; Validity, Subordination, Perfection and Maintenance of Security Interests.

(a)     All of the information set forth on Schedule III, including, without limitation, the Company's name, jurisdiction of organization and location of Collateral, are true, correct and complete in all respects. The Company shall not change their name, type of organization, jurisdiction of organization, organizational identification number (if it has one), legal or corporate structure, or identity, or add any new fictitious name unless it provides at least 30 days' prior written notice to the Secured Party of such change and, at the time of such written notification, the Company provides any financing statements or fixture filings necessary to perfect and continue the Security Interest granted, continued and evidenced by this Agreement.

(b)     This Agreement creates in favor of the Secured Party a valid, security interest in the Collateral, securing the payment and performance of the Obligations.  Upon filing of a UCC-3 financing statement amendment, in the form attached hereto as Exhibit A, with the secretary of state's office of the state in which the Company is organized (the "*Financing Statement*"), and payment of the applicable filing fees, all security interests created hereunder in any Collateral in favor of the Secured Party which may be perfected by filing UCC financing statements shall have been duly perfected. No consent of any third parties and no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for (i) the execution, delivery and performance of this Agreement, (ii) the creation or perfection of the Security Interest created hereunder in the Collateral, or (iii) the enforcement of the rights of the Secured Party hereunder.

(c)     The Security Interest in the Collateral, securing payment and performance of the Obligations is subordinated to that security interest in the Collateral granted to The Huntington National Bank dated October 20, 2009, attached hereto as Exhibit B.  The Company (i) represents that the total indebtedness owed to Huntington National Bank as of the date hereof is $134,427.22, (ii) agrees that it will not obtain further loans from, or otherwise incur additional indebtedness owing to, Huntington National Bank or any other party after the date hereof, while the New Note remains outstanding, and (iii) acknowledges and agrees that subordination of the Secured Party's security interest is conditioned on the foregoing clauses (i) and (ii).

(d)     The Company hereby authorizes the Secured Party to file the Financing Statement and any other financing statements under the UCC with respect to the Security Interest with the proper filing and recording agencies in any jurisdiction deemed proper by them.  The Company shall, at the Company's sole cost and expense, promptly execute and/or deliver to the Secured Party, such further deeds, mortgages, assignments, security agreements, financing statements or other instruments, documents, certificates and assurances and take such further action as the Secured Party may from time to time request and may in their reasonable discretion deem necessary to perfect, protect or enforce its security interest in the Collateral including, without limitation, if applicable, the execution and delivery of a separate security agreement with respect to the Company's Intellectual Property in which the Secured Party have been granted a security interest hereunder, substantially in a form reasonably acceptable to the Secured Party.

(e)     The Company shall at all times maintain the liens and Security Interest provided for hereunder as valid  liens and security interests in the Collateral in favor of the Secured Party until this Agreement and the Security Interest hereunder shall be terminated pursuant to Section 13.

4.4    Collateral.

(a)      Except as set forth on Schedule IV, the Company is the sole owner of the Collateral (except for non-exclusive licenses granted by the Company in the ordinary course of business), free and clear of any liens (other than as set forth in Schedule IV), security interests (other than as set forth in Schedule IV), encumbrances, rights or claims, and is fully authorized to grant the Security Interest. There has been no adverse decision that would materially affect the Company's claim of ownership rights in or exclusive rights to use the Collateral in any jurisdiction or to the Company's right to keep and maintain such Collateral in full force and effect, and there is no proceeding involving said rights pending or, to the best knowledge of the Company, threatened before any court, judicial body, administrative or regulatory agency, arbitrator or other governmental authority that could reasonably be expected to have such material adverse effect.

(b)      The Company shall keep and preserve its equipment, inventory and other tangible Collateral in good condition, repair and order, ordinary wear and tear excepted. The Company shall take all steps reasonably necessary to diligently pursue and seek to preserve, enforce and collect any rights, claims, causes of action and accounts receivable in respect of the Collateral.

(c)      The Company shall at all times maintain its tangible Collateral at the locations set forth under its name on Schedule III and may not relocate such Collateral unless it delivers to the Secured Party at least 30 days prior to such relocation (i) written notice of such relocation and the new location thereof (which must be within the United States) and (ii) evidence that appropriate financing statements under the UCC and other necessary documents have been filed and recorded and other steps have been taken to perfect the Security Interest to create in favor of the Secured Party a valid, perfected and continuing perfected lien in the Collateral. The Company shall not transfer, pledge, hypothecate, encumber, license, sell or otherwise dispose of any of the Collateral (except for non-exclusive licenses granted by the Company in its ordinary course of business and sales of inventory by the Company in its ordinary course of business) without the prior written consent of the Secured Party. The Company shall not operate or locate any such Collateral (or cause to be operated or located) in any area excluded from insurance coverage.

(d)      Except as set forth on Schedule IV, to the Company's knowledge there is not on file in any governmental or regulatory authority, agency or recording office an effective financing statement, security agreement, license or transfer or any notice of any of the foregoing (other than those that will be filed in favor of the Secured Party pursuant to this Agreement) covering or affecting any of the Collateral. So long as this Agreement shall be in effect, the Company shall not execute and shall not knowingly permit to be on file in any such office or agency any such financing statement or other document or instrument (except as set forth on Schedule IV or to the extent filed or recorded in favor of the Secured Party pursuant to the terms of this Agreement).

(e)      The capital stock and other equity interests listed on Schedule I represent all of the capital stock and other equity interests of the Company's Subsidiaries, and represent all capital stock and other equity interests owned, directly or indirectly, by the Company. All of the Pledged Securities are validly issued, fully paid and non-assessable, and the Company is the legal and beneficial owner of the Pledged Securities, free and clear of any lien, security interest or other encumbrance except for the security interests created by this Agreement or otherwise set forth on Schedule IV. The ownership and other equity interests in partnerships and limited liability companies (if any) included in the Pledged Securities (the "**Pledged Interests**") by their express terms do not provide that they are securities governed by Article 8 of the UCC and are not held in a securities account or by any financial intermediary. The Company shall vote the Pledged Securities to comply with the covenants and agreements set forth herein and the Exchange Agreement (if any).

(f)     The Company shall, within ten (10) days of obtaining knowledge thereof, advise the Secured Party, promptly, in sufficient detail, of any substantial change in the Collateral, and of the occurrence of any event which would have a material adverse effect on the value of the Collateral or on the Secured Party' security interest therein. The Company shall permit the Secured Party and their representatives and agents to inspect the Collateral at any time during normal business hours and to make copies of records pertaining to the Collateral as may be requested by a Secured Party from time to time.

(g)     The attached Schedule V contains a complete and accurate list of all material (a) patented or registered Intellectual Property owned or used by the Company or any Subsidiary, (b) pending patent applications and applications for registrations of other Intellectual Property filed by the Company or any Subsidiary, and (c) unregistered Intellectual Property Rights owned or used by the Company or any Subsidiary.

(h)     All information heretofore, herein or hereafter supplied to the Secured Party by or on behalf of the Company with respect to the Collateral is accurate and complete in all material respects as of the date furnished.

4.5     <u>Insurance</u>. The Company shall maintain with financially sound and reputable insurers, insurance with respect to the Collateral against loss or damage of the kinds and in the amounts sufficient to cover the full replacement cost thereof. Upon the written request of the Secured Party, the Company shall cause each insurance policy issued in connection herewith to provide, and the insurer issuing such policy to certify to the Secured Party, that (a) if such insurance be proposed to be cancelled or materially changed for any reason whatsoever, such insurer will promptly notify the Secured Party, and such cancellation or change shall not be effective for at least thirty (30) days after receipt by the Secured Party, of such notice, unless the effect of such change is to extend or increase coverage under the policy; and (b) the Secured Party will have the right (but no obligation) at its election to remedy any default in the payment of premiums within thirty (30) days of notice from the insurer of such default.

5.     <u>*EFFECT OF PLEDGE ON CERTAIN RIGHTS*</u>.

If any of the Collateral subject to this Agreement consists of nonvoting equity or ownership interests (regardless of class, designation, preference or rights) that may be converted into voting equity or ownership interests upon the occurrence of certain events (including, without limitation, upon the transfer of all or any of the other stock or assets of the issuer), it is agreed that the pledge of such equity or ownership interests pursuant to this Agreement or the enforcement of any of the Secured Party' rights hereunder shall not be deemed to be the type of event which would trigger such conversion rights notwithstanding any provisions in the Organizational Documents or agreements to which the Company or any of the Collateral is subject or to which the Company is party.

6.     <u>*DUTY TO HOLD IN TRUST*</u>.

6.1     <u>Cash and Payment Obligations</u>. Upon the occurrence of an Event of Default and at any time thereafter, the Company shall, upon receipt of any revenue, income, dividend, interest or other sums subject to the Security Interest, whether payable pursuant to the New Note or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the same in trust for and on behalf of and for the benefit of the Secured Party, and shall forthwith endorse and transfer any such sums or instruments, or both (to the extent permitted by law), to the Secured party for application to the satisfaction of the obligations.

*Amended and Restated Security Agreement*                                    *Page 8*

6.2     Securities and Other Assets.  If the Company shall become entitled to receive or shall receive any securities or other property (including, without limitation, shares of Pledged Securities or instruments representing Pledged Securities acquired after the date hereof, or any options, warrants, rights or other similar property or certificates representing a dividend, or any distribution in connection with any recapitalization, reclassification or increase or reduction of capital, or issued in connection with any reorganization of any of its direct or indirect subsidiaries) in respect of the Pledged Securities (whether as an addition to, in substitution of, or in exchange for, such Pledged Securities or otherwise), the Company agrees to (i) accept the same as the agent of the Secured Party; and (ii) hold the same in trust on behalf of and for the benefit of the Secured Party.

7.      *RIGHTS AND REMEDIES UPON DEFAULT.*

7.1     Scope of Rights and Remedies.  Upon the occurrence of any Event of Default and at any time thereafter, the Secured Party, acting through any agent appointed by it for such purpose, shall have the right to exercise all of the remedies conferred hereunder and under the New Note, and the Secured Party, shall have all the rights and remedies of a secured party under the UCC. Subject to the provisions of Section 4.3(c), the Secured Party shall have the following rights and powers:

(a)     The Secured Party shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and the Company shall assemble the Collateral and make it available to the Secured Party at places which the Secured Party shall reasonably select, whether at the Company's premises or elsewhere, and make available to the Secured Party, without rent, all of the Company's premises and facilities for the purpose of the Secured Party taking possession of, removing or putting the Collateral in saleable or disposable form.

(b)     Upon notice to the Company by the Secured Party, all rights of the Company to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and all rights of the Company to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease. Upon such notice, the Secured Party shall have the right to receive any interest, cash dividends or other payments on the Collateral and, at the option of the Secured Party, to exercise in the Secured Party's discretion all voting rights pertaining thereto.  Without limiting the generality of the foregoing, the Secured Party shall have the right (but not the obligation) to exercise all rights with respect to the Collateral as if it were the sole and absolute owner thereof, including, without limitation, to vote and/or to exchange, at its sole discretion, any or all of the Collateral in connection with a merger, reorganization, consolidation, recapitalization or other readjustment concerning or involving the Collateral or the Company or any of its direct or indirect subsidiaries.

(c)     The Secured Party shall have the right to operate the business of the Company using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Secured Party may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to the Company or right of redemption of the Company, which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Secured Party may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of the Company, which are hereby waived and released.

(d)     The Secured Party shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Secured Party and to enforce the Company's rights against such account debtors and obligors.

(e)     The Secured Party may (but is not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Secured Party or its designee.

(f)     The Secured Party may (but is not obligated to) transfer any or all Intellectual Property registered in the name of the Company at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Party or any designee or any purchaser of any Collateral.

7.2     <u>Disposition of Collateral</u>.  The Secured Party may comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.  Subject to the provisions of Section 4.3(c), the Secured Party may sell the Collateral without giving any warranties and may specifically disclaim such warranties.  If the Secured Party sells any of the Collateral on credit, the Company and Parent will only be credited with payments actually made by the purchaser.  In addition, the Company and Parent waive any and all rights that they may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights and remedies hereunder, including, subject to the provisions of Section 4.3(c), its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

7.3     <u>License to Use Intellectual Property</u>.  For the purpose of enabling the Secured Party to further exercise rights and remedies under this Section 7 or elsewhere provided by agreement or applicable law, the Company hereby grants to the Secured Party an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Company) to use, license or sublicense, following an Event of Default, any Intellectual Property now owned or hereafter acquired by the Company, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

8.     *APPLICATIONS OF PROCEEDS*.

Subject to the provisions of Section 4.3(c), the proceeds of any such sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, to the reasonable attorneys' fees and expenses incurred by the Secured Party in enforcing their rights hereunder and in connection with collecting, storing and disposing of the Collateral, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which the Secured Party shall pay to the Company any surplus proceeds.  If, upon the sale, license or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Secured Party is legally entitled, the Parent and Company will be jointly and severally liable for the deficiency, together with interest thereon, at an interest rate equal to the lower of eighteen percent (18%) and the maximum rate permitted by applicable law (the **"Default Rate"**), and the reasonable fees of any attorneys employed by the Secured Party to collect such deficiency.  To the extent permitted by applicable law, the Company and Parent waive all claims, damages and demands against the Secured Party arising out of the repossession, removal, retention or sale of the Collateral, unless due solely to the gross negligence or willful misconduct of the Secured Party as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction.

9.      *SECURITIES LAW PROVISION.*

The Company recognizes that the Secured Party may be limited in its ability to effect a sale to the public of all or part of the Pledged Securities by reason of certain prohibitions in the Securities Act of 1933, as amended, or other federal or state securities laws (collectively, the "**Securities Laws**"), and may be compelled to resort to one or more sales to a restricted group of purchasers who may be required to agree to acquire the Pledged Securities for their own account, for investment and not with a view to the distribution or resale thereof.  The Company agrees that sales so made may be at prices and on terms less favorable than if the Pledged Securities were sold to the public, and that the Secured Party has no obligation to delay the sale of any Pledged Securities for the period of time necessary to register the Pledged Securities for sale to the public under the Securities Laws.  The Company shall cooperate with the Secured Party in its attempt to satisfy any requirements under the Securities Laws (including, without limitation, registration thereunder if requested by the Secured Party) applicable to the sale of the Pledged Securities by the Secured Party.

10.     *COSTS AND EXPENSES.*

The Company and Parent agree to pay all reasonable out-of-pocket fees, costs and expenses incurred in connection with any filing required hereunder, including, without limitation, any financing statements pursuant to the UCC, continuation statements, partial releases and/or termination statements related thereto or any expenses of any searches reasonably required by the Secured Party.  The Company and Parent shall also pay all other claims and charges which in the reasonable opinion of the Secured Party might prejudice, imperil or otherwise affect the Collateral or the Security Interest therein.  The Company and Parent will also, upon demand, pay to the Secured Party the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Secured Party may incur in connection with (i) the enforcement of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, or (iii) the exercise or enforcement of any of the rights of the Secured Party under the New Note or this Agreement.  Until so paid, any fees payable hereunder shall be added to the principal amount of the New Note and shall bear interest at the Default Rate.

11.     *RESPONSIBILITY FOR COLLATERAL.*

The Company assumes all liabilities and responsibility in connection with all Collateral, and the Obligations shall in no way be affected or diminished by reason of the loss, destruction, damage or theft of any of the Collateral or its unavailability for any reason.  The Secured Party agrees to act in accordance with commercially reasonable standards and the UCC.  Without limiting the generality of the foregoing, (a) the Secured Party (i) has no duty (either before or after an Event of Default) to collect any amounts in respect of the Collateral or to preserve any rights relating to the Collateral, or (ii) has any obligation to clean-up or otherwise prepare the Collateral for sale, and (b) the Company shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by the Company thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Company under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which it may be entitled at any time or times.

12.     *SECURITY INTEREST ABSOLUTE*.

All rights of the Secured Party shall be absolute and unconditional, irrespective of: (a) any lack of validity or enforceability of this Agreement, the New Note or any agreement entered into in connection with the foregoing, or any portion hereof or thereof; (b) any change in the time, manner or place of payment or performance of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the New Note or any other agreement entered into in connection with the foregoing; (c) any exchange, release or nonperfection of any of the Collateral, or any release or amendment or waiver of or consent to departure from any other collateral for, or any guaranty, or any other security, for all or any of the Obligations; (d) any action by the Secured Party to obtain, adjust, settle and cancel in its sole discretion any insurance claims or matters made or arising in connection with the Collateral; or (e) any other circumstance which might otherwise constitute any legal or equitable defense available to the Company, or a discharge of all or any part of the Security Interest granted hereby. Until the Obligations shall have been paid and performed in full, the rights of the Secured Party shall continue even if the Obligations are barred for any reason, including, without limitation, the running of the statute of limitations or bankruptcy. The Company and Parent expressly waive presentment, protest, notice of protest, demand, notice of nonpayment and demand for performance. In the event that at any time any transfer of any Collateral or any payment received by the Secured Party hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall be deemed to be otherwise due to any party other than the Secured Party, then, in any such event, the Company's and Parent's obligations hereunder shall survive cancellation of this Agreement, and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Agreement, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof. The Company and Parent waive all right to require the Secured Party to proceed against any other person or entity or to apply any Collateral which the Secured Party may hold at any time, or to marshal assets, or to pursue any other remedy. The Company and Parent waive any defense arising by reason of the application of the statute of limitations to any obligation secured hereby.

13.     *TERM OF AGREEMENT*.

This Agreement and the Security Interest shall terminate on the date on which all payments under the New Note have been indefeasibly paid in full and all other Obligations have been paid or discharged; *provided, however*, that all indemnities of the Company and the Parent contained in this Agreement shall survive and remain operative and in full force and effect regardless of the termination of this Agreement.

14. _POWER OF ATTORNEY._

The Company authorizes the Secured Party, and does hereby make, constitute and appoint the Secured Party and its officers, agents, successors or assigns with full power of substitution, as the Company's true and lawful attorney-in-fact, with power, in the name of the Secured Party or the Company, to, after the occurrence and during the continuance of an Event of Default, (i) endorse any note, checks, drafts, money orders or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Secured Party; (ii) to sign and endorse any financing statement pursuant to the UCC or any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to the Collateral; (iii) to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (iv) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (v) to transfer any Intellectual Property or provide licenses respecting any Intellectual Property; and (vi) generally, at the option of the Secured Party, and at the expense of the Company, at any time, or from time to time, to execute and deliver any and all documents and instruments and to do all acts and things which the Secured Party deems necessary to protect, preserve and realize upon the Collateral and the Security Interest granted therein in order to effect the intent of this Agreement and the New Note all as fully and effectually as the Company might or could do; and the Company hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding. The designation set forth herein shall be deemed to amend and supersede any inconsistent provision in the Organizational Documents or other documents or agreements to which the Company or any of the Pledged Securities is subject or to which the Company is a party. Without limiting the generality of the foregoing, after the occurrence and during the continuance of an Event of Default, the Secured Party is specifically authorized to execute and file any applications for or instruments of transfer and assignment of any patents, trademarks, copyrights or other Intellectual Property with the United States Patent and Trademark Office and the United States Copyright Office. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

15. _OTHER SECURITY._

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, firm, corporation or other entity, then the Secured Party shall have the right, in its sole discretion, to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting the Secured Party's rights and remedies hereunder.

16. _RESERVED._

17.    *INDEMNIFICATION.*

The Company and the Parent shall, jointly and severally, indemnify, reimburse and hold harmless the Secured Party and its partners, members, shareholders, officers, directors, employees and agents (each, an *"Indemnitee"*) from and against any and all losses, claims, liabilities, damages, penalties, suits, costs and expenses, of any kind or nature, (including fees relating to the cost of investigating and defending any of the foregoing) imposed on, incurred by or asserted against such Indemnitee in any way related to or arising from or alleged to arise from this Agreement or the Collateral, except any such losses, claims, liabilities, damages, penalties, suits, costs and expenses which result from the gross negligence or willful misconduct of the Indemnitee as determined by a final, nonappealable decision of a court of competent jurisdiction.  This indemnification provision is in addition to, and not in limitation of, any other indemnification provision in the Exchange Agreement.

18.    *MISCELLANEOUS.*

18.1    Severability.  In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; *provided* that in such case the parties shall negotiate in good faith to replace such provision with a new provision which is not illegal, unenforceable or void, as long as such new provision does not materially change the economic benefits of this Agreement to the parties.

18.2    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  The Secured Party may assign its rights hereunder in connection with any private sale or transfer of the New Note, in which case the term "Secured Party" shall be deemed to refer to such transferee as though such transferee were an original signatory hereto.  The Company and Parent may not assign their rights or obligations under this Agreement.

18.3    Injunctive Relief.  The Company and Parent acknowledge and agree that a breach by them of their obligations hereunder will cause irreparable harm to the Secured Party and that the remedy or remedies at law for any such breach will be inadequate and agree, in the event of any such breach, in addition to all other available remedies, the Secured Party shall be entitled to an injunction restraining any breach and requiring immediate and specific performance of such obligations without the necessity of showing economic loss or the posting of any bond.

18.4    Governing Law; Jurisdiction.  This Agreement shall be governed by and construed under the laws of the State of New York applicable to contracts made and to be performed entirely within the State of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York and County of New York for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

18.5    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile transmission.

18.6    <u>Headings</u>.  The headings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

18.7    <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

> *If to the Company*:
>
> MESOCOAT, INC.
> 24112 Rockwell Drive
> Euclid, Ohio 44117
> Attn: Andrew Sherman, Chief Executive Officer
> Facsimile: (216) 404-0054
> E-mail: asherman@mesocoat.com
>
> *If to the Parent*:
>
> ABAKAN INC.
> 2665 South Bayshore Drive, Suite 450
> Miami, Florida 33133
> Attn: Robert H. Miller, Chief Executive Officer
> Facsimile: (786) 347-7706
> E-mail:  robert.miller@abakaninc.com
>
> *If to the Secured Party:*
>
> GEORGE TOWN ASSOCIATES S.A.
> c/o JTE FINANCE AG
> Biermensdorferstrasse 55
> CH 8004 Zurich, Switzerland
> Facsimile:_____
> E-mail:_____

*With a copy to:*

Mazzeo Song & Bradham LLP
708 Third Avenue
New York, NY 10017
Facsimile:  212-599-8400
E-mail:  dsong@mazzeosong.com

(or, in the case of a successor to a Secured Party in connection with a valid transfer of the New Note, the address of such successor designated in a notice given to the Company and signed by the original secured party and such successor), or as shall be designated by such party (or successor) in writing to the other parties hereto in accordance with this Section 18.7.

18.8    Entire Agreement; Amendments.  This Agreement and the Exchange Agreement constitute the entire agreement between the parties with regard to the subject matter hereof and thereof, superseding all prior agreements or understandings, whether written or oral, between or among the parties.  No (i) amendment to this Agreement or (ii) waiver of any agreement or other obligation of the Company or Parent under this Agreement may be made or given except pursuant to a written instrument executed by the Company, Parent and the Secured Party.  Any waiver given pursuant hereto shall be effective only in the specific instance and for the specific purpose for which given.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Security Agreement to be duly executed on the day and year first above written.

MESOCOAT, INC.

By: _____
     Name: Andrew Sherman
     Title: President

ABAKAN INC.

By: _____
     Name: Robert H. Miller
     Title: Chief Executive Officer

GEORGE TOWN ASSOCIATES S.A.

By: _____
     Name: Engelbert Schreiber
     Title: Director

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Security Agreement to be duly executed on the day and year first above written.

MESOCOAT, INC.

By: _____
       Name: Andrew Sherman
       Title: President


ABAKAN INC.

By: _____
       Name: Robert H. Miller
       Title: Chief Executive Officer


GEORGE TOWN ASSOCIATES S.A.

By: _____
       Name: Engelbert Schreiber jun.
       Title: Director

**Exhibit A to the**
**Amended and Restated Security Agreement**

UCC-3 Financing Statement Amendment
Attached

***Exhibit B to the***
***Amended and Restated Security Agreement***

The Huntington National Bank Commercial Security Agreement
Attached

## *SCHEDULE I*

### COLLATERAL DEFINITION EXCEPTION

The following assets and property of the Company **are not included** in the definition of Collateral in which the Secured Party has been granted a Security Interest as described in this Agreement.

- All of the Project Equipment, as defined in the Loan Agreement dated as of July 20, 2012 (the "Loan Agreement") between the Director of Development of the State of Ohio and MesoCoat, Inc., acquired with the proceeds of the R & D Loan (as defined in the Loan Agreement), including without limitation the following (as such list may be supplemented or amended from time to time):

  One CermaClad™ system and automated pipe blasting equipment used for high speed metal cladding, as described more fully below:

  A system purchased from Mattson Technology consisting of an arc lamp, an automated blasting system, power supply, and a pipe manipulation system for the application of corrosion resistant coatings to pipe. The blasting system removes mill scale from the pipe before treatment. The system includes a "stinger" 2-D 80 foot robot which controls the fusion process, a robot that applies slurry to the pipe, a robot that holds the inspections tools and a pipe handling system.

*SCHEDULE II*

<u>PLEDGED SECURITIES</u>

| <u>Issuer</u> | <u>Shares/Interests Pledged</u> |
|---|---|
| MesoCoat Coating Services, Inc. | 100% |
| PT MesoCoat Indonesia | 100% |

## *SCHEDULE III*

### COMPANY INFORMATION

| | |
|---|---|
| Name of the Company: | MesoCoat Inc. |
| Jurisdiction of Organization: | Nevada |
| Organizational Identification Number: | EIN – 20-8924902 |
| Trade names and other names used by the Company during the past five years: | MesoCoat |
| Each location where Collateral or the Company's books of account and records are located: | 24112 Rockwell Drive, Euclid, Ohio 44117 |
| Name and location of each consignee, bailee, warehouseman, agent or processor in possession of any Collateral owned by the Company: | None |

*SCHEDULE IV*

<u>EXISTING LIENS AND ENCUMBRANCES</u>

| | <u>Lienholder</u> | <u>Type of Lien</u> | <u>Amount of Debt</u> |
|---|---|---|---|
| 1. | The Director of Development of the State of Ohio | Loan | $1,000,000.00 |
| 2. | The Huntington National Bank | Loan | $  134,427.22 |
| 3. | County of Cuyahoga, Ohio | Loan | $    40,819.54 |

*SCHEDULE V*

INTELLECTUAL PROPERTY

| No. | Title | Patent Number | Assignee | Licensed to | Current IP Status | MesoCoat IP Rights |
|---|---|---|---|---|---|---|
| 1 | Rapid infrared heating of a surface | 6174388 B1 | Lockheed Martin Energy Research Corp., U.T. Battelle LLC, Oak Ridge, TN | MesoCoat Inc. | Issued patent | Exclusive rights |
| 2 | Abrasive particles with metallurgically bonded metal coatings | 6540800 B2 | | MesoCoat Inc. | Issued patent | Exclusive rights |
| 3 | Method of producing fine coated tungsten carbide particles | 6641918 B1 | | MesoCoat Inc. | Issued patent | Exclusive rights |
| 4 | Combined liquid phase and activated sintering of refractory metals | 7041250 B2 | | MesoCoat Inc. | Issued patent | Exclusive rights |
| 5 | Pulse thermal processing of functional materials using directed plasma arc | 7220936 B2 | UT-Battelle, LLC, Oak Ridge, TN | MesoCoat Inc. | Issued patent | Exclusive rights |
| 6 | Powder friction forming | 7560067 B2 | | MesoCoat Inc. | Issued patent | Exclusive rights |
| 7 | Heterogeneous composite bodies with isolated lenticular shaped cermet regions | 7635515 B1 | | MesoCoat Inc. | Issued patent | Exclusive rights |
| 8 | Heterogeneous composite bodies with isolated lenticular shaped cermet regions | 7681622 B2 | | MesoCoat Inc. | Issued Patent | Exclusive rights |
| 9 | Coatings, Composition and method related to non-spalling low density hardface coatings | US2010/0203255A1 | | N/A | Filed Full US Patent | Owned |
| 10 | Coatings, Composition and method related to non-spalling low density hardface coatings | N/A | | N/A | Filed PCT Patent Application | Owned |
| 11 | Article and method of manufacturing related to nanocomposite overlays | N/A | | N/A | Filed PCT Patent Application | Owned |
| 12 | Article and method of manufacturing related to nanocomposite overlays | US2010/0297432A1 | | N/A | Filed Full US Patent | Owned |
| 13 | Method and Apparatus for forming clad metal products | 61/451,114 | | N/A | Filed Provisional Patent Application | Owned |
| 14 | Thin Metal Coatings | | | N/A | Applied for a Provisional Patent | Owned |
| 15 | Ternary Ceramic Thermal Spraying Powder and Method of Manufacturing Thermal Sprayed Coating Using Said Powder | 61/798,032 | | N/A | Filed Provisional Patent | Owned |

# EXHIBIT E

 LexisNexis·

**1 OF 1 RECORD(S)**

## UCC Filings
## 1:Nevada UCC Record
### Debtor Information

|  |  |
|---|---|
| **Name:** | MESOCOAT, INC. |
| **Standardized Address:** | 24112 ROCKWELL DR |
|  | EUCLID, OH 44117-1252 |
| **Original Address:** | 24112 ROCKWELL DRIVE |
|  | EUCLID, OH 44117-1252 |

### Secured Party Information
**Secured 1**

|  |  |
|---|---|
| **Name:** | GEORGE TOWN ASSOCIATES S.A. |
| **Original Address:** | SAMUEL LEWIS AVE., 53RD STREET, OMEGA BLDG |

**Secured 2**

|  |  |
|---|---|
| **Name:** | KYRTOS LIMITED |
| **Standardized Address:** | 12TH FLR GOLDEN STAR BLDG |
|  | WANCHAI, |
| **Original Address:** | 12TH FLR, GOLDEN STAR BLDG, |
|  | WANCHAI, |

### Filing Information

|  |  |
|---|---|
| **Original Filing Number:** | 2013028180-1 |
| **Original Filing Date:** | 10/31/2013 |
| **Filing Agency:** | SECRETARY OF STATE/UCC DIVISION |
| **Filing Agency Address:** | 200 N CARSON |
|  | CARSON CITY, NV 89701 |

|  |  |
|---|---|
| **Filing Type:** | INITIAL FILING |
| **Filing Number:** | 2013028180-1 |
| **Filing Date:** | 10/31/2013 |
| **Filing Expiration Date:** | 10/31/2018 |
| **Vendor Entry Date:** | 11/5/2013 |
| **Vendor Update Date:** | 2013 |

|  |  |
|---|---|
| **Filing Type:** | ASSIGNMENT |
| **Filing Number:** | 2014010690-4 |
| **Filing Date:** | 4/30/2014 |
| **Filing Expiration Date:** | 10/31/2018 |
| **Vendor Entry Date:** | 5/7/2014 |
| **Vendor Update Date:** | 2014 |

**Important:**

The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use is: Litigation
Your GLBA Permissible Use is: Legal Compliance

Copyright© 2015 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**STATE OF NEVADA**



*ROSS MILLER*
*Secretary of State*

*SCOTT W. ANDERSON*
*Deputy Secretary*
*for Commercial Recordings*

**OFFICE OF THE**
**SECRETARY OF STATE**

**Filing Acknowledgement**

April 30, 2014

**Job Number**
U20140430-0094

**Initial Filing Number**
2013028180-1

**Filing Description**
Assignment

**Document Filing Number**
2014010690-4

**Date/Time of Filing**
04-30-2014 03:39 PM

**Debtors**

MESOCOAT, INC.
24112 ROCKWELL DRIVE
EUCLID OH  44117 USA

**Secured Parties**

KYRTOS LIMITED
12TH FLR, GOLDEN STAR BLDG,
20 LOCKHARD RD
WANCHAI XX  XX HKG

GEORGE TOWN ASSOCIATES S.A.
SAMUEL LEWIS AVE., 53RD STREET,
OMEGA BLDG
PANAMA XX  XX PA

The attached document(s) were filed with the Nevada Secretary of State, Uniform
Commercial Code Division.  The filing date and time have been affixed to each
document, indicating the date and time of filing.  A filing number is also affixed and can
be used to reference this document in the future.

Nevada Secretary of State
Patricia Camacho
Filing Officer

**UCC DIVISION:**
**Tracy Gillespie, Supervisor**
200 N. Carson Street
Carson City, Nevada  89701-4069
Telephone (775) 684-5708
Fax (775) 684-5630

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | Filed in the office of | Document Number |
|---|---|---|
| | *[signature]* | 2014010690-4 |
| | Ross Miller | Filing Date and Time |
| | Secretary of State | 04/30/2014 3:39 PM |
| | State of Nevada | |

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Return acknowledgment to:

★

Capitol Corporate Services, Inc.
P.O. Box 3100   Carson City, NV 89702
800/899-0490

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
2013028180-1   10/31/2013

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| George Town Associates S.A. | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Samuel Lewis Ave., 53rd Street, Omega Bldg | Panama | XX | XX | pa |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Kyrtos Limited | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)