# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Agreement**") is made as of this __ day of August, 2015, by and between **MESOCOAT, INC.**, a Nevada corporation, as debtor ("**Borrower**"), in favor of **GEORGE TOWN ASSOCIATES S.A.**, a Panama corporation, as secured party ("**Secured Party**").

## Recitals

**WHEREAS**, Borrower and Secured Party entered into that certain Secured Promissory Note (the "**Note**") of even date hereof, incorporated herein by reference, whereby Borrower promised to pay Secured Party the principal amount of $_____; and

**WHEREAS**, Borrower and Secured Party desire to enter into this Agreement to secure the obligation of Borrower to make payment(s) to Secured Party according to the terms of the Note.

**NOW, THEREFORE**, in consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Certain Definitions. Terms used herein that are defined in Article 9 of the UCC but not otherwise defined in this Agreement (such as "**account**," "**chattel paper**," "**commercial tort claim**," "**deposit account**," "**document**," "**equipment**," "**fixtures**," "**general intangibles**," "**goods**," "**instruments**," "**inventory**," "**investment property**," "**letter-of-credit rights**," "**proceeds**" and "**supporting obligations**") shall have the respective meanings given such terms in Article 9 of the UCC. As used in this Agreement, the following terms shall have the meanings set forth in this Section 1:

    a.      "**Collateral**" means the collateral in which the Secured Party is granted a perfected security interest by this Agreement which shall include all assets and properties of the Borrower, (except those assets and properties described in Schedule I hereto (the "**Excluded Collateral**")), including the following personal property owned or hereafter acquired by Borrower, wherever situated, and all additions and accessions thereto and all substitutions, and replacements thereof, and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer of the Collateral and of insurance covering the same and of any tort claims in connection therewith, and all dividends, interest, cash, notes, securities, equity interest or other property at any time and from time to time acquired, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Securities (as defined below):

        i. All goods, including, without limitation, (A) all machinery, equipment, computers, motor vehicles, trucks, tanks, boats, ships, appliances, furniture, special and general tools, fixtures, test and quality control devices and other equipment of every kind and nature and wherever situated, together with all documents of title and documents representing the same, all additions and accessions thereto, replacements therefor, all parts therefor, and all substitutes for any of the foregoing and all other items used and useful in connection with Borrower's business and all improvements thereto; and (B) all inventory;

      ii. All contract rights and other general intangibles, including, without limitation, all partnership interests, membership interests, stock or other securities, rights under any of the Organizational Documents, agreements related to the Pledged Securities, licenses, distribution and other agreements, computer software (whether "off-the-shelf", licensed from any third party or developed by Borrower), computer software development rights, leases, franchises, customer lists, quality control procedures, grants and rights, goodwill, trademarks, service marks, trade styles, trade names, patents, patent applications, copyrights, Intellectual Property, and income tax refunds;

      iii. All accounts, together with all instruments, all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment, motor vehicles and trucks which any of the same may represent, and all right, title, security and guaranties with respect to each account, including any right of stoppage in transit;

      iv.   All documents, letter-of-credit rights, instruments and chattel paper;

      v.   All commercial tort claims;

      vi. All deposit accounts and all cash (whether or not deposited in such deposit accounts);

      vii.   All investment property;

      viii.   All supporting obligations;

      ix.   All files, records, books of account, business papers, and computer programs;

      x. All fiber-optic cable runs and networks with respect to which Borrower has an ownership interest; and

      xi. The products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(x) above.

Without limiting the generality of the foregoing, the term "Collateral" shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Subsidiary, including, without limitation, the shares of capital stock and other equity interests listed on Schedule II (as the same may be modified from time to time pursuant to the terms hereof), and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of Borrower obtained in the future, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing (all of the foregoing being referred to herein as the "**Pledged Securities**") and all rights arising under or in connection with the Pledged Securities, including, but not limited to, all dividends, interest and cash.

Notwithstanding the foregoing, nothing herein shall be deemed to constitute an assignment of any asset which, in the event of an assignment, becomes void by operation of applicable law or the assignment of which is otherwise prohibited by applicable law (in each case to the extent that

such applicable law is not overridden by Sections 9-406, 9-407 and/or 9-408 of the UCC or other similar applicable law); *provided, however*, that to the extent permitted by applicable law, this Agreement shall create a valid security interest in such asset and, to the extent permitted by applicable law, this Agreement shall create a valid security interest in the proceeds of such asset.

      b.   **"Event of Default"** means the occurrence of any of the following: (i) Borrower's failure to repay the full outstanding principal balance of the Note when due, whether on the Maturity Date (as defined in the Note), upon acceleration or otherwise; (ii) Borrower's breach of any term, covenant, provision or obligation pursuant to this Agreement, or (iii) any provision of this Agreement shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by Borrower, or a proceeding shall be commenced by Borrower, or by any governmental authority having jurisdiction over Borrower, seeking to establish the invalidity or unenforceability thereof, or Borrower shall deny that Borrower has any liability or obligation purported to be created under this Agreement.

      c.   **"Intellectual Property"** means the collective reference to all existing rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, records and applications in the United States Copyright Office, (ii) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof, and all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, (iii) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade dress, service marks, logos, domain names and other source of business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common law rights related thereto, (iv) all trade secrets arising under the laws of the United States, any other country or any political subdivision thereof, (v) all rights to obtain any reissues, renewals or extensions of the foregoing, (vi) all licenses for any of the foregoing, and (vii) all causes of action for infringement of the foregoing.

      d.   **"Necessary Endorsement"** shall mean undated stock powers in blank or other proper instruments of assignment duly executed and such other instruments or documents as the Secured Party may reasonably request.

      e.   **"Obligations"** mean (i) all of Borrower's obligations under this Agreement, and (ii) all of Borrower's obligations under the Note, in each case, whether now or hereafter existing, voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from the Secured Party as a preference, fraudulent transfer or

otherwise as such obligations may be amended, supplemented, converted, extended or modified from time to time. Without limiting the generality of the foregoing, the term "Obligations" shall include: (i) principal of the Note and the loan extended pursuant thereto; (ii) any and all other fees, indemnities, costs, obligations and liabilities of Borrower from time to time under or in connection with this Agreement or the Note, and (iii) all amounts (including, but not limited to, post-petition interest) in respect of the foregoing that would be payable but for the fact that the obligations to pay such amounts are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving Borrower.

      f.    "**Organizational Documents**" means with respect to an entity, the documents by which such entity was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such entity (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

      g.    "**Person**" means any individual, corporation, trust, association, company, partnership, joint venture, limited liability company, joint stock company, governmental authority or other entity.

      h.    "**Subsidiary**" means, with respect to any Person, any corporation or other entity of which at least a majority of the outstanding shares of stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors (or Persons performing similar functions) of such corporation or entity (regardless of whether or not at the time, in the case of a corporation, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries.

      i.    "**UCC**" means the Uniform Commercial Code of the State of New York and/or any other applicable law of any state or state which has jurisdiction with respect to all, or any portion of, the Collateral or this Agreement, from time to time. It is the intent of the parties that defined terms in the UCC should be construed in their broadest sense so that the term "Collateral" will be construed in its broadest sense. Accordingly if there are, from time to time, changes to defined terms in the UCC that broaden the definitions, they are incorporated herein and if existing definitions in the UCC are broader than the amended documents, the existing ones shall be controlling.

    2.    <u>Grant of Security Interest</u>. As an inducement for the Secured Party to extend the loan as evidenced by the Note and to secure the complete and timely payment, performance and discharge in full, as the case may be, of all of the Obligations, Borrower hereby unconditionally and irrevocably pledges, grants and hypothecates to the Secured Party a continuing perfected security interest in and to, a lien upon and a right of set-off against all of its right, title and interest of whatsoever kind and nature in and to, the Collateral (the "**Security Interest**).

    3.    <u>Delivery of Certain Collateral</u>. Contemporaneously or prior to the execution of this Agreement, Borrower shall deliver or cause to be delivered to the Secured Party (a) any and all

certificates and other instruments representing or evidencing the Pledged Securities, and (b) any and all certificates and other instruments representing any of the other Collateral, in each case, together will all Necessary Endorsements. Borrower is, contemporaneously with the execution hereof, delivering to the Secured Party, or has previously delivered to the Secured Party, a true and correct copy of each Organizational Document governing any of the Pledged Securities.

4. <u>Representations, Warranties, Covenants and Agreements of Borrower</u>. Borrower represents and warrants to, and covenants and agrees with, the Secured Party, as follows:

a. <u>Good Standing; Due Authorization; Enforceability</u>.

i. Borrower is duly organized and in good standing in the jurisdiction of its formation. Borrower shall at all times preserve and keep in full force and effect its valid existence and good standing and any rights and franchises material to its business.

ii. Borrower has the requisite corporate, partnership, limited liability company or other power and authority to enter into this Agreement and otherwise to carry out their obligations hereunder. The execution, delivery and performance by Borrower of this Agreement and the filings contemplated therein have been duly authorized by all necessary action on the part of Borrower, and no further action is required by Borrower. This Agreement has been duly executed and delivered by Borrower and Receiver.

iii. This Agreement constitutes the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting the rights and remedies of creditors and by general principles of equity.

b. <u>No Conflicts</u>.    The execution, delivery and performance of this Agreement by Borrower does not (i) violate any of the provisions of any Organizational Documents of Borrower or any judgment, decree, order or award of any court, governmental body or arbitrator or any applicable law, rule or regulation applicable to Borrower, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing Borrower's debt or otherwise) or other understanding to which Borrower is a party or by which any property or asset of Borrower is bound or affected. No consent (including, without limitation, from stockholders or creditors of Borrower), except for consent of Receiver, which Receiver has given, as evidenced by the execution of Receiver of this Agreement, is required for Borrower to enter into and perform its obligations hereunder.

c. <u>Information; Validity, Subordination, Perfection and Maintenance of Security Interests</u>.

i. All of the information set forth on Schedule III, including, without limitation, Borrower's name, jurisdiction of organization and location of Collateral, are true, correct and complete in all respects. Borrower shall not change its name, type of organization, jurisdiction of organization, organizational identification number (if it has one), legal or corporate structure, or

identity, or add any new fictitious name unless it provides at least 30 days' prior written notice to the Secured Party of such change and, at the time of such written notification, Borrower provides any financing statements or fixture filings necessary to perfect and continue the Security Interest granted, continued and evidenced by this Agreement.

        ii. This Agreement creates in favor of the Secured Party a valid, security interest in the Collateral, securing the payment and performance of the Obligations. Upon filing of a UCC-1 financing statement, in the form attached hereto as Exhibit A, with the secretary of state's office of the state in which Borrower is organized (the "**Financing Statement**"), and payment of the applicable filing fees, all security interests created hereunder in any Collateral in favor of the Secured Party which may be perfected by filing UCC financing statements shall have been duly perfected. No consent of any third parties and no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for (i) the execution, delivery and performance of this Agreement, (ii) the creation or perfection of the Security Interest created hereunder in the Collateral, or (iii) the enforcement of the rights of the Secured Party hereunder.

        iii. The Security Interest in the Collateral, securing payment and performance of the Obligations is subordinated to that security interest in the Collateral granted to The Huntington National Bank dated October 20, 2009, attached hereto as Exhibit B. Borrower (1) represents that the total indebtedness owed to Huntington National Bank as of the date hereof is $134,427.22, (2) agrees that it will not obtain further loans from, or otherwise incur additional indebtedness owing to, Huntington National Bank or any other party after the date hereof, while the Note remains outstanding, and (3) acknowledges and agrees that subordination of the Secured Party's security interest is conditioned on the foregoing clauses (1) and (2).

        iv. Borrower hereby authorizes the Secured Party to file the Financing Statement any other financing statements under the UCC with respect to the Security Interest with the proper filing and recording agencies in any jurisdiction deemed proper by them. Borrower shall, at Borrower's sole cost and expense, promptly execute and/or deliver to the Secured Party, such further deeds, mortgages, assignments, security agreements, financing statements or other instruments, documents, certificates and assurances and take such further action as the Secured Party may from time to time request and may in their discretion deem necessary to perfect, protect or enforce its Security Interest in the Collateral, including, without limitation, if applicable, the execution and delivery of a separate security agreement with respect to Borrower's Intellectual Property in which the Secured Party has been granted a Security Interest hereunder, substantially in a form reasonably acceptable to the Secured Party.

        v. Borrower shall at all times maintain the liens and Security Interest provided for hereunder as valid liens and security interests in the Collateral in favor of the Secured Party until this Agreement and the Security Interest hereunder shall be terminated pursuant to Section 13.

      d.   <u>Collateral</u>.

        i. Except as set forth on Schedule IV, Borrower is the sole owner of the Collateral (except for non-exclusive licenses granted by Borrower in the ordinary course of business), free and clear of any liens (other than as set forth in Schedule IV), security interests

(other than as set forth in Schedule IV), encumbrances, rights or claims, and is fully authorized to grant the Security Interest. There has been no adverse decision that would materially affect Borrower's claim of ownership rights in or exclusive rights to use the Collateral in any jurisdiction or to Borrower's right to keep and maintain such Collateral in full force and effect, and there is no proceeding involving said rights pending or, to the best knowledge of Borrower, threatened before any court, judicial body, administrative or regulatory agency, arbitrator or other governmental authority that could reasonably be expected to have such material adverse effect.

   ii. Borrower shall keep and preserve its equipment, inventory and other tangible Collateral in good condition, repair and order, ordinary wear and tear excepted. Borrower shall take all steps reasonably necessary to diligently pursue and seek to preserve, enforce and collect any rights, claims, causes of action and accounts receivable in respect of the Collateral.

   iii. Borrower shall at all times maintain its tangible Collateral at the locations set forth under its name on Schedule III and may not relocate such Collateral unless it delivers to the Secured Party at least 30 days prior to such relocation (i) written notice of such relocation and the new location thereof (which must be within the United States) and (ii) evidence that appropriate financing statements under the UCC and other necessary documents have been filed and recorded and other steps have been taken to perfect the Security Interest to create in favor of the Secured Party a valid, perfected and continuing perfected lien in the Collateral. Borrower shall not transfer, pledge, hypothecate, encumber, license, sell or otherwise dispose of any of the Collateral (except for non-exclusive licenses granted by Borrower in its ordinary course of business and sales of inventory by Borrower in its ordinary course of business) without the prior written consent of the Secured Party. Borrower shall not operate or locate any such Collateral (or cause to be operated or located) in any area excluded from insurance coverage.

   iv. Except as set forth on Schedule IV, to Borrower's knowledge there is not on file in any governmental or regulatory authority, agency or recording office an effective financing statement, security agreement, license or transfer or any notice of any of the foregoing (other than those that will be filed in favor of the Secured Party pursuant to this Agreement) covering or affecting any of the Collateral. So long as this Agreement shall be in effect, Borrower shall not execute and shall not knowingly permit to be on file in any such office or agency any such financing statement or other document or instrument (except as set forth on Schedule IV or to the extent filed or recorded in favor of the Secured Party pursuant to the terms of this Agreement).

   v. The capital stock and other equity interests listed on Schedule II represent all of the capital stock and other equity interests of Borrower's Subsidiaries, and represent all capital stock and other equity interests owned, directly or indirectly, by Borrower. All of the Pledged Securities are validly issued, fully paid and non-assessable, and Borrower is the legal and beneficial owner of the Pledged Securities, free and clear of any lien, security interest or other encumbrance except for the security interests created by this Agreement or otherwise set forth on Schedule IV. The ownership and other equity interests in partnerships and limited liability companies (if any) included in the Pledged Securities (the "**Pledged Interests**") by their express terms do not provide that they are securities governed by Article 8 of the UCC and are not held

in a securities account or by any financial intermediary. Borrower shall vote the Pledged Securities to comply with the covenants and agreements set forth herein.

vi. Borrower shall, within ten (10) days of obtaining knowledge thereof, advise the Secured Party, promptly, in sufficient detail, of any substantial change in the Collateral, and of the occurrence of any event which would have a material adverse effect on the value of the Collateral or on the Secured Party' security interest therein. Borrower shall permit the Secured Party and their representatives and agents to inspect the Collateral at any time during normal business hours and to make copies of records pertaining to the Collateral as may be requested by a Secured Party from time to time.

vii. The attached Schedule V contains a complete and accurate list of all material (a) patented or registered Intellectual Property owned or used by Borrower or any Subsidiary, (b) pending patent applications and applications for registrations of other Intellectual Property filed by Borrower or any Subsidiary, and (c) unregistered Intellectual Property Rights owned or used by Borrower or any Subsidiary.

viii. All information heretofore, herein or hereafter supplied to the Secured Party by or on behalf of Borrower with respect to the Collateral is accurate and complete in all material respects as of the date furnished.

e.     Insurance. Borrower shall maintain with financially sound and reputable insurers, insurance with respect to the Collateral against loss or damage of the kinds and in the amounts sufficient to cover the full replacement cost thereof. Upon the written request of the Secured Party, Borrower shall cause each insurance policy issued in connection herewith to provide, and the insurer issuing such policy to certify to the Secured Party, that (a) if such insurance be proposed to be cancelled or materially changed for any reason whatsoever, such insurer will promptly notify the Secured Party, and such cancellation or change shall not be effective for at least thirty (30) days after receipt by the Secured Party, of such notice, unless the effect of such change is to extend or increase coverage under the policy; and (b) the Secured Party will have the right (but no obligation) at its election to remedy any default in the payment of premiums within thirty (30) days of notice from the insurer of such default.

5.     Effect of Pledge on Certain Rights. If any of the Collateral subject to this Agreement consists of nonvoting equity or ownership interests (regardless of class, designation, preference or rights) that may be converted into voting equity or ownership interests upon the occurrence of certain events (including, without limitation, upon the transfer of all or any of the other stock or assets of the issuer), it is agreed that the pledge of such equity or ownership interests pursuant to this Agreement or the enforcement of any of the Secured Party' rights hereunder shall not be deemed to be the type of event which would trigger such conversion rights notwithstanding any provisions in the Organizational Documents or agreements to which Borrower or any of the Collateral is subject or to which Borrower is party.

6.     Duty to Hold in Trust.

a.     Cash and Payment Obligations. Upon the occurrence of an Event of Default and at any time thereafter, Borrower shall, upon receipt of any revenue, income, dividend,

interest or other sums subject to the Security Interest, whether payable pursuant to the Note or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the same in trust for and on behalf of and for the benefit of the Secured Party, and shall forthwith endorse and transfer any such sums or instruments, or both (to the extent permitted by law), to the Secured Party for application to the satisfaction of the Obligations.

b.      <u>Securities and Other Assets</u>. If Borrower shall become entitled to receive or shall receive any securities or other property (including, without limitation, shares of Pledged Securities or instruments representing Pledged Securities acquired after the date hereof, or any options, warrants, rights or other similar property or certificates representing a dividend, or any distribution in connection with any recapitalization, reclassification or increase or reduction of capital, or issued in connection with any reorganization of any of its direct or indirect subsidiaries) in respect of the Pledged Securities (whether as an addition to, in substitution of, or in exchange for, such Pledged Securities or otherwise), Borrower agrees to (i) accept the same as the agent of the Secured Party; and (ii) hold the same in trust on behalf of and for the benefit of the Secured Party.

7.      <u>Rights and Remedies Upon Default</u>.

a.      <u>Scope of Rights and Remedies</u>. Upon the occurrence of any Event of Default and at any time thereafter, the Secured Party, acting through any agent appointed by it for such purpose, shall have the right to exercise all of the remedies conferred hereunder and under the Note, and the Secured Party, shall have all the rights and remedies of a secured party under the UCC. Subject to the provisions of Section 4.c.iii, the Secured Party shall have the following rights and powers:

i.The Secured Party shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and Borrower shall assemble the Collateral and make it available to the Secured Party at places which the Secured Party shall reasonably select, whether at Borrower's premises or elsewhere, and make available to the Secured Party, without rent, all of Borrower's premises and facilities for the purpose of the Secured Party taking possession of, removing or putting the Collateral in saleable or disposable form.

ii.Upon notice to Borrower by the Secured Party, all rights of Borrower to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and all rights of Borrower to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease. Upon such notice, the Secured Party shall have the right to receive any interest, cash dividends or other payments on the Collateral and, at the option of the Secured Party, to exercise in the Secured Party's discretion all voting rights pertaining thereto. Without limiting the generality of the foregoing, the Secured Party shall have the right (but not the obligation) to exercise all rights with respect to the Collateral as if it were the sole and absolute owner thereof, including, without limitation, to vote and/or to exchange, at its sole discretion, any or all of the Collateral in connection with a merger, reorganization, consolidation,

recapitalization or other readjustment concerning or involving the Collateral or Borrower or any of its direct or indirect subsidiaries.

iii. The Secured Party shall have the right to operate the business of Borrower using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Secured Party may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to Borrower or right of redemption of Borrower, which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Secured Party may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of Borrower, which are hereby waived and released.

iv. The Secured Party shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Secured Party and to enforce Borrower's rights against such account debtors and obligors.

v. The Secured Party may (but is not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Secured Party or its designee.

b.    Disposition of Collateral. The Secured Party may comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. Subject to the provisions of Section 4.c.iii, the Secured Party may sell the Collateral without giving any warranties and may specifically disclaim such warranties. If the Secured Party sells any of the Collateral on credit, Borrower will only be credited with payments actually made by the purchaser. In addition, Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights and remedies hereunder, including, subject to the provisions of Section 4.c.iii, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

c.    License to Use Intellectual Property. For the purpose of enabling the Secured Party to further exercise rights and remedies under this section or elsewhere provided by agreement or applicable law, Borrower hereby grants to the Secured Party an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Borrower) to use, license or sublicense, following an Event of Default, any Intellectual Property now owned or hereafter acquired by Borrower, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

8.    Applications of Proceeds. Subject to the provisions of Section 4.c.iii, the proceeds of any such sale, lease or other disposition of the Collateral hereunder shall be applied first, to the

expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, to the reasonable attorneys' fees and expenses incurred by the Secured Party in enforcing their rights hereunder and in connection with collecting, storing and disposing of the Collateral, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which the Secured Party shall pay to Borrower any surplus proceeds. If, upon the sale, license or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Secured Party is legally entitled, Borrower shall be liable for the deficiency, together with interest thereon, at an interest rate equal to the lower of eighteen percent (18%) and the maximum rate permitted by applicable law (the "**Default Rate**"), and the reasonable fees of any attorneys employed by the Secured Party to collect such deficiency. To the extent permitted by applicable law, Borrower waives all claims, damages and demands against the Secured Party arising out of the repossession, removal, retention or sale of the Collateral, unless due solely to the gross negligence or willful misconduct of the Secured Party as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction.

9.     Securities Law Provision. Borrower recognizes that the Secured Party may be limited in its ability to effect a sale to the public of all or part of the Pledged Securities by reason of certain prohibitions in the Securities Act of 1933, as amended, or other federal or state securities laws (collectively, the "**Securities Laws**"), and may be compelled to resort to one or more sales to a restricted group of purchasers who may be required to agree to acquire the Pledged Securities for their own account, for investment and not with a view to the distribution or resale thereof. Borrower agrees that sales so made may be at prices and on terms less favorable than if the Pledged Securities were sold to the public, and that the Secured Party has no obligation to delay the sale of any Pledged Securities for the period of time necessary to register the Pledged Securities for sale to the public under the Securities Laws. Borrower shall cooperate with the Secured Party in its attempt to satisfy any requirements under the Securities Laws (including, without limitation, registration thereunder if requested by the Secured Party) applicable to the sale of the Pledged Securities by the Secured Party.

10.     Costs and Expenses. Borrower agrees to pay all reasonable out-of-pocket fees, costs and expenses incurred in connection with any filing required hereunder, including, without limitation, any financing statements pursuant to the UCC, continuation statements, partial releases and/or termination statements related thereto or any expenses of any searches reasonably required by the Secured Party. Borrower shall also pay all other claims and charges which in the reasonable opinion of the Secured Party might prejudice, imperil or otherwise affect the Collateral or the Security Interest therein. Borrower will also, upon demand, pay to the Secured Party the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Secured Party may incur in connection with (i) the enforcement of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, or (iii) the exercise or enforcement of any of the rights of the Secured Party under the Note or this Agreement. Until so paid, any fees payable hereunder shall be added to the principal amount of the Note and shall bear interest at the Default Rate.

11.    Responsibility for Collateral. Borrower assumes all liabilities and responsibility in connection with all Collateral, and the Obligations shall in no way be affected or diminished by reason of the loss, destruction, damage or theft of any of the Collateral or its unavailability for any reason. The Secured Party agrees to act in accordance with commercially reasonable standards and the UCC. Without limiting the generality of the foregoing, (a) the Secured Party (i) has no duty (either before or after an Event of Default) to collect any amounts in respect of the Collateral or to preserve any rights relating to the Collateral, or (ii) has any obligation to clean-up or otherwise prepare the Collateral for sale, and (b) Borrower shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by Borrower thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of Borrower under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which it may be entitled at any time or times.

12.    Security Interest Absolute. All rights of the Secured Party shall be absolute and unconditional, irrespective of: (a) any lack of validity or enforceability of this Agreement, the Note or any agreement entered into in connection with the foregoing, or any portion hereof or thereof; (b) any change in the time, manner or place of payment or performance of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Note or any other agreement entered into in connection with the foregoing; (c) any exchange, release or nonperfection of any of the Collateral, or any release or amendment or waiver of or consent to departure from any other collateral for, or any guaranty, or any other security, for all or any of the Obligations; (d) any action by the Secured Party to obtain, adjust, settle and cancel in its sole discretion any insurance claims or matters made or arising in connection with the Collateral; or (e) any other circumstance which might otherwise constitute any legal or equitable defense available to Borrower, or a discharge of all or any part of the Security Interest granted hereby. Until the Obligations shall have been paid and performed in full, the rights of the Secured Party shall continue even if the Obligations are barred for any reason, including, without limitation, the running of the statute of limitations or bankruptcy. Borrower expressly waives presentment, protest, notice of protest, demand, notice of nonpayment and demand for performance. In the event that at any time any transfer of any Collateral or any payment received by the Secured Party hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall be deemed to be otherwise due to any party other than the Secured Party, then, in any such event, Borrower's obligations hereunder shall survive cancellation of this Agreement, and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Agreement, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof. Borrower waives all right to require the Secured Party to proceed against any other person or entity or to apply any Collateral which the Secured Party may hold at any time, or to marshal assets, or to pursue any other remedy. Borrower waives any defense arising by reason of the application of the statute of limitations to any obligation secured hereby.

13.   Term of Agreement. This Agreement and the Security Interest shall terminate on the date on which all payments under the Note have been indefeasibly paid in full and all other Obligations have been paid or discharged; provided, however, that all indemnities of Borrower contained in this Agreement shall survive and remain operative and in full force and effect regardless of the termination of this Agreement.

14.   Power of Attorney. Borrower authorizes the Secured Party, and does hereby make, constitute and appoint the Secured Party and its officers, agents, successors or assigns with full power of substitution, as Borrower's true and lawful attorney-in-fact, with power, in the name of the Secured Party or Borrower, to, after the occurrence and during the continuance of an Event of Default, (i) endorse any note, checks, drafts, money orders or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Secured Party; (ii) to sign and endorse any financing statement pursuant to the UCC or any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to the Collateral; (iii) to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (iv) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (v) to transfer any Intellectual Property or provide licenses respecting any Intellectual Property; and (vi) generally, at the option of the Secured Party, and at the expense of Borrower, at any time, or from time to time, to execute and deliver any and all documents and instruments and to do all acts and things which the Secured Party deems necessary to protect, preserve and realize upon the Collateral and the Security Interest granted therein in order to effect the intent of this Agreement and the Note all as fully and effectually as Borrower might or could do; and Borrower hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding. The designation set forth herein shall be deemed to amend and supersede any inconsistent provision in the Organizational Documents or other documents or agreements to which Borrower or any of the Pledged Securities is subject or to which Borrower is a party. Without limiting the generality of the foregoing, after the occurrence and during the continuance of an Event of Default, the Secured Party is specifically authorized to execute and file any applications for or instruments of transfer and assignment of any patents, trademarks, copyrights or other Intellectual Property with the United States Patent and Trademark Office and the United States Copyright Office. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

15.   Other Security. To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, firm, corporation or other entity, then the Secured Party shall have the right, in its sole discretion, to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting the Secured Party's rights and remedies hereunder.

16.   Reserved.

17.   Indemnification. Borrower shall indemnify, reimburse and hold harmless the Secured Party and its partners, members, shareholders, officers, directors, employees and agents (each, an **"Indemnitee"**) from and against any and all losses, claims, liabilities, damages, penalties, suits, costs and expenses, of any kind or nature, (including fees relating to the cost of investigating and defending any of the foregoing) imposed on, incurred by or asserted against such Indemnitee in any way related to or arising from or alleged to arise from this Agreement or the Collateral, except any such losses, claims, liabilities, damages, penalties, suits, costs and expenses which result from the gross negligence or willful misconduct of the Indemnitee as determined by a final, nonappealable decision of a court of competent jurisdiction.

18.   Miscellaneous.

a.      Severability. In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; *provided* that in such case the parties shall negotiate in good faith to replace such provision with a new provision which is not illegal, unenforceable or void, as long as such new provision does not materially change the economic benefits of this Agreement to the parties.

b.      Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. The Secured Party may assign its rights hereunder in connection with any private sale or transfer of the Note, in which case the term "Secured Party" shall be deemed to refer to such transferee as though such transferee were an original signatory hereto. Borrower may not assign its rights or obligations under this Agreement.

c.      Injunctive Relief. Borrower acknowledges and agrees that a breach by it of its obligations hereunder will cause irreparable harm to the Secured Party and that the remedy or remedies at law for any such breach will be inadequate and agree, in the event of any such breach, in addition to all other available remedies, the Secured Party shall be entitled to an injunction restraining any breach and requiring immediate and specific performance of such obligations without the necessity of showing economic loss or the posting of any bond.

d.      Governing Law; Jurisdiction. This Agreement shall be governed by and construed under the laws of the State of New York applicable to contracts made and to be performed entirely within the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York and County of New York for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under

this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

e.  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile transmission.

f.  Headings. The headings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

g.  Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to Borrower:

MESOCOAT INC.
24112 Rockwell Drive
Euclid, Ohio 44117
Attn:
Facsimile: (216) 404-0054
E-mail:

If to the Holder:

GEORGE TOWN ASSOCIATES S.A.
Samuel Lewis Ave. & 53rd Street
Omega Building Mezanine
Panama, Republic of Panama
Attn: Engelbert Schreiber

With a copy to:

Robins Kaplan LLP
601 Lexington Avenue, Suite 3400

New York, NY 10022
Attn: Craig Weiner, Esq.
Facsimile: 212-980-7499
E-mail: cweiner@robinskaplan.com

(or, in the case of a successor to a Secured Party in connection with a valid transfer of the Note, the address of such successor designated in a notice given to Borrower and signed by the original secured party and such successor), or as shall be designated by such party (or successor) in writing to the other parties hereto in accordance with this Section 18.g.

h.    Entire Agreement; Amendments. This Agreement constitutes the entire agreement between the parties with regard to the subject matter hereof and thereof, superseding all prior agreements or understandings, whether written or oral, between or among the parties. No (i) amendment to this Agreement or (ii) waiver of any agreement or other obligation of Borrower under this Agreement may be made or given except pursuant to a written instrument executed by Borrower and the Secured Party. Any waiver given pursuant hereto shall be effective only in the specific instance and for the specific purpose for which given.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed on the day and year first above written.

**BORROWER:**                                    **SECURED PARTY:**

**MESOCOAT INC.**                                **GEORGETOWN ASSOCIATES S.A.**


By: _____                       By:_____
      Name: Robert Seiden                            Name: Engelbert Schreiber
      Its: Court-appointed Receiver                 Its: Director

Exhibit A

UCC-1 Financing Statement

Exhibit B

The Huntington National Bank Commercial Security Agreement
Attached

Schedule I

## COLLATERAL DEFINITION EXCEPTION

The following assets and property of Borrower are not included in the definition of Collateral in which the Secured Party has been granted a Security Interest as described in this Agreement.

All of the Project Equipment, as defined in the Loan Agreement dated as of July 20, 2012 (the "Loan Agreement") between the Director of Development of the State of Ohio and MesoCoat, Inc., acquired with the proceeds of the R&D Loan (as defined in the Loan Agreement) including without limitation the following (as such list may be supplemented or amended from time to time):

- One CermaClad™ system and automated pipe blasting equipment used for high speed metal cladding, as described more fully below:

  A system purchased from Mattson Technology consisting of an arc lamp, an automated blasting system, power supply, and a pipe manipulation system for the application of corrosion resistant coatings to pipe. The blasting system removes mill scale from the pipe before treatment. The system includes a "stinger" 2-D 80 foot robot which controls the fusion process, a robot that applies slurry to the pipe, a robot that holds the inspection tools and a pipe handling system.

Schedule II

## PLEDGED SECURITIES

| Issuer | Shares/Interests Pledged |
|---|---|
| MesoCoat Coating Services, Inc. | 100% |
| PT MesoCoat Indonesia | 100% |

Schedule III

## BORROWER INFORMATION

Name of Borrower:                                        MesoCoat Inc.

Jurisdiction of Organization:                           Nevada

Organizational Identification Number:                   EIN 20-8924902

Trade names and other names used by                     MesoCoat
Borrower during the past five years:

Each location where Collateral or Borrower's             24112 Rockwell Drive,
books of account and records are located:                Euclid, Ohio 44117

Name and location of each consignee, bailee,             None
warehouseman, agent or processor in
possession of any Collateral owned by Borrower:

Schedule IV

## EXISTING LIENS AND ENCUMBRANCES

| Lienholder | Type of Lien | Amount of Debt |
|---|---|---|
| 1. The Director of Development of the State of Ohio | Loan | $1,000,000.00 |
| 2. The Huntington National Bank | Loan | $134,427.22 |
| 3. County of Cuyahoga, Ohio | Loan | $40,819.54 |
| 4. George Town Associates S.A. | Loan | $1,770,932.03 |

Schedule V

## INTELLECTUAL PROPERTY

| | Title | Patent Number | Assignee | Licensed to | Current IP Status | MesoCoat IP Rights |
|---|---|---|---|---|---|---|
| 1. | Rapid infrared heating of a surface | 6174388 B1 | Lockheed Martin Energy Research Corp. U I Battelle LLC, Oak Ridge, IN | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 2. | Abrasive particles with metallurgically bonded metal coatings | 6540800 B2 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 3. | Method of producing fine coated tungsten carbide particles | 6641918 B1 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 4. | Combined liquid phase and activated sintering of refractory metals | 7041250 B2 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 5. | Pulse thermal processing of functional materials using directed plasma arc | 7220936 B2 | UT-Battelle, LLC, Oak Ridge, TN | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 6. | Powder friction forming | 7560067 B2 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 7. | Heterogeneous composite bodies with isolated lenticular shaped cermet regions | 7635515 B1 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 8. | Heterogeneous composite bodies with isolated lenticular shaped cermet regions | 7681622 B2 | Powdermer Inc. | MesoCoat, Inc. | Issued patent | Exclusive rights |
| 9. | Coatings, Composition and method related to non-spalling low density hardface coatings | US2010/020325 5A1 | MesoCoat, Inc. | N/A | Filed Full US Patent | Owned |
| 10. | Coatings, Composition and method related to non-spalling low density hardface coatings | N/A | MesoCoat, Inc. | N/A | Filed PCT Patent Application | Owned |
| 11. | Article and method of manufacturing | N/A | MesoCoat, Inc. | N/A | Filed PCT Patent | Owned |

| | | | | | | |
|---|---|---|---|---|---|---|
| | related to nanocomposite overlays | | | | Applicatio n | |
| 12. | Article and method of manufacturing related to nanocomposite overlays | US2010/029743 2A1 | MesoCoat, Inc. | N/A | Filed Full US Patent | Owned |
| 13. | Method and Apparatus for forming clad metal products | 61/451,114 | MesoCoat, Inc. | N/A | Filed Provisional Patent Applicatio n | Owned |
| 14. | Thin Metal Coatings | | MesoCoat, Inc. | N/A | Applied for a Provision Patent | Owned |
| 15. | Ternary Ceramic Thermal Spraying Powder and Method of manufacturing Thermal Sprayed Coating Using Said Powder | 61/798,032 | MesoCoat, Inc. | N/A | Filed Provisional Patent | Owned |