FCG6GEOH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GEORGE TOWN ASSOCIATES S.A.,

                    Plaintiff,

          v.                              15 CV 3435(DLC)

ABAKAN, INC., and MESOCOAT,
INC.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          December 16, 2015
                                          3:30 p.m.

Before:

                    HON. DENISE L. COTE,

                                          District Judge

                         APPEARANCES

GOETZ FITZPATRICK, LLP
     Attorney for Plaintiff
BY:  DOUGLAS A. GROSS

LEWIS BAACH, PLLC
     Attorneys for Receiver Robert W. Seiden
BY:  DAVID GUERRERO LISTON
     ALEX PATCHEN

LINDA LEALI, P.A.
     Attorney for Objector

FCG6GEOH

```
 1                  (Case called; in open court)

 2                  THE DEPUTY CLERK:  George Town associates v. Abakan,

 3     Inc., others.

 4                  Counsel for the plaintiff, please state your name for

 5     the record.

 6                  MR. GROSS:  Good afternoon, your Honor.  Douglas Gross

 7     of Goetz Fitzpatrick for plaintiff, George Town Associates.

 8                  THE COURT:  We have the receiver with us today, I

 9     believe, Mr. Seiden?

10                  MR. SEIDEN:  Yes, your Honor.  Good afternoon.

11                  THE COURT:  Good afternoon.

12                  Counsel for the receiver?

13                  MR. LISTON:  Good afternoon, your Honor.  Happy to be

14     here.  David Liston on behalf of the receiver and also Alex

15     Patchen from my firm as well.

16                  THE COURT:  Thank you.  I see others in the courtroom.

17     I am glad we have others with us.

18                  I believe we have one objector, Ms. Leali.  Are you

19     present in the courtroom as well, Ms. Leali?

20                  MS. LEALI:  Yes, your Honor.  I have a pending motion

21     for a pro hac vice that was filed yesterday.  Unfortunately it

22     was booted back this morning because of a certificate of good

23     standing was not the correct certificate, your Honor.

24                  THE COURT:  So I am happy to accept your appearance

25     pro hac vice for today's matter, but I would ask you to correct
```

FCG6GEOH

1    the paperwork you filed with the Clerk's Office so it can be

2    formerly accepted by them as well.

3              MS. LEALI:  Yes, your Honor.

4              THE COURT:  Thank you so much.

5              MS. LEALI:  Thank you.

6              THE COURT:  We're here for a hearing on an application

7    by the receiver and I have been presented with documents, a

8    satisfaction and assignment agreement of December 16 that

9    corrects or amends one submitted to me of December 9th.  I have

10   also received a proposed order granting the motion for the

11   termination of the receiverships upon approval of satisfaction

12   of debt.

13             We have many things to discuss, but I will start by

14   hearing from you, Mr. Gross.

15             MR. GROSS:  Thank you, your Honor.  We're here today

16   because we have now resolved all objections of objecting

17   creditors.  The reason that the proposed transaction changed

18   yesterday is because of that settlement agreement.  There are

19   no objectors to this proposed agreement.

20             THE COURT:  Do you want to describe to me what

21   happened with respect to the four Mesocoat petitioning

22   creditors whose claims totaled close to $42,000?

23             MR. GROSS:  Yes.  I was planning to read into the

24   record that part of the settlement.  If your Honor will allow

25   me, I will read those provisions into the record as part of the

1    settlement.

2              THE COURT:  Are you reading from a document I have?

3              MR. GROSS:  No.  It is e-mail of settlement

4    negotiations.  It was not incorporated in the final agreement,

5    but it was incorporated in an e-mail exchange but I wanted to

6    read it into the record today.

7              1:  Mesocoat petitioning creditors get paid in full

8    the $41,920 by Mesocoat within 14 days subsequent to approval

9    by your Honor of the transaction and full closing of the

10   transaction.

11             There is one caveat that I would like to read in.

12   "George Town, Sonoro, Avakan and Mesocoat agree not to pursue

13   claims before Judge Cristol against the petitioned creditors

14   and their counsel, Linda Leali, Esquire, under Section 303 of

15   the Bankruptcy Code.  Petitioning creditors will not get a

16   release from anyone."

17             "Also, in the event that the" --

18             THE COURT:  I am sorry.  The petitioning creditors,

19   these are the four Mesocoat creditors, or how is that term

20   defined in the agreement you are reading to me?  Does it

21   include the Abakan creditors as well?

22             MR. GROSS:  I believe it includes all the creditors.

23             THE COURT:  So it is the 10 creditors, six from Abakan

24   and four from Mesocoat?

25             MR. GROSS:  Yes.

FCG6GEOH

1          THE COURT:  What is that portion of the agreement?

2     The release, interrupted you as you were reading another

3     provision.

4          MR. GROSS:  Yes.  Let me must continue.

5          "Also, in the event that petitioning creditors

6     participate in another involuntary bankruptcy as against Abakan

7     and/or Mesocoat and George Town, Sonoro, Abakan, Mesocoat's

8     obligation to not pursue the petitioning creditors and/or their

9     counsel, Linda Leali, Esquire, under Section 303 of the

10    Bankruptcy Code shall be extinguished and all moneys and equity

11    received pursuant to the transaction shall be forfeited and

12    remitted to George Town."

13         THE COURT:  So I think you were reading to me just a

14    moment ago when I interrupted and tried to figure out who you

15    were referring to something about a release.

16         MR. GROSS:  Yes.  The petitioning creditors will not

17    get a general release from anyone.  So that is all 10.

18         THE COURT:  Okay.

19         MR. GROSS:  This settlement agreement is in the best

20    interest of all parties.  It exchanges $6.3 million in debt for

21    77.5 percent ownership in Mesocoat.  It leads Mesocoat subject

22    to approximately $2 million of debt, which will have to be paid

23    in the ordinary course of business.  So it is effectively an $8

24    million deal.  The value of the equity as found by the expert

25    hired by the receiver is 3.5 million so that the debt that is

FCG6GEOH

1   being wiped out and converted to equity exceeds the value of

2   the equity in Mesocoat now.

3           The alternative to this would be a UCC foreclosure in

4   which as a practical matter George Town would bid in its debt.

5   No one has come along to bid over that.  All the expressions of

6   interest have disappeared.  This is the only offer that is out

7   there.  If George Town determines to sell off the assets of

8   Mesocoat, it is not a going concern, it doesn't stay in

9   business and it is harmful to the creditors and Mesocoat and

10  harmful to both the shareholders and to the creditors of

11  Avakan.

12          By this transaction, Abakan will retain the

13  22.5 percent interest in Mesocoat.  It retains its interest in

14  PowderNet, which we believe is a lot more value than they

15  suggested when most of it was sold at a distressed price this

16  summer.

17          THE COURT:  I am not sure that is part of the record,

18  that is, the PowderNet sale at distressed prices this summer.

19          MR. GROSS:  I don't know that it was established.  You

20  are correct, your Honor, we did talk about that in the scope of

21  the contempt proceeding where they sold contrary to the Court's

22  order.  It was not in the ordinary course of business.

23          THE COURT:  I remember the PowderNet transaction,

24  which was one of the circumstances which led to the imposition

25  of a receiver over Abakan, I believe.

FCG6GEOH

1          MR. GROSS:  Right.

2          THE COURT:  You are referring to it as a sale of

3    assets at a distressed price.  Are you referring to something

4    else?

5          MR. GROSS:  No.  I am referring to that, your Honor.

6    It is 3.6 percent interest in PowderNet retained by Abakan.  So

7    I am going over what Abakan will have after this transaction

8    goes through.  If your Honor wants me to, I can call a witness

9    to testify as to what the value of that 3.6 percent is.  Plus

10   they retain this 22 and a half percent interest in Mesocoat.

11   Now, Mesocoat now has entities who are essentially investing in

12   it and want to keep it as a going concern as a practical matter

13   will have to put more money in.  As you know George Town has

14   already put in $500.  To get this company going, more money

15   will have to go in.  So Abakan will have the advantage of

16   having a going concern as opposed to a piecemeal sale of the

17   assets of Mesocoat.  That is why we believe it is in the

18   interest of everyone for this deal to go forward.

19         THE COURT:  Now, there was a submission to me

20   indicating that George Town was going to invest in another $1

21   million in Mesocoat.  Did that happen already?

22         MR. GROSS:  No.  That is in contemplation.  I think as

23   a practical matter, I don't see how this company can survive as

24   a going concern or any reason for George Town to trade debt for

25   equity unless it is prepared to put more money in.  It was not

FCG6GEOH

```
1    just George Town.  It was the other entities or individuals who
2    were also converting their debt to equity.  There has been no
3    firm deal yet, no, your Honor.
4            THE COURT:  Just so the record is clear, you don't
5    mean everyone who is converting debt to equity, for instance
6    the Abakan creditors?
7            MR. GROSS:  Correct.
8            THE COURT:  You probably mean George Town, Sonoro and
9    Mr. Eberhard?
10           MR. GROSS:  Yes, that is to whom I am referring.
11           We're prepared today to establish the fairness of the
12   transaction.  The appraiser here hired by the receiver had
13   nothing to do with George Town.  We can establish what the
14   value of assets are left for Abakan if your Honor so desires.
15   We have the receiver here to testify about the process that led
16   to this.
17           THE COURT:  Okay.
18           MR. GROSS:  We're hopeful this is a final resolution
19   of the matter and Mesocoat will continue in business and this
20   case will be over.
21           THE COURT:  Thank you very much, Mr. Gross.  I
22   appreciate that.
23           So perhaps it would be helpful to place this in
24   context.  I had a November 3rd memorandum in support of the
25   termination of the receiverships upon approval of satisfaction
```

FCG6GEOH

of debt.  A schedule was set for opposition to that application
for this hearing.  I only received one submission in opposition
to the application, and that was Ms. Leali's submission of
December 7th.  There was a flurry of letters that followed the
December 7th filing.  I believe everything has been docketed on
ECF so I will not go through that in detail now.  Then I have
the reply memorandum from George Town of December 11th.  In
addition, I have the revised satisfaction and assignment
agreement to which I already made reference, which is dated
December 15th.  It left open one group of creditors, that is
the satisfaction and assignment agreement of December 15th,
left open the claims by the four Mesocoat creditors and we now
understand based on Mr. Gross's description on the record that
there has been a settlement reached for those four creditors.

      And, Ms. Leali, thank you for being here.  Did
Mr. Gross correctly recite the terms of that settlement
agreement for those four creditors?

      MS. LEALI:  Yes, your Honor, but may I add just an
additional clarity with respect to that?

      Your Honor, if I may also -- well, let add the clarity
and then I will add my other point.

      The four Mesocoat petitioning creditors are in the
amounts that they are owed are Mark Baumgarten, Management
Consulting, LLC, and that firm is owed the amount of $2,367.83.

      THE COURT:  Is this all as described at pages 8 and 9

FCG6GEOH

1    of your brief?

2            MS. LEALI:  Yes, your Honor.

3            THE COURT:  We can just incorporate that by reference

4    then.  It should be on ECF so it is part of the record in this

5    case.

6            MS. LEALI:  Thank you, your Honor.

7            The other additional point I would like to say is that

8    we're withdrawing our objection and in fact specifically

9    endorsing and supporting the transaction as it has been

10   outlined today primarily based upon the immaterial improvements

11   that have been described to this Court.

12           THE COURT:  Thank you very much, Ms. Leali.

13           In setting out the framework here, I want to make a

14   couple of overarching points because I think it is important to

15   know why I am sitting in judgment on any of this and it is

16   because of a series of documents that Abakan executed, which

17   included a security agreement, that gave George Town access

18   should there be a default in ways I have described in my

19   summary judgment opinion in this matter essentially to all of

20   Mesocoat.  As these events have unfolded, we have learned over

21   the ensuing months that Abakan never paid the debt it owed to

22   George Town and if it had, which was roughly $1.8 million, then

23   this entire proceeding would have been over.  The fact that

24   there was no investor who stepped forward to make that payment

25   of $1.8 million, and it's less than that, 1.770932, is some

FCG6GEOH

1    evidence in my mind that this is perhaps a promising company no

2    independent investor has enough confidence in its future to

3    make an investment of that size.

4             So months have gone on here.  Receivers were appointed

5    first for Mesocoat and then also for Abakan because of Abakan's

6    contemptuous conduct.  During this time, notice has been

7    widespread with respect to these events.  The receiver filed an

8    8-K.  I filed scheduling orders on the public docket.  And as

9    time came close for any objections to the proposed transaction,

10   lawyers representing the board of directors for Abakan

11   withdrew.  They had an absolute right to object to this

12   proposed agreement and they did not.  I have bent over

13   backwards to allow appearance of counsel through the pro hac

14   vice mechanism so that every interested voice could be heard

15   even when there was an objection to Ms. Leali's presence on

16   this docket in this matter.  I have accepted her submissions

17   and considered them and was prepared to ask questions and rule

18   with respect to them if my questions were sufficiently answered

19   and therefore to address the issues on the merits.  As we heard

20   those issues have been settled and resolved.

21            So we have a substantial passage of time with no

22   investors satisfying George Town's debt; no valuation

23   presented, even though I asked for one to present an

24   alternative valuation that receiver receives at the end of

25   August; no objections to this proposal to satisfy the debt and

FCG6GEOH

1   redistribute in essence Mesocoat stock other than that filed by

2   Ms. Leali, which has now been retracted.

3           I think, again just looking at this from the big

4   picture point of view and as far as I understand it, this

5   proposal will permit Mesocoat to continue as opposed to having

6   a foreclosure sale.  It reduces the debt owed to Abakan's

7   significantly and it enforces in a way Abakan's contract.  The

8   agreements that Abakan negotiated and executed and the promises

9   it made in its contractual arrangements with George Town, those

10  I am intimately familiar with; but I think if it were

11  necessary, we could explore the way in which there were similar

12  commitments made by Abakan that are now reflected in a judgment

13  held by the Sonoro parties and perhaps the same could be true

14  of Mr. Eberhard.  I just don't have the knowledge presented on

15  this record to comment in detail on that.

16          The open issues that appeared to me as I entered this

17  proceeding first and foremost were the complaints by the four

18  Mesocoat creditors.  I must say that the Mesocoat creditors are

19  each described in Ms. Leali's submission as people who provided

20  specific services for which they could and would in the normal

21  course expect repayment -- engineering services, computer

22  services, repair services, services to get building permits.

23  These are the kinds of debts accumulated in the ordinary course

24  of business that should be paid.  I understand arrangements

25  have been made to do so.

1    This is a different set of debts than those described

2  for the six unsecured creditors from Abakan.  In connection

3  with those six debts, the Abakan debts, there is a much more

4  general description of what they did.  One provided some

5  translation and business development services.  One is a

6  website designer.  By and large it looked like -- again,

7  because of the settlement hearing, I don't have to get into any

8  detail about this -- that some of these six may be in essence

9  investors who hope to get some benefit from working with Abakan

10 and on its behalf.  In any event, their claims have been

11 addressed, too.

12    I want to go through the objections presented on

13 December 7th and make sure we have a sufficient record with

14 respect to those.  For some of this I think I am going to rely

15 on you, Mr. Seiden, to give me your testimony.  You don't need

16 to come up, but I am going to place you under oath.

17    Ms. Rojas, if you could administer the oath to

18 Mr. Seiden where he is.

19    THE DEPUTY CLERK:  Please raise your right hand.

20  FCG6GEOH,

21    called as a witness by the Court,

22    having been duly sworn, testified as follows:

23 DIRECT EXAMINATION

24    THE COURT:  So, Mr. Seiden, what did you do to solicit

25 competing offers in connection with this transaction?

1      MR. SEIDEN:  Well, thank you, Judge.

2           Myself and my staff had engaged in a elaborate effort

3  to disseminate information to the public.  We issued press

4  released.  As your Honor indicated we also issued 8-Ks.  We

5  filed four 8-Ks with the SEC.  We were also receiving

6  unsolicited phone calls and e-mails from several individuals

7  who expressed interest.

8           I personally met with some of these people.  I also

9  engaged in conversations directly and through counsel with

10  these individuals.  Two of the companies were in China; one of

11  the companies was in Humble, Texas; and another company is

12  represented by a law firm Wilson Sonsini here in New York.  All

13  these entities I have been speaking with.  Most of them signed

14  nondisclosure agreements and we shared a lot of documents with

15  them, including financial statements that are current.  We also

16  allowed one of them to go on site to do physical due diligence

17  at the facilities in Ohio where the individual at that company

18  met with the key management staff, including the CEO, chief

19  technology officer and visited the facilities and plant and

20  observe the technology as well as meeting with the chief

21  financial officer.

22           This all occurred over the past two months

23  approximately.  Most of it compressed in the last 30 days I

24  would say.  Several of them as a result of that provided me

25  with written formal offers and these include company Liquid

FCG6GEOH                          Seiden - direct

1   Metal Coatings Company from Texas as well as a company from

2   China called Hengda, and another company called U.P. Sentech.

3   Two of them were physically presented to me with formal offers

4   and we had negotiated over the last 30 days and both of them

5   determined that they would not make a formal offer that had no

6   conditions attached to it.

7            The issue that I had been negotiating with them was

8   that they all wanted conditions that they would take several

9   months to try and meet the conditions based on sales, figures

10  being hit, things of that nature, and I advised them that the

11  company could not afford several more months without diffusion

12  of capital.  During the course of it, they determined that they

13  did not want to formally continue with a negotiation or to

14  formally make a bid and they withdrew their offers.  So that

15  despite our efforts to try to get the formal offers in front of

16  your Honor, that was not forthcoming from any of these.

17           The only offer that had come forward was the offer

18  from George Town that had essentially been revised over time.

19  The initial offer they made was subsequently augmented and

20  based on the objections from different parties that had been

21  interested in this matter, I asked my office and we used our

22  goodwill as receiver to speak with all the parties and try to

23  create an atmosphere of harmony to coalesce and do an agreement

24  that can be consensually presented to your Honor.  This was

25  worked on with great urgency in the last two weeks and I want

FCG6GEOH                         Seiden - direct

1    on the thank on record the counsel for Ms. Leali, and the

2    counsel for George Town, Mr. Greg Weiner who is here today, and

3    other attorneys including Jaffrey Aaronson in Florida, and my

4    counsel David listen, who were instrumental in enabling what I

5    would consider an outstanding conclusion to this extremely

6    difficult matter to come to a conclusion.

7                I hope have I answered your question.

8                THE COURT:  You did.  Thank you.

9                Based on this record I am prepared to find that the

10   receiver cooperated with other investors who were considering

11   making competing bids, shared information about the company so

12   that they could evaluate the merits of such a decision and

13   ultimately decided that no formal competing bid would be

14   presented either to the receiver or to me.

15               The next complaint that Ms. Leali made was that there

16   is only one appraisal here, that there are valuable patents --

17   again, I am summarizing her point -- and the appraiser who

18   looked at those patents and intellectual property was not

19   really competent to value that technology and I shouldn't rely

20   on that single appraisal in rendering a fairness opinion here.

21   Again, I think the market has spoken.  There was an opportunity

22   to submit competing appraisals; no one did.  There was an

23   opportunity to submit competing bids; no one did.  I don't find

24   that the appraisal that was submitted to me in August therefore

25   is unreliable for the reasons identified in the objection.

1          The next objection was that the original proposal

2     ignored the interest of various U.S. agencies.  Of course there

3     is no submission by any U.S. agency with respect to the merits

4     of this transaction, and I would ask you again, Mr. Seiden, is

5     there anything you know about the U.S. government's interest in

6     any of the business of Abakan or Mesocoat that should give me

7     pause here in reviewing the merits of the transaction?

8          MR. SEIDEN:  No, your Honor.  There are some

9     government contracts that Mesocoat does have, including one

10    with the Department of Energy and one with the State of Ohio

11    and one with Alberta, Canada, all of which we have been in

12    communication with them and they are aware what is going on and

13    we have heard no complaints or issues, other than the State of

14    Ohio, which has been asking for payment which we have been

15    working out with them, a payment schedule.

16         THE COURT:  Thank you.  Of course I have received the

17    Ohio DSA e-mail forwarded to me by one of the parties and I

18    have no reason to believe that their security and interest in

19    certain equipment is not protected by this transaction.

20    Therefore, I don't think that presents a problem.

21         The next objection had to do with the 10 creditors,

22    six from Abakan and four from Mesocoat.  That has been

23    addressed.

24         The next objection had to do with the fact that this

25    isn't a bankruptcy proceeding and the bankruptcy process is a

1    better forum for addressing these issues.  I think if I

2    understand the objection, and I know Ms. Leali is no longer

3    pressing it, but I want to take it on the merits anyway.  My

4    job independently is to think hard about these issues.  I think

5    the only open issue for me is notice and I am going to give

6    Mr. Seiden again a chance to tell me what he has done to make

7    sure that everyone had adequate notice here besides anything he

8    has mentioned in the past.

9            What we had is a request by the parties for me to

10   approve a transaction which was really not contemplated by the

11   security agreement entered into between George Town and Abakan.

12   Under that agreement, George Town would have had the right to

13   proceed to foreclosure.  Instead they stayed their hand.  We

14   have had many court proceedings and we have had lots of notice.

15   We have had lots of opportunity for folks to be heard.  Now

16   we're at a hearing to review the merits of a proposed

17   transaction.  So it is a little bit of a false comparison to

18   say that this court process should be compared to a bankruptcy

19   process.  Really one other comparison that could have been made

20   here is a foreclosure process versus a bankruptcy process.  Of

21   course the process we have had here has allowed lots of notice

22   over many months with opportunity for every significant

23   player -- shareholder, board, creditor -- to be heard, a formal

24   schedule for objections and then today's hearing.  So while I

25   appreciate that the bankruptcy courts are an important arm of

1    the federal judicial system, in the unique circumstances we're

2    faced with here, I don't see there is any impediment for my

3    proceeding despite the fact that theoretically this could have

4    become a bankruptcy proceeding.  I know in Florida that appears

5    to be over, but I don't want to tread on the Florida bankruptcy

6    proceeding right now.

7              So let's go to notice.

8              So, Mr. Seiden, we know the four 8-Ks were filed.

9    Obviously I filed some orders scheduling opportunity for

10   parties to be heard even when they have no horrible appearance

11   through this Court.

12             What else did you do to give notice to interested

13   parties?

14             MR. SEIDEN:  Yes, your Honor.  As I mentioned we had

15   disseminated four 8-Ks through the public filing system.  We

16   also did several press releases, which went over all the news

17   wires, including the business news wires, at not an

18   insignificant expense as you can imagine.  As the Mesocoat

19   level, my staff and management of Mesocoat called every single

20   creditor, including some of the creditors -- I think all the

21   creditors in fact that were petitioning creditors, and that was

22   over the last 30 days.  There were calls as well that we

23   received and that we responded to from Abakan vendors as well,

24   including of of the significant creditors, which was the

25   accounting firm that I had been in communication with

1    throughout that is owed a significant amount of money.  There

2    were so many creditors that we relied more on the press release

3    and other court filings as well since we were not able to reach

4    all of them.

5              THE COURT:  You have confidence you reached all of the

6    Mesocoat creditors?

7              MR. SEIDEN:  Yes, 100 percent.

8              THE COURT:  So let's talk about the merits.  I think

9    that is the last set of objections presented in the December

10   7th filing.  A lot of those objections to the merits of the

11   satisfaction transaction are now moot because of amendments.

12   There was an objection to the transfer of 100 percent of the

13   stock.  That has been revised as the documents explain.  There

14   was an objection because certain creditors should be treated in

15   a way that was equivalent to the way the transaction treated

16   Sonoro.  I think through the amendments that objection has also

17   been mooted.  There was a question about the transaction being

18   silent as to remaining Mesocoat assets.  I am not sure that I

19   understood that objection.  I think it is fair to say that I

20   didn't understand that objection, but I think that is also

21   resolved by the amendment.

22             Mr. Gross, do you want to address that?

23             MR. GROSS:  I am sorry.  Which objection, your Honor?

24             THE COURT:  Page 16 of the December 7th objection,

25   paragraph 32 indicates that the satisfaction transaction is

FCG6GEOH                          Seiden - direct

silent as to what happens to the assets of Mesocoat, which the

receiver is holding in trust for George Town's benefit.  The

question that is asked in the December 7th filing is whether

those assets are remaining with Mesocoat or are being released

to George Town.

          I take it they are remaining with Mesocoat?

          MR. GROSS:  Yes.  The transaction is the division of

the shares in Mesocoat.  It is not going to George Town.  It is

fairly clear on the face of the settlement agreement.

          THE COURT:  Thank you.

          Ms. Leali, I know you have withdrawn your objections,

but I just wondered if you could help me.  Have I addressed

each of the objections that you raised or has the record today

addressed each of them?

          MS. LEALI:  Yes, your Honor.

          THE COURT:  Thank you.

          I had wanted to ask a series of questions about

Mr. Eberhard's participation in this transaction; but now that

a wide range of creditors are participating, I don't think it

is necessary for me to explore this separate treatment of

Mr. Eberhard about whose debt I know the least.

          Does anyone believe I need to inquire into that

particular debt and the transaction with respect to the

satisfaction of that debt?

          MR. GROSS:  No, your Honor.

1          THE COURT:  So let's talk about a proposal given to me

2     today.  I am sorry.  Before I do that I have a couple questions

3     about the satisfaction and assignment agreement.

4          Turning to page 3, one question concerns paragraph 3,

5     which goes from the bottom of page 2 to the top of page 3.  It

6     is the question about the breadth of the release.

7          Maybe this is a question for you, Mr. Seiden.  I will

8     let you remain at the table in which you are located because

9     your counsel are next to you.  So that if at any time you wish

10    to consult with counsel before answering the question, please

11    feel free.

12          MR. SEIDEN:  Thank you.

13          THE COURT:  So as I read paragraph 3, Abakan is

14    releasing George Town, Sonoro, Eberhard and those associated

15    with him as described there for from all demands, claims,

16    liabilities, debts, etc., that accrue before or after the

17    effective date that Abakan may have against the releasees.  I

18    am not sure why I should release things that might accrue after

19    the effective date.  Have any claims been identified so far so

20    that I know precisely what is being released insofar as it has

21    been shared with the receiver or anyone?

22          MR. SEIDEN:  No, your Honor.  As receiver for Abakan,

23    I am aware of no claims.  As a receiver for Mesocoat, we're

24    aware of no claim.  The language as described, maybe counsel

25    for George Town would like to address whether it is overbroad

1   in terms of future conduct if that relates to things that

2   occurred before the effective date.  I cannot speak to that.

3   We're not aware of any claims that would trigger this

4   provision.

5            THE COURT:  Mr. Gross.

6            MR. GROSS:  Yes, your Honor.  I am not aware of any

7   claims and I consent to say "before the effective date" without

8   saying "after."

9            THE COURT:  I will say before or on the effective

10  date.  So the word "after" will be replaced by the word "on."

11           My next question has to do with paragraph 6,

12  PowderNet.  So, Mr. Seiden, Abakan is agreeing that all cash

13  installment payments it is entitled to receive from PowderNet

14  on or after the effective date shall be made to Mesocoat.  This

15  term appears to consider that rerouting of payments to be in

16  perpetuity.

17           MR. SEIDEN:  The only payment, your Honor, that we are

18  aware of based on the conversations with the CFO Mesocoat, who

19  also happens to be the CFO of PowderNet, is that there is one

20  more payment due of $150,000 on or before December 22nd of this

21  year.  We're not aware of any other payment that is owed or

22  due.

23           We may need a word from Mr. Gross.

24           THE COURT:  Mr. Gross.

25           MR. GROSS:  Your Honor, that is only for the existing

FCG6GEOH                          Seiden - direct

1    agreement.  We could add that the 3.6 percent of PowderNet that

2    remains owed by Abakan should not be deemed included.  This

3    only deals with the entire sell, not the 3.6 percent that

4    continues to be held by Abakan or PowderNet.

5                THE COURT:  I don't actually understand everything you

6    just said to me, Mr. Gross.  That's just fine, but I will need

7    it explained.  It sounds like I am going to get a revised

8    document in connection with that submission, which will include

9    a revision to paragraphs 3 and 6, and you'll explain to me how

10   what this percentage of shares and this $150,000 how they

11   relate to each other and specifically what you are requesting.

12               So those were my questions with respect to the

13   satisfaction and assignment agreement.  Then today I received a

14   proposed order granting the motion for termination of

15   receiverships upon approval of satisfaction of debt.  It

16   reflects on page 2 consummation of an agreement as modified on

17   the record.  I prefer to have a written document, an amended

18   satisfaction document or agreement presented to me.  We'll get

19   a schedule for that.

20               Then there is a paragraph here that asks me to enjoin

21   all creditors, shareholders and defendants, respective boards

22   of directors from filing voluntary or involuntary bankruptcy

23   petition for 91 days for or against Abakan.  I have no

24   authority presented to me of legal authority for this.  If

25   would be an extraordinary action for me to take.  It is

 1   possible in certain circumstances that a court can take such

 2   action.  I don't think I could take it outside the context of a

 3   receivership.  The document expects the receivership to end

 4   within 30 days and the injunction to last for 91.  So if

 5   counsel want me to consider such a passage, it is going to have

 6   to have legal support and give everyone an opportunity to be

 7   heard.

 8           MR. GROSS:  Your Honor, would it be possible to

 9   suggest an alternative that this Court retain jurisdiction to

10   consider challenges to this transaction?

11           THE COURT:  Of course I have authority with respect to

12   any judgment I enter.  And should another action be filed in

13   this district and be designated and is related, I would be

14   happy to review it to see whether I believe it is related under

15   our local rules for related cases.  I have authority to make

16   sure my judgments are enforced and not interfered with.  I am

17   not going to issue the injunction requested here again without

18   legal authority and an opportunity for people to be heard and

19   oppose it.

20           MR. GROSS:  Okay, your Honor.  We may suggest an

21   alternative and come with legal authority for that.

22           THE COURT:  Mr. Gross, is there anything you wanted to

23   add?

24           MR. GROSS:  There is one minor footnote.  We had said

25   in one of or filings that we were going to wait until a

1   bankruptcy hearing on January 13th.  Since that is not taking

2   place, we're not going be waiting for a nonexistent hearing.

3            THE COURT:  Thank you.

4            Mr. Seiden, anything that you wanted to add?

5            MR. SEIDEN:  No, your Honor.  I wanted to thank the

6   Court for your confidence in me on these two very important

7   matters and I appreciate the opportunity.

8            THE COURT:  Thank you.  Thank you for your service.

9            Mr. Leali, is there anything that you wanted to add?

10           MS. LEALI:  No, your Honor, but thank you very much

11  for letting me appear today.

12           THE COURT:  So, again, we have visitors in the

13  courtroom, which I am happy to see.  There are about eight

14  people I think.  No one else has placed an appearance on the

15  record.  I want to make sure if anyone wanted to be heard, they

16  have an opportunity to come up to the podium and place their

17  name on the record and say whatever they would like.

18           Sir, please approach and identify yourself.

19           MR. ROTHOUSE:  Thank you, your Honor.  My name is

20  Warren Rothouse.  I am with a company called Surety Financial

21  Group.

22           THE COURT:  Can you spell your last name, sir?

23           MR. ROTHOUSE:  R-o-t-h-o-u-s-e.

24           THE COURT:  Who do you represent?

25           MR. ROTHOUSE:  Surety Financial Group.  We at one time

1     were the investors relation company that represented Abakan.

2                   THE COURT:  Okay.

3                   MR. ROTHOUSE:  So the only objection I truly have is

4     that I understand -- I don't know his name.

5                   THE COURT:  Mr. Seiden.

6                   MR. ROTHOUSE:  Mr. Seiden.  I was contacted by Mr.

7     Seiden initially to send out the very first press release upon

8     them coming and I said to Mr. Seiden, Abakan owes me a great

9     deal of money.  If they make good on that, I will be happy to.

10    That is the last I ever heard about that.

11                  So in reference to your comment about him notifying

12    all the shareholders, the only objection I have is that he

13    never contacted me and said, This is what is going to happen

14    and we want to notify your shareholders.  I was the investor

15    relations company responsible for the bulk the shareholders who

16    had come in, but I have learned about what was going on with

17    the company via the 8-Ks.

18                  THE COURT:  Through the 8-Ks?

19                  MR. ROTHOUSE:  That is correct.

20                  So that is the only objection I have.  And with this

21    agreement, what I don't understand, and maybe someone can

22    enlighten me, I don't understand what happens to those

23    investors.  Is everybody left intact and the shares they have

24    are the shares they have, including Bob Miller?

25                  THE COURT:  Well, who would like to answer that?

FCG6GEOH                         Seiden - direct

1          Mr. Gross, what happens to the current Abakan

2     shareholders if I approve this transaction.

3          MR. GROSS:  Well, they have certain assets.  They have

4     the 3.6 percent interest in PowderNet, which we will make clear

5     in the revised agreement, which we think has substantial value,

6     and they have the 22.5 percent interest in Mesocoat, which we

7     think should have substantial value.  So they are retaining

8     those two pockets of assets of Abakan, which is better than

9     they would do outside of this agreement.

10          MR. ROTHOUSE:  Agreed.  So the shareholders that are

11     in place still hold their stock?  That is what I am asking in

12     Abakan.  Nothing changes other than what Abakan holds?

13          MR. GROSS:  That's correct.

14          MR. ROTHOUSE:  That's fine.

15          So Mr. Miller is part of the agreement?  He gets to

16     keep his million of shares, is that what I am to understand?

17          THE COURT:  How this works, Mr. Rothouse, is you get

18     to address me.

19          MR. ROTHOUSE:  That's okay.

20          THE COURT:  And then I figure out if it is a question

21     that should be answered and who should answer it.

22          MR. ROTHOUSE:  Understood.  Thank you, your Honor.

23          So, yeah, that was my question, is that the company

24     was obviously mismanaged in my opinion.  Just my opinion.  So I

25     don't know what the ramifications are to the old board and the

1    shares that they held and so it is just going to be a question

2    that I am going to be posed with by investors who have come

3    into Abakan.  I certainly can appreciate if there is no way to

4    give me that answer today.

5         THE COURT:  Well, you know I encourage you to feel

6    free to talk with Mr. Seiden who is the receiver for Abakan and

7    will be for some weeks here.  As I understand it, this

8    agreement affects the ownership of Mesocoat stock but not the

9    ownership of Abakan stock.

10         Do I understand that correctly, Mr. Gross?

11         MR. GROSS:  Yes, your Honor.

12         MR. ROTHOUSE:  So Mesocoat will now be run by George

13   Town and whoever it deems appropriate to run the company, is

14   that correct, your Honor?

15         THE COURT:  There is a proposal here that the

16   ownership of Mesocoat stock be allocated as follows:  George

17   Town would be the largest shareholder with close to 39 percent.

18   Sonoro would have a little over 28 percent.  So together they

19   would have over 50 percent.  So I have the other numbers.  It's

20   in the filing made on our ECF system on February 15th.  This is

21   the amended proposed satisfaction and assignment agreement.  I

22   think maybe Mr. Gross just kindly handed you a copy.  So Abakan

23   would continue under this proposal to have 22.5 percent of

24   Mesocoat.

25         MR. ROTHOUSE:  Okay.

FCG6GEOH                          Seiden – direct

1          MR. SEIDEN:  If I may, your Honor?

2          THE COURT:  Mr. Seiden.

3          MR. SEIDEN:  I intend to file an 8-K hopefully

4    tomorrow with a copy of the agreement attached if you are not

5    opposed to that, your Honor, which will be available to

6    everyone.

7          MR. ROTHOUSE:  Thank you.  Beautiful.  That's all I

8    have, your Honor.

9          THE COURT:  Thank you, Mr. Rothouse.

10         Anyone else who wishes to be heard?

11         Please, sir, approach and identify yourself for the

12   record.

13         Your Honor, my name is Ray Tellini.  I sat in this

14   courtroom and testified.

15         THE COURT:  Oh, yes.  Mr. Tellini, hello.

16         MR. TELLINI:  I did resign from the Abakan board and I

17   have a concern with the resignation of the receiver prior to 91

18   days from the consummation of the sale because it will put

19   previous management back in place and your Honor has put them

20   in contempt.  So I have zero faith in that management.  If the

21   receiver would agree to stay the 91-day period, he could then

22   seek alternative replacement remedies of those directors and

23   management.

24         THE COURT:  So Mr. Seiden I know you are probably

25   expensive for Mesocoat and for Abakan.  I know the current

FCG6GEOH                        Seiden - direct

1    proposal is to have you in place for 30 days.  Why was that

2    period of time chosen?

3              MR. SEIDEN:  I didn't choose that time period, your

4    Honor.  I think it was my counsel who had spoken with counsel

5    from George Town and I think that they assume that would be

6    approximately a fair amount of time to wind things down in

7    terms of the receivership and convey the ongoing matters that

8    we have been managing over to new management that might be in

9    place or new board.  With respect to the point brought by Mr.

10   Tellini, I understand.  I would be willing to serve the 91 days

11   if that is what your Honor wishes.  We would do it on a manner

12   that is obviously scaled down from where it had been under the

13   circumstances where there is no litigation and interference

14   that has caused a lot of our time to be spent on dealing with

15   issues that were extraneous to the running of the company.

16             THE COURT:  Well, Mr. Tellini -- and I apologize for

17   not recognizing you -- courts don't get to run companies and

18   for that I think America is very happy.  So there was a need

19   for a receivership.  I think I expressed my reluctance at the

20   time to impose one on Abakan but felt that their contemptuous

21   conduct gave me no choice.  So in my mind the receivership

22   should end as quickly as possible.  I had understood that one

23   of the tasks of the receivership that had to happen before it

24   wound up its duties was to make a final report and that would

25   take at least a few weeks and we were in the holiday period.

FCG6GEOH                         Seiden - direct

1    So it sounds like Mr. Gross is going to have to revisit this

2    request for an injunction and you may want to speak with him

3    and consult with him and Mr. Seiden about your concerns.

4             MR. TELLINI:  Thank you, your Honor.  Mr. Seiden has

5    done an excellent job.

6             THE COURT:  Thank you.

7             Does anyone else wish to be heard?

8             No one else has indicated a desire to be heard.

9             So I think I have enough to approve the satisfaction

10   and assignment agreement.  It is difficult to know what

11   standard to impose here because under the documents that Abakan

12   executed, the only restriction for the sale or disposition of

13   the Mesocoat assets was that the sale or disposition be

14   commercially reasonable.  Under that standard I believe there

15   has been a very persuasive showing that this is commercially

16   reasonable, no competing offers, plenty of notice, months of

17   ongoing litigation, many parties in and out through pro hac

18   vice submission, ultimately everyone withdrawing from the field

19   and choosing not to address this issue or proposal on the

20   merits.  I have imposed a higher standard than commercially

21   reasonable.  I want to make sure that this transaction is fair

22   to one and all, that I have considered every objection that has

23   been made even those that have been withdrawn, that I also look

24   carefully at the proposal to see if I can independently

25   identify any issues, which it appears I have identified two.

1    We'll hear more about that on a schedule to be set in a moment.

2    Based on then this opportunity for everyone to be heard and the

3    submissions made to me, I find that the proposal as I

4    understand it will be modified is entitled to approval.

5    Therefore, I am prepared to sign and approve the satisfaction

6    and assignment agreement of December 15th with amendments to

7    paragraph 3 and clarification and potential amendment to

8    paragraph 6.

9             Mr. Gross, how long to get me that?

10            MR. GROSS:  I would say by the end of the week.  By

11   Friday we should get that amended.

12            THE COURT:  That's December 18.  I will review it

13   promptly and if I can't reach you on the 18th, I plan to act on

14   the 21st.

15            With respect to the proposed order, I plan to strike

16   the injunction paragraph.  If I get a submission by Friday that

17   asks me to reconsider that decision, I of course will look at

18   any authority.  You may want to look at a Second Circuit

19   decision in that regard, *SEC v. Byers*, 609 F.3d 87.

20            I think that completes today's proceeding.

21            Mr. Gross, is there anything else to add?

22            MR. GROSS:  No, your Honor.  Thank you.

23            THE COURT:  Mr. Seiden?

24            MR. SEIDEN:  No, your Honor.  Thank you.

25            THE COURT:  Ms. Leali?

FCG6GEOH                          Seiden – direct

1              MS. LEALI:  No, your Honor.

2              THE COURT:  Thank you all.

3              THE DEPUTY CLERK:  All rise.

4                              o0o